IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEVENS TRUCKING CO. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No: _____ |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| J.B. HUNT TRANSPORT SERVICES INC., | § | |
| | § | |
| Defendant. | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

Plaintiff Stevens Trucking Company (Stevens Trucking) brings these causes of action against J.B. Hunt Transport Services, Inc. (JB Hunt), and will show the Court as follows:

## I.    INTRODUCTION AND NATURE OF THE CASE

1.    This case addresses whether JB Hunt's advertising and representations about a focus on trucking safety and adherence to trucking safety regulations are true, whether those advertisements and representations by JB Hunt should be true for purposes of fair competition with other trucking companies and the safety of the public, and the impact on Stevens Trucking and the public if those advertisements and representations by JB Hunt are false.

## II.    JURISDICTION AND VENUE

2.    Plaintiff Stevens Trucking asserts a federal Lanham Act claim against Defendant JB Hunt. Accordingly, this Court has subject matter jurisdiction over this dispute under 28

---

U.S.C. § 1331.

3.    This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1). The amount in controversy well exceeds $75,000.00. Plaintiff Stevens Trucking is a citizen of the state of Oklahoma and Defendant JB Hunt is a citizen of the state of Arkansas.

4.    Venue is proper in the Western District of Oklahoma under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions occurred in this judicial district.

5.    The contract and contractual relationship at issue in this case that was specifically targeted and impacted by the acts and omissions of Defendant JB Hunt existed with Plaintiff Stevens Trucking in El Reno, Oklahoma, within this judicial district. Stevens Trucking contracted with Ford Motor Company (Ford) for nearly 20 years and the loads between Texas and Michigan at issue in this case were routed through Oklahoma as part of the Stevens Trucking network for the past six years.

6.    The contract with Ford was vital to Stevens Trucking's operation since it tied Stevens Trucking's Oklahoma and National Network together and allowed Stevens Trucking's Oklahoma-based drivers to reconnect at the home terminal. Additional factual details regarding the acts and omissions of Defendant JB Hunt directed toward and impacting this contract and contractual relationship are set forth in Section VI below.

7.    Furthermore, the subject of the contract and contractual relationship at issue in this case that was specifically targeted and impacted by the acts and omissions of Defendant JB Hunt involved major commercial trucking lanes running hundreds of miles through the

_____

State of Oklahoma, starting in the northeastern corner of the state, following State Highway 69 through Durant, and then crossing the Red River into Texas.

8.    Additional factual details regarding the acts and omissions of the defendant directed toward and impacting this contract and contractual relationship are set forth in Section VI below.

9.    JB Hunt runs trucking and intermodal freight services that routinely cross into, out of, and across Oklahoma.

10.    JB Hunt regularly uses Oklahoma highways to transport goods for customers.

11.    Due to Oklahoma sitting along key interstate routes, (I-35, I-40, I-44) Oklahoma is a key corridor for JB Hunt and JB Hunt maintains continuous, systematic, and intentional contact with the state.

12.    JB Hunt furthermore maintains dedicated operations and facilities in Oklahoma. For example, it operates drop yards, maintenance facilities, and driver operations centers to support its fleet.

13.    JB Hunt employs truck drivers and support staff who live and work in Oklahoma.

14.    JB Hunt purposely avails itself of Oklahoma's labor market by recruiting, training, and managing employees in Oklahoma.

15.    JB Hunt provides transportation and logistics services to shippers and businesses located in Oklahoma.

16.    By contracting with Oklahoma companies, JB Hunt has direct commercial relationships subject to Oklahoma law.

---

17. JB Hunt is registered to do business in Oklahoma and is required to comply with rules and regulations set forth by the Oklahoma Corporation Commission, and the Oklahoma Department of Transportation, as well as all tax requirements.

18. JB Hunt's registration in Oklahoma subjects the company to service of process in Oklahoma.

19. JB Hunt has appeared as a defendant in the Eastern District of Oklahoma (e.g., 6:13-cv-00193, order dated June 9, 2014), confirming that it sufficiently transacts business within the state to be hauled into federal court in Oklahoma.

20. Furthermore, the acts and omissions of Defendant JB Hunt causing the loss of revenue and its resulting impact on Plaintiff Stevens Trucking, its individual drivers and employees, were foreseeably and specifically experienced in the Western District of Oklahoma.

21. This Court has personal jurisdiction over Defendant JB Hunt because it conducts business in Oklahoma, directed and committed tortious acts and omissions specifically targeting an Oklahoma party, and caused foreseeable harm in Oklahoma.

### III.    THE PARTIES

22. The parties to this case are businesses involved in the trucking and freight hauling business.

### A.  Stevens Trucking

23. Plaintiff Stevens Trucking Company is an Oklahoma corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma.

24. Stevens Trucking—a privately held company—was founded in 1979 and has been in operation for more than 45 years, spanning two generations. From its beginning,

Stevens Trucking has put safety and its drivers and their families first. Stevens Trucking pays its drivers, a number of whom have been with the company for 10 years or more, 80 to 90 cents per mile with benefits, which equates to an annual salary of $75,000 to $90,000. The company's founder, Kenney Stevens, still holds his commercial driver's license (CDL), stays in close contact with his company's drivers, and continues to focus on these core values of the company.

25.    Kenney's sons work alongside him and share his dedication to the purpose of the family business. Cole Stevens serves as Chief Strategy Officer for the company, Eric Stevens serves as the Chief Business Officer, and Kenney's oldest son Chad is the Chief Operating Officer.

26.    Stevens Trucking currently operates over 360 trucks (or power units) and has over 400 employees. Stevens Trucking has been awarded top places to work by The Oklahoman on several occasions.

27.    Stevens Trucking holds a "Satisfactory" safety rating, which is the highest safety rating for a trucking company from the Federal Motor Carrier Safety Administration (FMCSA).

28.    Less than 10% of all trucking companies in the United States as of 2023 held a satisfactory safety rating.

29.    Stevens Trucking actively promotes safety.  Stevens Trucking, whose safety director is a former Oklahoma Highway Patrolman, often coordinates crash data testing with the Oklahoma Highway Patrol to help further the Oklahoma Highway Patrol's understanding of heavy truck dynamics and crash reconstruction.

## B.  JB Hunt

30.    Defendant J.B. Hunt Transport Services, Inc. is a Delaware corporation with a principal place of business in Arkansas. At all relevant times, JB Hunt conducted significant business in the State of Oklahoma and maintains a registered agent in the State of Oklahoma. J.B. Hunt Transport Services, Inc. may be served by serving its agent for service of process, Corporation Service Company, at 10300 Greenbriar Place, Oklahoma City, OK 73159-7653.

31.    JB Hunt was founded in 1961 by Johnnie Bryan Hunt and his wife, Johnelle Hunt. The business began humbly in Stuttgart, Arkansas, as an agricultural supply and rice-hull packing business. It entered the trucking industry in 1969 after Mr. Hunt purchased five used trucks and seven used refrigerated trailers. Mr. Hunt referred to himself as a driver first and a corporate executive second.

32.    Initially, the trucking side of JB Hunt's operations was not successful, and the company relied upon the agricultural supply side of operations to turn a profit.

33.    In 1973, Wayne Garrison and Kirk Thompson joined JB Hunt.

34.    Garrison and Thompson brought operational strategy. In 1979, JB Hunt made significant changes by standardizing its fleet and using smaller, more fuel-efficient engines, thereby increasing profitability.

35.    Garrison and Thompson furthermore chose to slow down the standard highway speed of the truck fleet to increase fuel savings.

36.    One of the other key changes in the 1970s and 1980s was JB Hunt's approach to drivers. Understanding the importance of company image, drivers were placed in uniforms and required to present an almost "military-like" presence in terms of manner, presentation,

_____

and professionalism.

37.     Videos of Johnnie Hunt in the 1970s and 1980s show Mr. Hunt requiring drivers to have "a collar on, a clean shave and hair cut" before leaving the yard.

38.     A key innovation of Johnnie Bryan Hunt was the founding of the Intermodal division in 1989. The Intermodal division connected trucking and rail transport companies to improve efficiency and reduce cost.

39.     JB Hunt continued to expand its trucking operations across the country including multiple over-the-road trucking routes exceeding 1,000 miles.

40.     Kirk Thompson succeeded Mr. Hunt as president and CEO of JB Hunt in 1987, while Mr. Hunt continued to serve on the JB Hunt company board until 2004.

41.     Mr. Hunt started each day by walking through the office and checking on his employees and drivers.

42.     JB Hunt advertises that it is rooted firmly in the belief that drivers are the heart of any successful transport company. Multiple speeches, written advertisements, and ad campaigns for JB Hunt harken back to its beginnings as a company founded by a driver for drivers. Based upon this advertising and tradition, JB Hunt grew into one of America's largest trucking and logistics firms.

## IV.    OVERVIEW OF THE TRUCKING INDUSTRY

### A. Trucking Regulation and Licensing of Drivers

43.     Freight motor carriers in the United States are regulated under federal law.

44.     Congress created the FMCSA within the U.S. Department of Transportation (DOT) to reduce crashes, injuries, and fatalities involving commercial motor vehicles (CMV).

It fulfills that mandate by promulgating and enforcing the Federal Motor Carrier Safety Regulations and by overseeing carrier safety performance.

45. Some of the safety rules enacted by the FMCSA include those governing fatigue, the use of drugs and alcohol, and unsafe driving practices. Fatigue-related regulations include those pertaining to "hours of service," that is, how long drivers are allowed to work in a day or week.

46. One of the FMCSA's major tools of enforcement is a safety "compliance review."

47. A compliance review involves a FMCSA inspector coming to a motor carrier's place of business to inspect certain safety documents maintained by the carrier; alternatively, the FMCSA inspector may request these documents be submitted online.

48. The documents reviewed by the FMCSA inspector include drivers' hours of service logs, vehicle maintenance logs, crash data, evidence of a carrier's drug and alcohol testing and safety programs, and evidence of proper licensing of drivers, among others.

49. The reality, however, is that the FMCSA has limited ability to enforce safety regulations due to the massive number of commercial trucks on our Nation's highways. The FMCSA, itself, has publicly acknowledged that its investigation process is resource-intensive and reaches only a small percentage of carriers. For example in 2019 the FMCSA conducted only 11,671 safety compliance reviews out of more than 567,000 active interstate carriers.

50. The Government Accountability Office, likewise, has long noted FMCSA's limited oversight resources and the historically small share of carriers directly reviewed each year.

51.     Moreover, because a compliance review is usually triggered only when a carrier has an unacceptable rate of violations based upon the miles per power unit, and the miles driven along with the number of drivers and power units is self-reported by carriers, a carrier, by manipulating the number of miles driven, can avoid triggering an alarm within the FMCSA for a compliance review.

52.     Indeed, it is well known in the trucking industry that certain unsafe carriers will increase their self-reported number of miles driven per year in order to bring their ratio of violations to miles driven into a more acceptable threshold—thus avoiding detection by the FMCSA.

53.     In short, it is well known within the trucking industry that FMCSA's oversight operates largely on the honor system for key carrier data. Given how easy the system is to manipulate, and because the FMCSA's ability to monitor motor carriers is extremely limited, honest and accurate carrier self-reporting is essential to public safety.

54.     Another factor greatly impacting public safety is the licensing of drivers. The relationship between licensing standards and safety in trucking has been well recognized since the 1980s.

55.     Prior to the enactment of the Commercial Motor Vehicle Safety Act of 1986 (CMVSA), there were no minimum standards governing the issuance of licenses to drivers of commercial motor vehicles.

56.     This lack of minimum credentialing standards contributed to a high fatality rate in crashes involving large trucks and buses.

57.     In 1986 alone, crashes involving large trucks and buses accounted for 5,895

deaths in the United States. This equated to a fatality rate of 381 deaths per 100 million vehicle miles traveled.

58.    While some states had specific minimum prerequisites for the issuance of commercial licenses, others did not.

59.    Commercial drivers could take advantage of this lack of uniformity by applying for a new license in a new state whenever they accumulated too many traffic infractions or points on their driving records.

60.    The new state, unaware of the driver's prior record, would issue a new license, allowing the driver to avoid license suspension or revocation and start accumulating new violations on a "clean" record in a new state. Some drivers did this repeatedly across several states.

61.    In response, Congress passed the CMVSA on October 27, 1986, which went into effect on July 1, 1987. The purpose of this Act was twofold: (1) to improve highway safety by ensuring that drivers of large trucks and buses were qualified to operate those vehicles, and (2) to remove unsafe, unqualified drivers from our Nation's highways.

62.    During the drafting of this legislation, Congress initially considered establishing a national, federally-issued CDL, but was persuaded by the states that the licensing of drivers was inherently a state function.

63.    The CMVSA, therefore, preserved the states' lead role in CDL issuance, but imposed minimum CDL licensing standards and required states to comply with them in order to avoid the withholding of certain federal funds.

64.    Central to this new legal framework was the "domicile requirement," which

mandated as follows:

> "The State shall issue commercial drivers' licenses only to those persons who operate or will operate commercial motor vehicles and are domiciled in the State; except that the State, in accordance with such regulations as the Secretary shall issue, may issue a commercial driver's license to a person who operates or will operate a commercial motor vehicle and who is not domiciled in a State which does issue commercial drivers' licenses."

65.    The system largely worked, and the rate of crashes per miles driven improved between 1986 and 2011.

66.    On May 9, 2011, FMCSA published a final rule, Commercial Driver's License Testing and Commercial Learner's Permit Standards, which established new minimum federal standards for the issuance of a commercial learner's permit (CLP).

67.    The goal of the rule was to further enhance safety by ensuring that only qualified drivers receive CDLs.

68.    The FMCSA further amended 49 CFR § 383.71 (Driver Application and Certification Standards), to require affirmative proof of domicile.

69.    The provision specifically mandated that an individual "provide proof that the State to which application is made is his/her State of domicile, as the term is defined in § 383.5," when applying for a CLP, an initial CDL, transferring a CDL or renewing a CDL.

70.    The FMCSA also amended 49 CFR § 383.73 to place a similar obligation on the states to obtain proof of domicile from applicants in such situations and defined acceptable proof of domicile as "a document with the person's name and residential address within the State, such as a government issued tax form."

71.    A majority of states voluntarily implemented the regulation requiring proof of domicile. However, other states (at the urging of lobbyists within the transportation sector)

argued they should have the autonomy to license individuals as they saw fit.

72.    States complying with the regulation on proof of domicile began refusing to accept transfers of CDLs issued by states that refused to comply with the requirement.

73.    The American Trucking Associations (ATA), a lobbying arm of JB Hunt and other large trucking companies, actively became involved in the issue.

74.    The ATA advocated for loosening testing standards and for expanding the ability of a driver to obtain a CDL in a state in which the driver did not reside to include all CLP/CDL applicants, not just those transitioning from military service.

75.    This effectively would increase the number of non-residents of the United States who could obtain CDLs.

76.    This issue—whether CDLs could be issued to non-residents of any given state (and to foreign nationals) came before the House of Representatives in March 2018.

77.    In March 2018, the FMCSA voiced its concern for allowing states to issue CDLs to applicants who do not reside within the "State of Application:"

> "The FMCSA's position has been and continues to be that the domicile requirement, first mandated by Congress 30 years ago in the CMVSA, is a fundamental CMV safety requirement. The domicile requirement underpins the 'one driver/one record' concept at the core of the CMVSA and the Motor Carrier Safety Improvement Act of 1999 (MCSIA). These statutes sought to improve highway safety by ensuring that drivers of large trucks and buses were qualified to operate those vehicles and to remove unsafe, unqualified drivers from the highways. For these reasons, FMCSA continues to support the mandates found in the CMVSA and MCSIA, including current Federal domicile requirements. The Agency will continue to partner with States, industry groups, safety advocates, and other stakeholders to identify solutions to ease regulatory burdens without undermining the safety gains associated with the domicile requirement."

78.    Although foreign nationals have been able to lawfully obtain CDLs since the 1980s, these drivers remained a minority of all truck drivers in the United States.

---

79.    This likely was because, for decades, the FMCSA required drivers to "read and speak the English language sufficiently" to converse in public, understand traffic signs, respond to officials, and complete reports.

80.    Given the highly regulated nature of trucking, the FMCSA desired to have a common language that would allow drivers, law enforcement, and those in the industry to communicate clearly and effectively.

81.    This is not uncommon in transportation industries. For example, in the aviation industry, pilots, air traffic controllers, and other aviation professionals involved in international flights must demonstrate proficiency in English.

82.    In 2016, however, in response to political pressure outside of core American carriers that have operated safely for decades, the FMCSA loosened the English language proficiency requirement, allowing drivers who do not speak or read English to obtain CDLs.

83.    Several family-owned legacy trucking companies were against this change.

84.    This change in the English language proficiency requirement negatively impacted public safety.

85.    Prior to 2016, truck crashes had been fairly stable, averaging approximately 3,000 to 4,000 a year. After 2016, truck crashes began rising steadily, reaching almost 5,000 per year by 2021.

86.    The number of CDLs issued to foreign nationals increased significantly following the COVID-19 pandemic.

87.    During COVID, the ATA claimed that a "driver shortage" was imminent and, unless CDL licensing restrictions were loosened, the supply chain and American trucking

industry would be in crisis.

88.    In response to the lobbying efforts of the ATA, the government cut red tape, giving states the tools to more than double commercial license issuances.

89.    In one year (January 2021 to January 2022) more than 876,000 CDLs were issued—a 72% increase from the previous year.

90.    New York, California, and Texas were specifically applauded for their efforts in "speeding up" the issuance of CDLs. These three states accounted for over 250,000 of the new CDLs.

91.    Ten states in total accounted for 804,973 of the new 876,000 CDLs. These states have significantly lax standards for issuance of non-domiciled CDLs.

92.    The vast majority of the new 876,000 CDLs were issued to drivers from India, Eastern Europe, China, and Latin America. The numbers of new CDLs, however, were not consistent with employment opportunities.

93.    For example, California issued 168,107 of the new 876,000 CDLs. The largest carrier in California, Dependable Supply Chain Services, only employs 576 drivers.

94.    Similarly, Minnesota issued 92,672 of the new 876,000 CDLs, even though the largest carrier in that state (Anderson Trucking) only employs 2,443 drivers.

95.    In fact, the largest 10 carriers in the country only employ a total of 164,769 drivers.

96.    These foreign drivers with newly-issued CDLs in the United States typically worked at far lower wages in their home countries than in the United States—at rates significantly below the U.S. poverty level.

97.    For example, the average salary for a truck driver in India is approximately $2,500 per year, and the average salary of a truck driver in Serbia is approximately $4,496 per year.

98.    This drastic increase in the number of newly issued CDLs to foreign born individuals allowed large trucking companies and their brokerage arms (such as JB Hunt) to exploit these drivers and gain an unfair advantage over traditional trucking companies (such as Stevens Trucking).

99.    This dramatic increase in the number of newly issued CDLs also negatively impacted the safety of our Nation's roads.

100.    Indeed, the number of fatal crashes involving commercial motor vehicles rose from 4,821 in 2020, to 5,733 in 2021, and to 5,837 in 2022.

## B.  The Rise of Freight Brokerage

101.    Historically, trucking consisted primarily of "asset" based carriers—that is, trucking companies that own trucks, trailers, and directly employ truck drivers.

102.    These asset-based carriers generally have large terminals where employees can park the company trucks to be serviced during their federally mandated rest breaks. Additionally, these terminals house dispatchers who coordinate with customers and drivers and respond to emergencies by drivers on the roadway, and safety directors who meet regularly with drivers to ensure that FMCSA regulations are being followed.

103.    Generally speaking, for every four drivers, an asset-based carrier employs an additional person in order to help manage the operational and administrative side of the business.

104.    Asset-based carriers understand the importance of safe operations, both to protect the public and to protect the carrier's finances. If a crash occurs, asset-based carriers are directly responsible for the actions of their employees, resulting in large out-of-pocket costs and an increase in insurance premiums if safety standards have been violated.

105.    Furthermore, if a driver violates an FMCSA regulation, such as driving over the federally allowed number of hours, that violation counts against the company and is publicly available for customers to review. Safety is a top concern for customers, and multiple violations of FMCSA safety regulations have a direct impact on a trucking company's ability to attract and retain business.

106.    Given the importance of safety for traditional asset-based carriers, over 40% of their operating cost each month goes to driver pay.

107.    The vast majority of drivers in the trucking industry are paid by mile, instead of by the hour or by a traditional salary. This means that drivers who are paid very low rates per mile are financially pressured to break FMCSA safety regulations regulating the number of hours a driver is allowed to operate in order to increase their daily pay.

108.    Conversely, when carriers pay drivers well and incentivize running efficient operations, drivers earn a good wage by staying within the safety rules.

109.    Today, truck drivers working for safe well-established asset-based carriers earn between 80 to 90 cents per mile, which equates to $75,000 to $90,000 per year.

110.    As far back as 2012, Congress received testimony from leading economists, including Dr. Michael Belzer, that a livable wage is directly tied to safety. When drivers are paid well and take pride in their job and employer, they are more likely to drive safely.

111. Freight brokerage is the non-asset side of the trucking industry that coordinates the movement of freight through motor carriers.

112. Historically, the majority of brokers did not own trucking assets, employ drivers, or have terminals; instead they acted merely as intermediaries, utilizing their connections with reputable asset-based carriers to coordinate the movement of freight for their customers.

113. The profit margins for freight brokers and asset-based carriers historically was fairly similar, ranging between 5 and 8 percent. A small percentage of trucking companies or "asset-based" carriers would have a brokerage arm. These companies would use their brokerage authority to help connect an inconsequential number of loads when capacity for their company drivers was thin.

114. Although existing since the early 1950s, freight brokers and brokerage services within asset-based trucking fleets were generally utilized in only limited circumstances.

115. Sophisticated shippers preferred to directly utilize asset-based carriers with drivers that were known and trusted due to established safety records.

116. This preference for professional truck drivers explains Johnnie Hunt's continued insistence on professionalism during the 1970s through the 1990s.

117. Much mid-century brokerage revolved around seasonal agricultural commodities. Brokers acted as the matchmakers between seasonal shippers and available trucks, typically imposing a surcharge of approximately 5–7% (and often another 2% if they advanced expenses).

118. Freight brokerage from 1950 to 2000 was primarily localized, produce-heavy, relationship driven, and often intertwined with small carrier-owned trucks; rates were set

informally and changed seasonally based upon the harvest size of that year.

119.    Starting in the early 2000s with the advancement of technology, large asset-based carriers began building brokerage arms.

120.    This was a stark change from traditional brokering where only a fraction of asset-based carriers held brokerage authority, and such authority was used sparingly at best.

121.    These companies, including JB Hunt, offered brokerage as an add-on to their traditional asset-based fleets, that is, as a way to increase capacity on a short-term basis, as opposed to being the primary method of moving a customer's freight.

122.    Over time, however, brokerage exploded—largely due to the rapid expansion of the brokerage arms of large asset-based carriers, such as JB Hunt, and their ability to significantly decrease labor cost through hiring carriers that utilize labor for a fraction of the traditional cost.

123.    Combined with the explosion of newly-issued CDLs to exploited foreign born drivers, these "carrier/brokers" began brokering loads out to independent drivers at rates where the average driver often earns less than 15 cents per mile.

124.    This provides carrier/brokers with a significant competitive advantage if profit, rather than safety, becomes the dominant concern. To maintain the appearance of safety when selling themselves to customers, carrier/brokers focus on their history of using well-qualified drivers and the safety records they established over the previous decades as traditional asset-based carriers.

125.    After making the sale, the carrier/broker then puts on its broker hat—dispatching the shipments to significantly cheaper labor with minimal insurance, all while

maintaining the facade of control over "their" drivers.

126.    In many cases, independent carriers used by carrier/brokers are one-person carriers, that is, a driver with a single truck or power unit. They often do not have terminals, safety managers, or dispatch teams, and they often work out of ghost addresses such as apartments.

127.    Accordingly, a carrier/broker will provide the trailer, track the driver through GPS technology, and call the driver through "check calls" to ensure they are progressing on time.

128.    The carrier/broker will thus represent to its customer, through the official shipping document known as the bill of lading, that the driver for the carrier/broker is actually one of their own drivers.

129.    The bill of lading is the legal document that determines who is responsible for the load, when and where it is to be delivered, and the carrier for that load.

130.    After a crash involving a catastrophic injury or fatality, however, the carrier/broker will claim that it was acting as a broker, not a carrier, and therefore claim to not be responsible under a federal preemption argument.

131.    Hiding behind the veil of preemption, the carrier/broker will argue that state negligence claims cannot be brought against freight brokers.

132.    In short, although the carrier/broker is an asset-based carrier and sold itself to its customer as an asset-based carrier, it will subsequently seek legal immunity as a broker.

133.    Most families and their lawyers lack the finances, time, and sophistication to properly challenge a complex preemption motion. Due to ignorance of how freight brokerage

works, the majority of families are thus forced into a small settlement with the contracted trucking company.

134.    Moreover, even though carrier/brokers on the surface appear to be acting as traditional asset-based carriers, and even though they market themselves as such, carrier/brokers claim they are not required to report crashes by their contractors on their safety records.

135.    This allows a carrier/broker to maintain, or even lower, its already favorable per-mile safety violation record, which it then, in turn, markets to obtain additional business. It also allows the carrier/broker to maintain or decrease its low insurance premiums.

## C.  The Driving Down of American Truck Driver Wages

136.    For decades, large well-funded trucking firms, such as JB Hunt, have financially supported trucking industry research through the American Transportation Research Institute (ATRI). This "research" has repeatedly claimed that a "driver shortage" exists in the United States.

137.    The purported "driver shortage" has been used by large trucking companies for many years as a reason for reducing labor costs.

138.    On average, labor accounts for 42% of a trucking company's operating costs. Other costs – such as fuel, tires, and tolls – are largely determined by factors that are beyond the reach of the influence of trucking companies. Only the cost of labor can be impacted enough to make a significant difference.

139.    Independent economists, industry insiders, and government studies, however, have all shown that any perceived "driver shortage" is the result of repeated decreases in driver

compensation by large well-funding trucking companies' continual attempts to decrease the cost of labor.

140. Trucking is no different than any other market. If trucking companies offered significantly higher pay or better conditions, the labor supply would rise.

141. JB Hunt's own internal experiment in the 1990s discussed further below, which resulted in an approximate 33% increase in pay raise for drivers, confirmed that both driver retention and driver safety increased with increased pay.

## V.    JB HUNT BROKERAGE SEES EXPLOSIVE GROWTH

142. In 2019, the Bureau of Labor Statistics with economists Stephen Burks and Kristen Monaco concluded that the U.S. trucking labor market functions like any other labor market—it is often "tight" but not fundamentally broken. Wages and employment levels did not show the patterns of a persistent shortage; if there were a true scarcity of drivers, wages would be rising rapidly relative to similar jobs, which was not observed.

143. On May 6, 2019, JB Hunt released "JB Hunt 360." JB Hunt 360 is part of JB Hunt's brokerage operations. It utilizes JB Hunt trailers, JB Hunt technology, and "contractor" drivers through the JB Hunt trailer network.

144. JB Hunt 360 is often referred to as "360 Box" as well, and the terms are used interchangeably by JB Hunt.

145. JB Hunt strategically placed JB Hunt trailers with JB Hunt customers to service its largest customers.

146. In announcing JB Hunt's continued expansion into brokerage, CEO John Roberts stated, "360box adds capacity to a customer's supply chain while moving more freight

in a way that's efficient for both the customer and the carrier… By using our trailers, shippers can now connect with the power of small carriers and owner-operators, which together represent 83 % of all drivers."

147.    While JB Hunt was claiming there was a "driver shortage" during this time and that brokerage was the key solution to freight efficiency, JB Hunt was actively laying off drivers, decreasing its truck count, and increasing its number of trailers for "power only".

148.    At launch in 2019, JB Hunt owned 500 JB Hunt 360 trailers used in its brokerage operations.

149.    By 2025, JB Hunt owned 14,500 JB Hunt 360 Box trailers to be used in its brokerage operations.

150.    In 2019, JB Hunt owned 16,376 18-wheelers (commonly referred to as "tractors").

151.    JB Hunt during this time had 845 tractors in its fleet dedicated to "Truckload." In Truckload, a single shipper loads an entire trailer full, and the load is carried over the road, typically on distances further than 600 miles.

152.    The bread and butter of Truckload typically consists of routes between 600 and 1,300 miles.

153.    JB Hunt Truckload is JB Hunt's traditional "over the road" trucking business, similar to Stevens Trucking. JB Hunt Truckload in 2019 employed 865 company drivers.

154.    By 2022 JB Hunt owned only 620 trucks in Truckload.

155.    By 2024 this number was down to 2 trucks.

156.    During this time, JB Hunt 360 brokered more loads than JB Hunt's entire

"truckload" segment.

157.    In 2019, JB Hunt had 865 company drivers in the Truckload segment.

158.    By 2025, JB Hunt had only three company drivers in the Truckload segment, and 1,917 independent contractors.

159.    By 2025, JB Hunt specifically noted that Truckload was run through JB Hunt 360.

160.    In a July 2018, 2023 earnings call, Darren Field, EVP, stated that: "We continue to have very strong demand. We had double-digit growth in the [360] Box network again in the second quarter… Customers appreciate the flexibility of the drop-trailer network."

161.    CEO John Roberts in the same call stated: "We see… areas of investment with a large addressable market and growing demand in our brokerage and power-only 360Box offering in Highway Services."

162.    The financials support these public statements. In 2019, JB Hunt's Truckload segment (JB Hunt employee-drivers hauling full trailers over the road) decreased 20%. This decrease was an 11% decrease in loaded mile and a 9% decrease in load count.

163.    During the same time, JB Hunt's brokerage arm integrated capacity solutions (ICS) increased 9% from the fourth quarter of 2018 to the first quarter of 2019.

164.    JB Hunt 360 "freight transactions" increased from $174 million to $289 million and ICS revenue for JB Hunt on the platform increased to $225 million of the $289 million.

165.    From 2023 to 2024, JB Hunt decreased its employee count by 9.4%.

166.    From 2023 through Q1 of 2025, JB Hunt achieved a $200 million reduction in payroll expenses by laying off American jobs.

167.    In an April 2024 earnings call, executive vice president Brad Hicks stated that: "Overall, demand for our J.B. Hunt 360Box service offering is outperforming the overall market… This model allows us to be more variable with our costs and ultimately scale a cost-competitive solution for our customers."

## VI.    JB HUNT'S DECEPTIVE CLAIMS OF SAFETY

### A.    JB Hunt's Focus on Drivers and Safety Before 2003

168.    With significant deregulation of the U.S. trucking industry occurring in the early 1980s, a competitive race to decrease labor cost—and thereby decrease the rates that trucking companies charged to customers—emerged as the industry moved into the 1990s. As a result, some of the largest trucking companies increasingly paired freshly licensed CDL drivers as co-drivers with their longstanding company drivers. The resulting team of drivers allowed trucks to keep moving without violating hours-of-service limitations, while simultaneously lowering the companies' labor costs. Unfortunately, crashes began to rise.

169.    Deciding to fight this trend away from safety, JB Hunt shut down its student driver school in late 1996 and turned to hiring high-quality drivers. It also announced a major pay and benefits increase for its over-the-road (VAN) drivers, effective February 1997.

170.    JB Hunt's new compensation package raised annual driver pay by roughly one-third. Company leadership aimed to attract more experienced, professional drivers with this "union wages without the union" approach, expecting safer and more productive performance as a result of the changes.

171.    Results, as reported in JB Hunt's 1998 annual report, were dramatic: driver turnover in the VAN segment (referring to dry van trucking utilizing enclosed trailers for

general freight) plummeted from 86% in 1996 to 45% in 1997, and the company noted that the higher driver wages were partially offset by "reduced vehicle collisions" and improved fleet utilization. In other words, investing in better driver pay coincided with significantly fewer accidents on the road.

172.    JB Hunt's 1998 annual report also highlighted a "significant decrease in insurance and claims expense" due to "fewer vehicle collisions . . . [after] attracting and retaining experienced professional drivers" who drove more safely. As a result, accident-related costs dropped and 1998 became one of the company's safest and most profitable years of the decade, validating executives' belief that higher driver wages and safety outcomes are closely linked.

173.    In March 2002, however, JB Hunt's board of directors voted to decrease driver pay, returning it back to its earlier level preceding the 1997 pay raise, and to focus on "power only" owner-operators who would only pick up and deliver freight.

### B. Brokerage Expansion and Becoming "Mode Agnostic" 2003–2017

174.    As Mr. Hunt began to step back from the company, JB Hunt began publicly claiming that the trucking industry was facing a severe "driver shortage." This claimed shortage of drivers led to an increase in brokering loads out to less expensive drivers. Internal data from JB Hunt indicates that JB Hunt also began to systematically reduce driver pay and benefits for its own drivers.

175.    JB Hunt's board of directors began touting this new direction during investor calls in 2003, specifically pointing to higher revenue per mile resulting from a "reduction in driver pay." JB Hunt further noted that it had lowered the "associated payroll tax and driver

pay" by outsourcing more drivers, thus further enhancing 2003 operating income.

176.    Following Mr. Hunt's retirement from the company at the end of 2004, JB Hunt greatly increased its cost-cutting strategies focused significantly on reducing driver compensation, and aggressively pushed the narrative of a "driver shortage." During this time period, JB Hunt faced significant internal and external pressures to meet Wall Street's growth expectations for reaching a $10 billion valuation. (The pressure on JB Hunt to meet Wall Street growth expectations during this time was subsequently acknowledged by Shelly Simpson, the former COO and now current president of JB Hunt).

177.    In order to reach this $10 billion valuation (to which bonus structures for executives were tied) JB Hunt needed to expand its use of contractors through its "integrated capacity solutions" (ICS) unit originally headed by Simpson.

178.    ICS, founded in 2007, is the foundation of JB Hunt's brokerage arm. Simpson was an integral part of the team.

179.    Simpson explained that when expanding JB Hunt's brokerage services, JB Hunt faced a significant problem. Customers hired JB Hunt for its safety reputation and company drivers, not its ability to post freight on a message board for anyone to pick up and deliver. Simpson acknowledged this difficulty, stating: "[I]t was like cussing in Sunday School. . .. [O]ur drivers and customers were very hesitant to the change and the impact it would have on our core business model."

180.    As a remedy, JB Hunt executives announced at a November 2009 investors meeting that the company would become "mode agnostic." That is, instead of advertising its ICS brokerage and asset-based units as separate offerings, JB Hunt would train its sales team

to sell just "JB Hunt" as a company, and not make a distinction between brokerage and asset-based services to its customers.

181.    This move to being "mode agnostic" included merging JB Hunt's business units—final mile, intermodal, dedicated, truckload, integrated (brokerage)—all under one JB Hunt sales banner.

182.    Sales teams were trained to meet the "customer's needs" by focusing them on the history of JB Hunt as a carrier, its people and drivers, and the capacity JB Hunt had to deliver.

183.    Sales teams at JB Hunt were told that customers struggled with the concept of JB Hunt acting as a broker, and to direct customers to the fact that JB Hunt had a long-established history of safe company drivers.

184.    Sales teams at JB Hunt were trained to utilize JB Hunt's brokerage arm to decrease costs and increase capacity, but to shield customers from JB Hunt's use of independent contractors by emphasizing to them that JB Hunt would remain the "single point of contact."

### C.  The New Non-Domiciled CDL Labor Pool and JB Hunt 2019–2024

185.    Prior to 2019, mid-sized American trucking was prospering.

186.    Family run trucking companies were growing, paying their drivers better, and seeing sustainable growth.

187.    Stevens Trucking saw this sustainable growth as well.

188.    Leading into 2021, JB Hunt and other large well-funded trucking companies began lobbying the government claiming that a "driver shortage" in the face of COVID would

---

cripple supply chains across the country, and aggressively advocated for cheaper and more accessible labor.

189.    Industry stakeholders—including the North American Punjabi Trucking Association (NAPTA)—warned federal officials that the rapid expansion of "non-domiciled" CDLs would create a safety-vetting gap.

190.    During the rollout of the Trucking Action Plan, NAPTA's CEO, Raman Dhillon, told Administration and DOT/FMCSA officials that fast-tracking licensure for foreign-national applicants without robust screening would trigger "a crisis" of inadequately vetted drivers.

191.    Dhillon flagged specific weaknesses—insufficient verification of experience, lax testing and oversight practices in some states, and failures to ensure English-language proficiency—and urged the government to address them before widening licensing pipelines.

192.    The core danger that NAPTA identified is structural, that is, non-domiciled CDLs allow individuals who are lawfully present but not domiciled in a state to be licensed, yet state-by-state issuance and oversight practices vary widely and can be exploited.

193.    Moreover, state licensing agencies lack a basic understanding of immigration law. Foreign nationals who present an Employment Authorization Document ("EAD") were routinely handed non-domiciled CDLs.

194.    EADs are not the proper documents to secure a CDL.

195.    Immigrations Customs and Enforcement has warned companies that EADs are not proper authorizations for CDLs.

196.    These warnings went unheeded.

## D. JB Hunt Awareness of Non-Domiciled CDL Safety Problems

197. The ATA's own research arm, the ATRI, understood that the "cost per mile" for a trucking company to move a load in 2022 and 2023 hovered around $2.26 per mile.

198. This is just the cost to move the load and does not account for profit.

199. Removing 42% for labor cost, the hard operating cost per mile in this period was approximately $1.31 per mile.

200. During this timeframe, however, JB Hunt routinely began brokering loads to carriers for approximately $1.75 per mile.

201. This means, *to just break even*, JB Hunt needed to pay its drivers approximately 44 cents per mile.

202. The average well-qualified truck driver hauling for an American trucking company makes between 80 and 90 cents per mile.

203. Despite industry knowledge that the rates for which JB Hunt was brokering loads were well below what it took to safely operate, JB Hunt, through its ICS unit, pushed forward with paying less and less per mile.

204. Even with the recent introduction of advanced safety technologies, such as lane departure systems, collision avoidance mechanisms, cameras, safer passenger vehicles, and electronic logging devices, there has been a significant rise in crashes since 2021.

205. Several of these crashes have garnered national headlines and show a common thread—cheap exploited immigrant labor driving on behalf of large carrier/brokers.

206. JB Hunt was thus well on notice of the danger of exploiting labor in order to increase margins.

207.    April 25, 2019, Lakewood, Colorado (4 dead): Rogel Mederos, a Cuban immigrant who had a non-domiciled CDL and did not speak English, lost his brakes coming down the Rockies and hit stopped traffic at over 85 miles per hour. Mederos had 30 safety violations in two years and was hauling for a large freight broker.

208.    May 24, 2024 (double fatality of mother and daughter): Harmeet Singh drove over 24 hours straight and ran a stop sign in rural west Texas while fatigued, blocking the entire eastbound lanes of Highway 84 and killing a mother and daughter. Singh had a non-domiciled CDL, did not speak English, and explained his excessive driving hours by claiming to have had a co-driver that mysteriously left the truck shortly before the crash. Singh was hauling for large asset-based logistics company Scotlynn USA as an "independent contractor." Scotlynn directed the route, hours, temperature, and timing of Singh's delivery. Scotlynn has denied all wrongdoing.

209.    June 11, 2024 (1 fatality): Ignacio Mendoza, while hauling for large broker Total Quality Logistics (TQL), attempted to illegally pass a vehicle at 80 miles per hour. Mendoza's truck jack-knifed and killed Scott Miller. Mendoza was an undocumented Mexican national who had been deported over 16 times and only had a Mexico driver's license. TQL claims Mendoza was an "independent contractor" despite making multiple "check calls" to ensure he was on time, tracking him via GPS, providing him instructions in Spanish, and instructing him on which route to take. TQL did not report these violations to the federal government. TQL has denied all wrongdoing.

210.    March 13, 2025, Austin, Texas (5 dead, 11 injured): Soloman Araya, a non-domiciled CDL holder from Eritrea who was driving while intoxicated and over his hours of

service, failed to slow down for stopped traffic. The resulting collision triggered a 17-vehicle chain reaction that killed five people (including an infant) and injured 11 others. Araya was driving for Amazon.

211.    June 28, 2025, Terrell, Texas (5 fatalities): Alexis Companioni, a Cuban national with a non-domiciled CDL, fell asleep at the wheel and plowed through multiple vehicles in stalled traffic on Interstate 20 while hauling for Hope Trans, LLC. Covenant Logistics Group, Inc., the company who brokered the load, claimed Companioni was a "contractor," despite pushing him to meet stringent delivery deadlines. Covenant did not report Companioni's violations to the federal government. Covenant has denied all wrongdoing.

## VII.    **JB Hunt's Deception of Its Customers**

212.    Utilizing the ecosystem of exploited foreign labor to underbid competitors, JB Hunt specifically solicits large customers, such as Ford, Family Dollar, Ross, Kohl's, Frito Lay, Conagra, and others, by pledging company drivers and equipment.

213.    JB Hunt, however, fails to tell its customers that loads over 1,000 miles are almost always hauled by carriers that pose a substantial safety risk.

214.    JB Hunt markets itself as a safe, asset-based carrier, then intentionally disregards the contractual obligations designed to uphold those very safety standards.

215.    JB Hunt's contracts with large companies typically require JB Hunt, who claims that it is acting as the carrier, to follow specific terms designed to ensure safety, including, among other things, that its drivers are English proficient. For example, one major contract required as follows:

      a.    JB Hunt remains fully responsible for all freight at the moment of pickup

from shipper.

b.    JB Hunt warrants compliance with federal guidelines and safety rules.

c.    Mandated 24-hour communication, driver conduct rules, and accident reporting requirements.

d.    Daily EDI 214 status pings and satellite/cell communication "required for every order."

e.    JB Hunt is responsible for detention, layover, and precise routing penalties, giving JB Hunt strong financial incentives to control driver behavior.

f.    Requires on time delivery, which JB Hunt is required to enforce.

g.    Requires JB Hunt to have drivers take specific routing instructions to certain facilities.

h.    **Requires JB Hunt to ensure proper CDLs, proficiency of English language**, equipment, and abide by all speed limits for all drivers hauling loads.

i.    Very specific operational requirements including:

    i.    Each load must be accepted within two hours;

    ii.   98% of loads accepted;

    iii.  JB Hunt provide administrative and backup management support as required to effectively manage inbound transportation requirements.

    iv.   Single customer service contact at JB Hunt; and

    v.    Cell phone communication with every driver.

216.   JB Hunt warrants that JB Hunt company drivers will be hauling customers'

loads, and that each of those drivers will meet the stringent contract requirements by the shipper, including English proficiency and proper licensing

217.    When operating in a brokerage capacity, JB Hunt represents that the contracted carriers meet safety standards equivalent to its own. Brokerage capacity, however, if even mentioned at all, is marketed as a backup plan rather than as the primary method for transporting freight.

218.    After securing the contract as an asset-based carrier selling JB Hunt drivers, JB Hunt puts on its "brokerage" hat.

219.    JB Hunt, through the use of JB Hunt 360 and its brokerage operations, will then have non-domiciled CDL holders working for less than $6 an hour show up at the customer's facility with a JB Hunt trailer and a bill of lading providing that JB Hunt is the carrier.

220.    These drivers move the majority, if not all, of the customer's freight on routes greater than 1,000 miles without the customer being made aware that each of these drivers violate the contract terms.

221.    These drivers will not meet the safety, insurance, English proficiency, and federal compliance standards set forth by the shipper.

222.    Customers are not told that JB Hunt is extensively using non-domiciled CDL holders and foreign nationals who are exploited and do not meet the contractual terms to haul freight.

223.    Customers are not informed that JB Hunt is exploiting these workers and often requiring a single foreign national to do the work of two well-paid American drivers, requiring them to break federal law and taking risks that a safe trucking company would not.

224. Moreover, JB Hunt does not report accurately report the number of "contractors" it uses for Dedicated Contract Services of "DCS." For example, in December of 2024, JB Hunt only reported having "one independent contractor truck" hauling for dedicated customers.

### E.  The Public Facing Safety Statements and Marketing by JB Hunt

225. JB Hunt has systematically advertised that its commitment to its drivers has always set it apart in the industry. "Recognizing that drivers are the backbone of their operations," JB Hunt invests significant time marketing its drivers in multiple forms of media.

226. JB Hunt acknowledges that its target market is blue chip customers such as large retailers, auto part manufactures, consumer products, and medical supplies.

227. Sophisticated Fortune 500 companies such as Ford are targeted through website and video advertisements as well as special conference speeches that are aimed at the type of service and language that large blue chip customers expect.

### a.  Examples of JB Hunt's Written Advertisements Published on JB Hunt's Website.

228. JB Hunt has consistently touted its commitment to safety and its drivers in written advertisements. These advertisements, however, do not inform their audience that JB Hunt largely relies on unsafe, un-vetted drivers who do not conform to federal safety regulations to transport freight for its customers.

229. Each of the advertisements below was originally published on JB Hunt's website with the intent to reach large customers with lucrative shipping lanes, such as Ford. These advertisements omit the fact that JB Hunt uses unsafe, unqualified drivers.

230. As of September 2, 2025, each of these advertisements was still available online.

231.    ***Published November 3, 2021 – Safety is our Priority for Dedicated Fleet Management.***

    a)  "Precisely why safety and operations work hand in hand at J.B. Hunt so that safety standards start at the ground level - not something that every commercial carrier can say. J.B. Hunt Dedicated goes above and beyond for safety standards. We train and keep our employees updated with the best safety practices in the industry, invest in technologies that will take those safety practices a step further and hold specific safety standards surrounding dedicated transportation and fleet management."

    b)  "J.B. Hunt Dedicated works hard to provide the best in fleet management and supply chain solutions by employing professional drivers that exceed expectations in safety and performance. We utilize a hair drug screening for new dedicated driver hires before allowing them on the road, which is one step further than the urine drug screening that the Department of Transportation requires of drivers."

    c)  "Every J.B. Hunt Dedicated driver goes through the training required by the Federal Motor Carrier Safety Administration (FMCSA) along with additional customer-specific training that can last anywhere from three days to six months, tailoring operational and safety procedures to customers' specific needs."

232.    ***Published December 7, 2021 – Dedicated Transportation Solutions Focused on Complexity.***

    a)  "Drivers with JB Hunt Dedicated have been well-trained….because along with

providing our drivers with the best equipment possible, we invest in special training for company drivers."

b) "The drivers that JB Hunt Dedicated sends to Chicken Express—along with the drivers we send to all our dedicated customers – are hand selected to drive for specific accounts."

c) "We have a large pool of professional drivers to work specifically on dedicated accounts. This wealth of drivers means JB Hunt can place them on routes they prefer and where they will excel."

d) "We secure quality drivers, so you can be confident that the best driver for the job is always the one at your door."

233.    **Published June 22, 2022 – Driver Retention and Hiring Methods – "everyone needs a driver."**

a) "The need for qualified drivers is higher than we could have anticipated, even a few years ago."

b) "Knowing the market is volatile, do you really want to have to find, hire, and retain drivers for your business?"

c) JB Hunt has "invested in people you trust that can take those stresses off."

d) "[F]inding and hiring truck drivers is something JB Hunt excels at. We possess an unwavering focus on company driver retention."

e) "Our founder, Johnnie Bryan Hunt, a truck driver himself, created this company with drivers in mind."

f) "His driver-centric vision survives to this day throughout our driver recruitment

and retention efforts."

g) "[W]e have access to a large pool of company drivers compared to our competitors. JB Hunt has made investments to bolster our robust driver pool."

h) "RETAINING THE BEST IN THE INDUSTRY"- "[O]ne big reason that drivers choose to work for JB Hunt is because we operate a say-do company culture that places our people as a top priority."

i) "[G]et the top drivers in the industry on the road for you!"

234.   **Published on JB Hunt's Website on April 29, 2024 – "Practicing Safety With Every Mile."**

a) "One thing you'll hear a lot about at J.B. Hunt is the importance of safety. It's not just something we talk about - it is one of our fundamental values and is essential to our culture."

b) "Our values - Integrity, Respect, Innovation, Safety and Excellence - were instilled by Mr. and Mrs. Hunt over 60 years ago. They represent the behaviors that define who we are and highlight how each person in our organization can rise to the responsibility that they have as an individual to uphold the promise represented by our scroll."

c) "Safety is part of everything we do, whether it's in an office, a shop or the cab of a truck. The company's best performance in history from a safety perspective was in 2023. Our more than 22,800 company drivers achieved a significant reduction in Department of Transportation preventable accidents per million miles, setting a new record for us."

d) "We are always evaluating ways to improve safety and provide continuing education around training, risk identification and prevention. For drivers, safety training begins during the onboarding process and continues throughout each driver's career."

e) "Our Million Mile drivers represent the epitome of who we want all of our drivers to be," said Nick Hobbs, chief operating officer, president, contract services and EVP. "It's their unwavering commitment to be the very best at what they do that makes this accomplishment so special. We couldn't do what we do without them."

235. ***Published on JB Hunt's Website in July of 2024 – Career Support "As a Say-do Company."***

a) "Safety comes first at J.B. Hunt."

b) "In addition to investing in safety technology for our drivers to take advantage of, we trust our drivers and believe they are the captain of their ship. We work to make sure they are empowered to make the safest decisions they can each time they get behind the wheel. That's why we are committed to providing all our drivers and driver managers with Smith System® training and certifications as a company-wide commitment to safety."

236. ***Published on July 2024 – JB Hunt "Our Foundations."*** "Our more than 60 years in the logistics industry have taught us what keeps freight moving forward. We've learned that three core foundations drive everything we do: People you trust. Technology that empowers. Capacity to deliver."

237.    On the rare occasion that JB Hunt does mention contractors in these written advertisements, it always highlights how incredibly "safe and well-vetted" its contractors are—selling these drivers as reputable small business owners instead of exploited labor.

238.    For example, in an advertisement published on JB Hunt's website targeting large customers with consistent over the road lanes called "Capacity to Delivery," on June 20, 2022 at 8:15 am, JB Hunt stated: "That extends to your supply chain, too. We're here to help you eliminate inefficiencies in your supply chain. With access to an array of transportation options and thousands of qualified third-party carriers nationwide."

239.    The advertisement goes on to say, "according to the American Trucking Association, 97.4% of all trucking companies operate fewer than 20 trucks. J.B. Hunt operates thousands of trucks and over 164,500 pieces of trailing equipment. By leveraging company-owned assets in addition to a pool of **qualified** third-party carriers, we give our customers unmatched access to capacity."

240.    JB Hunt further advertises to large customers who need a large capacity of freight moved across the country that its people and drivers are extraordinary. In People, Technology, and Capacity, published on JB Hunt's website as early as 2023 and still in circulation today, JB Hunt advertises to large customers, such as Ford, that "our access to capacity helped us match their loads with reliable, vetted, third-party carriers…who are best in class."

### b.  JB Hunt's Video Advertisement Campaigns

241.    Along with numerous web advertisements, JB Hunt has engaged in a significant video campaign featuring its drivers. These video campaigns highlight multiple company

_____

drivers and emphasize the slogan that JB Hunt is "Driven for you" and a company "by a driver for drivers."

242.    These videos, distributed through JB Hunt's website, its Facebook page, and other means, target potential customers, emphasizing: "Safety can bring your business value."[1,2]

243.    The following are just a few examples of some of the statements made by JB Hunt in its video advertising campaigns.

  a) "We have the best transportation company in American and that is because of y'all" – Nick Hobbs CEO with footage of JB Hunt drivers.[3]

  b) "We are nothing without our drivers."[4]

  c) "You are the face and heartbeat of our company" –Shelley Simpson CEO of JB Hunt.[5]

  d) "[D]rive like a champion—way of life at JB Hunt" showing a hard working American driver operating a JB Hunt vehicle and showing him coming home safe to his family.[6]

  e) "I know we have a higher standard when it comes to safety, we are not going

---

[1]
https://drivers.jbhunt.com/benefits/resources#:~:text=Safety%20Culture,company%2Dwide%20commitment%20to%20safety.&text=Video%20Player%20is%20loading.,-Play%20Video&text=This%20is%20a%20modal%20window.,-This%20video%20is

[2] https://www.jbhunt.com/blog/company/safety-culture#:~:text=One%20thing%20you'll%20hear,equipment%20performs%20at%20roadside%20inspections.

[3] Id.

[4] *Id.* VP of Operations JB Hunt

[5] *Id.*

[6] https://www.facebook.com/jbhunttransport/videos/drive-like-a-champion-a-way-of-life-at-jb-hunt/1092537250916407/

---

to compromise on safety" - Nick Hobbs COO.[7]

f) "I look at the decisions we make and they are always putting our people and safety first" - Stuart Scott CIO.[8]

### c. Public Statements of JB Hunt Executives

244.    In public comments, high level JB Hunt executives continually push the narrative that JB Hunt drivers and their commitment to safety represent the core value of the company.

245.    When looking at JB Hunt's use of companies that clearly exploit the labor pool, these statements are false.

246.    In the 42nd Annual Patterson lecture series on May 15, 2024, JB Hunt CEO Shelley Simpson made the following statements:

a) "[W]e took really great care of our people. . . [Y]ou see I was at that board table in 2009 at 6:30am and Kirk Thompson at our weekly meeting said we needed to change our business model due to the recession. . . [O]ne way we are going to take care of our people is we are not going to do layoffs."

b) "Cost of labor specifically for our drivers that deserve the wage they are fairly paid…when we think of this disruption (labor cost) we deal with it with Mr. Hunt in mind."

c) "We believe people are the most important asset . . . [W]e make sure they know we will take really great care of them . . . [E]ven during freight recession we are

---

[7] Behind the Scroll Safety: https://www.facebook.com/jbhunttransport/videos/behind-the-scroll-safety/1925535274543041/
[8] *Id.*

committed to making sure our people feel safe and have a job. . . [W]e believe

betting on people is a long term strategy . . . [I]f we changed this it would help

our cost space in the short term but long term our organization would suffer."

    d) "In 2023 our people deliver record safety performances. Core to who we are

       taking care of our drivers and the motoring public."

## VIII.  JB HUNT'S INTERFERENCE WITH STEVENS TRUCKING'S CONTRACT WITH FORD MOTOR COMPANY

247.    Over the past 45 years, Stevens Trucking built a strong business model, including hauling auto parts for companies such as Ford. These predictable "dedicated" routes or "lanes" usually take two days to drive and have been a staple of the Stevens Trucking business model.

248.    Ford has been a customer for 20 years.

249.    In 2008, Stevens was the "Motor Carrier of the Year" for the Ford account.

250.    Stevens during that time carried Ford through the 2008 financial crisis, which sent shockwaves through the automotive industry.

251.    During COVID, Stevens remained a dedicated partner with Ford, working day and night to ensure Ford's needs were met.

252.    Cole Stevens recounts 70 straight days at the office, where he essentially did not see his family and young children, trying to ensure that Ford and other customers were serviced during this unprecedented time.

253.    During their relationship, Stevens Trucking and Ford had together overcome large auto worker strikes, extreme weather events, the financial crisis, and COVID.

254.    From 2017 to 2024, Ford hired Schneider Logistics (Schneider), a motor carrier

and freight broker, to manage the logistics of arranging the shipment of its auto parts from Newport, Michigan to Texas.

255.    Over this period of time, Stevens Trucking hauled Ford loads brokered by Schneider Logistics from Ford's Newport Michigan parts warehouse to facilities in both Houston and Fort Worth.

256.    Ford signed off on Schneider utilizing Stevens Trucking to haul these lanes.

257.    These contracts had a term of one year.

258.    These routes or lanes, which run through Oklahoma, ran twice a day, every day, and provided on average approximately $8,000,000 a year in revenue to Stevens Trucking.

259.    These lanes tied together Stevens Trucking's network. The lanes coming through Oklahoma helped connect Stevens Trucking's tire customers in Oklahoma, sending loads up to Michigan with auto manufacturers, then sending auto parts from Michigan down into Texas.

260.    This efficiency increased Stevens' profits and the at-home time for its drivers.

261.    Every carrier, including Stevens Trucking, who desired to haul loads for Ford through Schneider had to contractually promise and affirm in the bid process that the carrier would be acting in its role and authority as a motor carrier, not in its role as a freight broker. In other words, the carrier was prohibited from "re-brokering" or "double brokering" the load after being awarded the contract.

262.    Given the dangers of concealment and legal prohibitions relating to double brokering, Ford made clear to Schneider that Schneider was only to hire asset-based carriers and was forbidden from double-brokering the load by awarding lanes to another freight

broker.

263.    When discussing the Ford lanes with Schneider, Stevens Trucking, on several occasions, asked Schneider if it could use its brokerage authority to find coverage if necessary.

264.    On every occasion, Schneider made clear to Stevens Trucking that Ford forbids such practices.

265.    For example, in a phone call on February 21, 2024, Cole Stevens asked Schneider if Stevens Trucking could utilize its brokerage arm to execute "Power-Only" moves in order to catch up orders from two weeks of terrible icy weather in the central United States. Schneider denied the request.

266.    Power-Only would be using a brokerage to contract truck drivers to haul Stevens Trucking trailers.

267.    This prohibition was consistent with the contractual terms that Schneider, on behalf of Ford, imposed on Stevens Trucking. The following expectations were made crystal clear in each contract:

a)  "Carrier (Stevens Trucking) shall be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation, including, without limitation, costs and expenses of all Carrier's transportation equipment, its maintenance, and those persons who operate it. In providing services, Carrier represents and warrants that the driver(s) utilized are competent and properly licensed, and are fully informed of their responsibilities for the protection and care of the involved commodities."

b)  "Carrier warrants that it is legally qualified to perform the contemplated

transportation . . ."

c) "Carrier agrees to comply with all applicable provisions of any international, federal, provincial, state and/or local law, rule and regulation."

d) "Carrier agrees not to accept a shipment from Broker (Schneider) if that shipment would require Carrier or any of its employees, agents or permitted subcontractors to exceed or violate any speed or safety law, rule or regulation."

e) "Carrier assumes liability as a common carrier for loss."

f) "To the proportionate extent only caused in whole or in part by acts or omissions of Carrier, their agents, or employees Carrier agrees to indemnify, defend and hold Broker (Schneider) and Customer (Ford), and their officers, employees, agents and directors, harmless from and against any and all fines, penalties, costs, demands, [and] damages . . ."

g) Carrier's Right to Subcontract. Except as provided in this section, Carrier shall not, in any manner, subcontract, broker or tender to any third party for transportation, any freight tendered to Carrier by Broker for transportation pursuant to this Contract. Carrier may subcontract the services that Carrier has agreed to perform for Broker under this Agreement, only if: (i) Carrier provides Broker prior written notice of such subcontracting, (ii) Broker acknowledges in writing, that the subcontracting may occur; and (iii) Carrier remains liable for the full and faithful performance of all obligations contained in this Agreement . . ."

268.    In May 2024, Schneider requested new annual bids for the Michigan to Fort

Worth and Houston lanes.

269.    On May 16, 2024, after multiple rounds of competitive bidding, Schneider awarded Stevens Trucking the preliminary annual award for several lanes related to the Ford account, including the Michigan to Houston and Fort Worth lanes.

270.    A preliminary award is an award that is expected to become final once awarded.

271.    Over the course of nearly twenty years, if Stevens won the preliminary award after multiple rounds of bidding, Stevens would typically win the "final award".

272.    The preliminary award was awarded to Stevens based upon rates proposed by Ford and Schneider.

273.    Based on industry custom and practice, once a preliminary award has been granted after multiple rounds of bidding, the award routinely becomes final.

274.    In the preliminary award Schneider set "targeted" rates per mile.

275.    Targeted rates per mile identify how much Schneider would pay Stevens Trucking per mile to haul the load as an asset-based carrier. As discussed above, Stevens Trucking was forbidden from brokering the load out to other carriers.

276.    Schneider, on average, set initial proposed rates at $2.24 per mile.

277.    This is all Schneider would pay to Stevens Trucking for the freight to be hauled.

278.    At the time, this was below the industry standard rate per mile for an asset-based carrier per ATRI's published "cost per mile" analysis.

279.    The "cost per mile," established by the ATRI after conducting a nationwide analysis of the trucking industry, is not profit per mile. It is the actual average cost to motor carriers to move freight from A to B. Until a carrier clears its actual "cost per mile," the carrier

_____

is not making an actual profit.

280.    In 2023, the ATRI's analysis determined that the average cost per mile for a carrier was $2.27.

281.    On May 31, 2024, after being awarded the preliminary award based upon Schneider's proposed rates, Stevens Trucking followed up with Isaac Hughes, who was in charge of the bid at Schneider.

282.    Even after being awarded the preliminary bid at rates agreed to by Schneider, Stevens Trucking made further price cuts in strategic areas in an effort to grow its six-year relationship with Schneider and Ford.

283.    The Stevens Trucking strategic cuts set the cost per mile to haul these loads on average at $2.13 per mile.

284.    The contract would provide revenue close to $8,000,000 per year for the Stevens Trucking business.

285.    On June 26, 2024, without advance notice, Schneider sent back the final freight award to Stevens Trucking for the Ford business.

286.    This award gutted the Stevens Trucking business—leaving only $300,000 to $400,000 of the initial $8,000,000 contract. This suddenly eliminated 95% of the Stevens Trucking business with Ford.

287.    Significantly, Stevens Trucking lost the lanes from Michigan to Fort Worth and Houston that it had held over the previous six years.

288.    These lanes run directly through the state of Oklahoma and, based upon Stevens Trucking's location and drive pool, were ideal lanes for the Stevens Trucking drivers

to ensure they had steady routine work, home time, and hours of service.

289.   This loss of not only income, but consistent steady work that allowed for home time and predictability, had a massive impact on Stevens Trucking and its drivers.

290.   After the loss of the Ford contract, Stevens Trucking, in July of 2024, lost $333,365.

291.   To try to keep drivers working and try to re-balance the network, Stevens Trucking was required to replace its 1,200-mile Ford lanes with 400-mile regional lanes with multiple stops.

292.   These lanes are extremely less profitable.

293.   Stevens to date has lost approximately $8,000,000 in revenue and $5,800,000 in efficiency and continues to lose approximately $500,000 on average per month.

294.   In the aftermath of the loss, Stevens Trucking began to ask how a preliminary contract award—which was based on a bid below Schneider's asking price—was virtually eliminated without notice.

295.   Stevens Trucking subsequently learned that Schneider awarded JB Hunt the Ford lanes and that, contrary to Ford's expressed policy requiring the loads to be hauled by asset-based drivers, JB Hunt immediately began brokering the loads through its ICS unit.

296.   Upon information and belief, Schneider awarded the contract to JB Hunt in its capacity as an asset-based carrier.

297.   Upon information and belief, JB Hunt did not disclose that it would be brokering the loads out to non-domiciled CDL drivers, unsafe companies, and carriers that do not match Ford's criteria.

_____

298.   Upon information and belief, Ford would not have allowed Schneider to award the contract to JB Hunt had Ford been aware that JB Hunt would broker the loads out to carriers who did not meet Ford's criteria.

299.   Follow up bidding on Ford lanes in August 2025 revealed that JB Hunt has continued to decrease the cost of these lanes well below what a safe asset-based carrier could possibly charge. As of August 2025, the rates are as low as $1.30 a mile—half of the operating cost for a safe asset-based carrier.

300.   An investigation of the Michigan to Houston and Fort Worth lanes reveal that JB Hunt has in fact brokered the Ford loads contrary to Schneider and Ford's statements to Stevens Trucking that such brokering is forbidden.

301.   To broker loads, JB Hunt uses an online application called JBH 360. Through this application, JB Hunt posts the loads it is brokering, and independent carriers are then able to bid on these loads.

302.   As an example, on December 17, 2024, JB Hunt, through its brokerage application JBH 360, tendered load 43Y7784 from Ford's Newport, Michigan, facility to its Houston, Texas, facility.

303.   Stevens Trucking was forbidden from brokering loads for Ford.

304.   Notably, this load was for power only, which means a contractor's truck is required to be paired with a JB Hunt trailer.

305.   The bid was for less than $1.85 a mile.

306.   This is well below the market average of $2.40 to $2.50 per mile for what a safe asset-based carrier could charge at that time.

307.    On the same day, JB Hunt tendered a load from Newport, Michigan to Fort Worth, Texas, as a power only load—again well below the market price.

308.    The tendered loads made clear that JB Hunt was looking for a contractor to haul a JB Hunt trailer for the Ford account.

309.    Stevens Trucking was routinely told that Ford would not allow for brokerage and Stevens Trucking was awarded the preliminary award as an asset-based carrier.

310.    The following load tenders are just a very small sample based upon a brief investigation and all follow this same pattern and practice. Each of the following loads were bid out between $1.47 to $1.75 per mile, well below the actual *cost* it takes to move a load per mile according to JB Hunt's own internal data.

  a.    June 27, 2025: Load 50L1613 from Newport Michigan to Fort Worth, Texas.

  b.    June 18, 2025: Load 5YC1689 from Newport, Michigan, to Fort Worth, Texas. $1,678 for 1139 miles ($1.47 a mile).

  c.    June 24, 2025: Load 5YY5704 from Newport, Michigan, to Houston, Texas.

  d.    July 10, 2025: Load 52C7750 from Newport, Michigan, to Ft. Worth, Texas.

  e.    July 11, 2025: Load 52F5080 from Newport, Michigan, to Houston, Texas. $2,030 for 1235 miles, $1.65 per mile.

  f.    July 16, 2025: Load 53A0733 from Newport, Michigan, to Houston, Texas.

311.    On each of the above loads (and numerous others), JB Hunt represented to Ford and Schneider that it was the carrier for each load even though it was brokering the loads through its JB Hunt ICS unit and its JBH 360 application.

312.    In short, despite agreeing to act as the actual carrier on each load, JB Hunt

unfairly brokered the loads out for half the cost per mile and double the efficiency than what a safe asset-based carrier could do.

313.    This provides JB Hunt with an unfair advantage over safe asset-based companies like Stevens Trucking.

## IX.    CAUSES OF ACTION

314.    Based upon the foregoing, Plaintiff Stevens Trucking asserts the following causes of action against Defendant JB Hunt.

### A.    Count I: False Advertising Under the Lanham Act (15 U.S.C. § 1125(a)(1)(B))

315.    Plaintiff incorporates all preceding paragraphs as if fully stated herein.

316.    As outlined above, JB Hunt widely disseminated numerous oral, written, video, and online statements regarding its drivers and their safety and performance.

317.    These statements were directed to key, large commercial interstate shippers and brokers such as Ford and Schneider.

318.    These statements were made in the advertisement and promotion of JB Hunt's commercial activity.

319.    In these statements, JB Hunt communicated to potential customers that its drivers were highly qualified and rigorously vetted and trained.

320.    In these statements, JB Hunt communicated to potential customers that driver safety was paramount to the company.

321.    In these statements, JB Hunt communicated to potential customers that the drivers it would use to haul the customers' loads were among the safest in the trucking industry.

---

322.    In these statements, JB Hunt communicated to potential customers that the drivers it would use to haul the customers' loads would comply with all FMCSA regulations.

323.    These statements were objectively false and/or misleading.

324.    JB Hunt did not tell its potential customers that, instead of using highly skilled and safe company drivers to haul the customers' loads, it would outsource the loads to independent drivers.

325.    JB Hunt did not tell its potential customers that it knew that many of these drivers would be foreign nationals holding non-domiciled CDLs who would be willing to work at rates far less than any safety-focused company would accept.

326.    JB Hunt did not tell its potential customers that these independent drivers would be accepting the loads at rates well below what any reasonable trucking company would know to be safe.

327.    JB Hunt did not tell its potential customers that it knew that these independent drivers would need to violate FMCSA safety regulations in order to make it worthwhile for them to accept the load at the rates at which JB Hunt would be offering.

328.    JB Hunt knew that its potential customers viewed safety as an important factor in deciding which trucking company to use as a shipper.

329.    As such, JB Hunt's statements were deceptive and/or likely to deceive a substantial portion of its intended audience.

330.    In fact, as outlined above, JB Hunt took intentional actions to cover up the type of unsafe contractors it was using.

331.    For example, JB Hunt placed itself on the bill of lading as the carrier, provided

itself as the "single point of contact" to Ford and Schneider, and prohibited the contracted drivers from contacting Ford or Schneider.

332.    Given the importance of safety to large, national, interstate shippers, JB Hunt's deceptive statements were likely to influence the purchasing decisions of these companies.

333.    JB Hunt's deceptive statements were influential in Schneider awarding the Ford lanes to JB Hunt.

334.    JB Hunt knew that if Ford and Schneider knew that JB Hunt intended to use unsafe contractors, then Ford and Schneider would not have awarded JB Hunt the Ford contract.

335.    As a proximate cause of JB Hunt's unlawful actions, Stevens Trucking has suffered significant economic damages as outlined above.

336.    Stevens Trucking had to hire attorneys to investigate the sudden loss without warning of a nearly twenty-year relationship with Ford and Schneider. These fees and investigation costs exceed $3,000,000 to date.

337.    Stevens Trucking has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

## B. Count II: Violation of the Oklahoma Deceptive Trade Practices Act (Okla. Stat. tit. 78, § 53)

338.    Plaintiff incorporates all prior paragraphs as if fully stated herein.

339.    As set forth above, J.B. Hunt's statements and advertisements falsely represented to potential customers that it would staff routes with its own safe and experienced company drivers.

340.    While advertising and stating that it would staff routes with its own safe and

experienced company drivers, JB Hunt knew that it would be using unsafe contract drivers to fulfill the contracts it obtained.

341.    To the extent J.B. Hunt acknowledged the potential use of contractors, it falsely and misleadingly assured that such contractors would be well-vetted, safe, and reliable.

342.    In truth, J.B. Hunt knowingly deployed unsafe, unqualified, and dangerous contractors who were willing to violate safety regulations and cheat the system as described above.

343.    JB Hunt thus knowingly and falsely represented the characteristics of the services it was offering.

344.    Additionally, JB Hunt unlawfully represented that the services it was offering were of a particular quality, when the actual quality of its services were of a different quality.

345.    JB Hunt willfully made these unlawful representations. JB Hunt intentionally made the unlawful representations with the specific aim of undercutting its competitors, such as Stevens Trucking.

346.    Stevens Trucking has been damaged by the unlawful representations that JB Hunt made during the course of its business.

347.    As a result of these unlawful representations, J.B. Hunt was able to underbid Stevens Trucking for Ford's business to the detriment of Stevens Trucking.

348.    As a proximate cause of JB Hunt's unlawful actions, Stevens Trucking has suffered damages as outlined above.

349.    Stevens Trucking had to hire attorneys to investigate the sudden loss without warning of a six-year relationship with Ford and Schneider.

_____

350.    Stevens Trucking has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

351.    Stevens Trucking is currently losing approximately $500,000 per month as a result of JB Hunt's actions.

### C.  Count III: Interference With Prospective Economic Advantage

352.    Plaintiff incorporates all prior paragraphs as if fully stated herein.

353.    Stevens Trucking had a longstanding business relationship with Schneider and Ford.

354.    For the six years prior to 2024, Stevens Trucking had hauled the Michigan to Fort Worth and Houston lanes for Ford. These lanes ran through Oklahoma.

355.    Schneider, on behalf of Ford, had awarded these lanes to Stevens Trucking in annual contracts. Each annual contract provided millions of dollars of revenue to Stevens Trucking.

356.    In 2024, Stevens Trucking reasonably expected to again be awarded these lanes. As set forth in more detail above, Stevens Trucking had been given the preliminary award and afterwards had made strategic cuts in order to maintain its longstanding relationship with Schneider and Ford.

357.    JB Hunt knew of Stevens Trucking's longstanding business relationship with Schneider and Ford. It also knew that Stevens Trucking had been given the preliminary award for the Michigan to Fort Worth and Houston lanes in 2024.

358.    JB Hunt intentionally interfered with Stevens Trucking's relationship with Schneider and Ford and Stevens Trucking's expectation of being given the final award for

these lanes.

359.    JB Hunt induced Schneider and Ford not to give the final award for these lanes to Stevens Trucking.

360.    JB Hunt did so by representing to Schneider and Ford that it could run the lanes as an asset-based carrier at a much cheaper cost than Stevens Trucking, while concealing from Schneider and Ford that it would broker these lanes to unsafe contract carriers contrary to the terms of the contract.

361.    Additionally, JB Hunt concealed from Schneider and Ford that it knew that the contractors it would be using would find it necessary to violate FMCSA safety regulations when hauling Ford products over these lanes.

362.    JB Hunt represented to Schneider and Ford that it would use safe company drivers, that it would use contract drivers only with Schneider's and Ford's consent, that it would utilize the best in-truck safety technology, and that it would do so for less with more capacity/on time deliveries.

363.    JB Hunt, however, knew that it did not intend to follow these promises.

364.    JB Hunt's interference resulted in Schneider and Ford not finally awarding these lanes to Stevens Trucking and terminating the longstanding relationship that Stevens Trucking had with Schneider and Ford.

365.    The acts JB Hunt used to interfere with Stevens Trucking's relationship with Schneider and Ford were unfair and/or unlawful.

366.    Alternatively, to the extent the means JB Hunt used to interfere with Stevens Trucking's relationship with Schneider and Ford were lawful, JB Hunt was without

justification in interfering with the relationship.

367.    As a proximate cause of JB Hunt's actions, Stevens Trucking lost an $8,000,000 per year contract plus lost opportunity cost.

368.    Stevens has lost an efficiency of, to date, $5.8 million.

369.    Stevens Trucking had to hire attorneys to investigate the loss of a six-year relationship with Ford and Schneider without warning.

370.    Stevens Trucking has had to deploy capital to stop the bleeding instead of growing the business and retaining/growing market share.

371.    Stevens Trucking is currently losing approximately $500,000 per month as a result of JB Hunt's actions.

## X.    DAMAGES

372.    As a result of JB Hunt's actions, as outlined above, Stevens Trucking has suffered the following damages:

    a) Approximately $8,000,000 in direct loss of revenue from the Ford Contract that was held prior to JB Hunt's actions from June 2024 to present day;

    b) Future loss of revenue from the Ford Contract that was held prior to JB Hunt's actions;

    c) Approximately $5,800,000 of additional damages identified from June 2024 to present day from the impact of lost network efficiency due to the loss of the Ford Contract that was held prior to JB Hunt's actions;

    d) Future damages from the continuing impact of lost network efficiency due to the loss of the Ford Contract that was held prior to JB Hunt's actions;

    e)   Attorney's fees and costs to date of approximately $3,000,000;

    f)   Trebling of damages as authorized by the Lanham Act;

    g)   Punitive Damages as authorized under Oklahoma Common Law for JB Hunt's willful, wanton and reckless conduct;

    h)   These costs, lost revenues, and lost efficiency costs are accumulating daily and will continue into the future; and

    i)   Pre-judgment and post-judgment interest as allowed by law.

## XI.    <u>JURY DEMAND</u>

373.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial and has tendered the appropriate fee.

## <u>PRAYER</u>

Plaintiff respectfully prays that Defendant be cited to appear and required to answer herein accordingly to law, that this cause be set for trial before a jury, that Plaintiff recover judgment of and from said Defendant for its actual damages in this cause in such amounts as the evidence may show and the Jury may determine to be proper, including trebled and/or punitive damages that Plaintiff be awarded its reasonable attorney fees incurred in bringing this action, together with the costs of suit, pre-judgment interest and post judgment interest, and for all such other and further relief, both in equity and at law, to which Plaintiff may show that it is justly entitled.


Dated: September 9, 2025                          Respectfully submitted,

                                          **PIERCE COUCH HENDRICKSON BAYSINGER AND GREEN LLP**

*s/Hailey M. Hopper*

Gerald P. Green, OBA No. 3563
John C. Lennon, OBA No. 30149
Hailey M. Hopper, OBA No. 31093
Post Office Box 26350
Oklahoma City, OK  73126
Telephone:        (405) 235-1611
Facsimile:        (405) 235-2904
jgreen@piercecouch.com
jlennon@piercecouch.com
hhopper@piercecouch.com

**WREN COOK MURPHY**

James Wren (*pro hac vice pending*)
Texas State Bar No: 22018200
Jim@wrencookattorneys.com
Louie J. Cook (*pro hac vice pending*)
Texas State Bar No:  24101191
louie@wrencookattorneys.com
Paul Murphy (*pro hac vice pending)*
Texas State Bar No: 24027561
paul@wrencookattorneys.com
14205 N Mo Pac Expy Ste. 570
Austin, Texas 78728
Telephone: 737-292-4926

**DURHAM PITTARD SPALDING**

Justin R. Kaufman (*pro hac vice pending)*
New Mexico State Bar No. 21999
jkaufman@dpslawgroup.com
125 Lincoln Avenue, Suite 402
Santa Fe, New Mexico 87501
Telephone:        505.986.0600
Facsimile:        505.986.0632

**ATTORNEYS FOR PLAINTIFF**