## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) STEVENS TRUCKING CO. AND (2) WESTERN FLYER EXPRESS LLC, | § § § | |
| Plaintiffs, | § § | Civil Action No: 5:25-CV-01031 |
| vs. | § § § | JURY TRIAL DEMANDED |
| (1) J.B. HUNT TRANSPORT, INC., | § § § | |
| Defendant. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Stevens Trucking Company ("Stevens Trucking") and Western Flyer Express, LLC ("Western Flyer") file this Second Amended Complaint against J.B. Hunt Transport, Inc. ("JB Hunt") and will show the Court as follows:

## I.   INTRODUCTION AND NATURE OF THE CASE

1.   This case addresses whether JB Hunt's advertising and representations about a focus on trucking safety and adherence to trucking safety regulations are true, whether those advertisements and representations should be true for purposes of fair competition with other trucking companies and the safety of the public, and the impact on Stevens Trucking, Western Flyer and the public if those representations by JB Hunt are false.

## II.   JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

2.   This action arises under the Lanham Act under 15 U.S.C. § 1125.

Accordingly, this Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331.

3.      This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1). The amount in controversy well exceeds $75,000.00. Plaintiff Stevens Trucking is a citizen of the state of Oklahoma and Defendant JB Hunt is a citizen of the state of Arkansas.

### B. <u>Personal Jurisdiction</u>

4.      The Court has personal jurisdiction over JB Hunt. The Defendant conducts substantial, continuous, and systematic business in Oklahoma, purposefully directed tortious acts at Oklahoma businesses and caused foreseeable harm in the District.

### C. <u>Venue</u>

5.      Venue is proper in the Western District of Oklahoma under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions occurred in this District and because Defendants maintain facilities, personnel, and operations in the District that are directly tied to the conduct alleged.

### D. <u>Overview of Facts Supporting Jurisdiction and Venue</u>

6.      The contracts and contractual relationships at issue in this case that were specifically targeted and impacted by the acts and omissions of Defendant JB Hunt existed with Plaintiff Stevens Trucking in El Reno, Oklahoma, and with Plaintiff Western Flyer in Oklahoma City, Oklahoma, within this judicial district.

7.      JB Hunt interfered with that contract and the well-established lanes hauled by Stevens Trucking and targeted a lane that went through the State of Oklahoma multiple

times per day, almost year-round.

8.      The contracts and contractual relationships at issue in this case that were specifically targeted and impacted by the acts and omissions of Defendant JB Hunt involved major commercial trucking lanes running hundreds of miles through the State of Oklahoma,

9.      Stevens Trucking contracted with Ford Motor Company (Ford) for nearly 20 years and the loads between Texas and Michigan at issue in this case were routed through Oklahoma as part of the Stevens Trucking network. JB Hunt targeted and interfered with that contract specifically targeting lanes running through the State of Oklahoma multiple times per day, almost year-round.

10.     Oklahoma includes key interstate routes (I-35, I-40, I-44) therefore is critical for JB Hunt's business operations (as well as for Plaintiffs' business operations), including those at issue in this case. JB Hunt maintains continuous, systematic, and intentional contact with the state of Oklahoma.

11.     To facilitate and support performing the business operations at issue in this case, JB Hunt specifically placed a large trailer pool at Kimberly Clark's Jenks, Oklahoma facility. JB Hunt interacts daily with the dispatchers, guard-shack attendants, sales representatives, warehouse managers, warehouse employees, and operations managers there to support JB Hunt's business operations within Oklahoma and beyond.

12.     JB Hunt placed dedicated operations and facilities in Oklahoma such as drop yards, maintenance facilities, and driver operations centers to support its fleet.

13.     JB Hunt collects data on Oklahoma shippers, drivers, and carriers through JB

_____

Hunt 360, Carrier 360, and the JB Hunt Drive application.

14.     JB Hunt utilizes the data collected through JB Hunt 360, Carrier 360, and JB Hunt Drive to make competitive decisions regarding the Oklahoma marketplace.

15.     JB Hunt used the Oklahoma data obtained from JB Hunt 360, Carrier 360, and JB Hunt Drive to price loads coming and going from the Oklahoma market.

16.     The data obtained from Oklahoma in JB Hunt 360, Carrier 360, and JB Hunt Drive was part of the dataset used by JB Hunt to unfairly underbid Stevens Trucking and Western Flyer for the lanes lost in this litigation.

17.     JB Hunt pays state taxes in Oklahoma, and JB Hunt employees pay Oklahoma state income tax. JB Hunt moreover is registered to do business in Oklahoma and is required to comply with rules and regulations set forth by the Oklahoma Corporation Commission, and the Oklahoma Department of Transportation, as well as all tax requirements.

18.     Consistent with the allegations set forth above and below, Defendant JB Hunt is subject to personal jurisdiction in this Court because it has purposefully availed itself of the privilege of conducting substantial business activities within the state of Oklahoma, including regularly operating commercial trucking services, contracting with Oklahoma-based customers, and maintaining a continuous presence through its transportation logistics network. These activities constitute sufficient minimum contacts with Oklahoma such that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. Plaintiff's claims arise out of or relate to JB Hunt's commercial transportation activities in Oklahoma, including tortious interference with Plaintiff's customers and

business relationships in Oklahoma and the shipment and movement of goods through the Western District of Oklahoma, which form an integral part of the events giving rise to the alleged harm in Oklahoma. Accordingly, JB Hunt has sufficient minimum contacts with Oklahoma to warrant the exercise of specific personal jurisdiction in this Court

## III.    THE PARTIES

19.    The parties to this case are businesses involved in the trucking and freight hauling business.

20.    Plaintiff Stevens Trucking Company is an Oklahoma corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma.

21.    Plaintiff Western Flyer Express, LLC is a limited liability company organized under the laws of Oklahoma with its principal place of business in Oklahoma.

22.    Defendant JB Hunt Transport, Inc. ("JB Hunt") is a Georgia corporation with a principal place of business in Arkansas. At all relevant times, JB Hunt was and is registered to do business in Oklahoma, conducts significant business in the State of Oklahoma, and maintains a registered agent in the State of Oklahoma.

23.    JB Hunt may be served via its agent for service of process, Corporation Service Company, at 10300 Greenbriar Place, Oklahoma City, OK 73159-7653.

## IV.    OVERVIEW OF THE TRUCKING INDUSTRY

### A.    Trucking Regulation and Licensing of Companies and Drivers

### General Background

24.    Freight "motor carriers" and freight "brokers" in the United States are both

_____

regulated under federal law.

25.     Trucking companies in the United States may be registered as a motor carrier or as a broker or as both.  Whether a trucking company is acting as a motor carrier or as a broker on a given freight load can be a question of fact that is not determined solely by the type of licensure(s) held by the trucking company.

26.     The Department of Transportation must issue a DOT number for a trucking company to become a properly licensed motor carrier in the United States.

27.     A trucking company is required to operate under that DOT number and report several categories of information including truck and driver count, home terminal address, corporate officers, and miles per year to the Federal Motor Carrier Safety Administration (FMSCA).

28.     Congress created the FMCSA to reduce crashes, injuries, and fatalities involving commercial motor vehicles (CMV). It fulfills that mandate by promulgating and enforcing the Federal Motor Carrier Safety Regulations and by overseeing carrier safety performance.

29.     Safety rules enacted by the FMCSA include those governing fatigue, use of drugs and alcohol, and unsafe driving practices. Fatigue-related regulations include those restricting "hours of service," that is, how long drivers are allowed to work per day or week.

30.     The FMSCA monitors the number of crashes a carrier is involved in to take enforcement action against motor carriers involved in excessive crashes or fatalities.

31.     The FMSCA also monitors the number of safety violations to take action against motor carriers involved in an unacceptable number of violations.

32.    For FMSCA to work effectively, trucking companies must operate all drivers, trucks, and operations under the DOT number assigned by the Department of Transportation because a company's safety record is tied to its DOT number.

## Chameleon Carriers

33.    A "chameleon carrier" is a fraudulent trucking company that operates by shutting down a previous entity with a poor safety record and then reopening the same operation under a new name and DOT number to obtain a clean slate with the Department of Transportation.

34.    These carriers operate under multiple DOT numbers to avoid compliance with regulations, defraud insurance, and avoid enforcement actions.

35.    These carriers often function as one company, with one owner, but break their operation into multiple names and DOT numbers, so they can close a shell company and open another overnight in the event of a fatality crash or major safety violation.

36.    Federal law prohibits motor carriers from using changes in identity, registration, or DOT numbers to evade compliance with safety regulations or to conceal a history of violations.

37.    Federal law makes it a potential felony to use any trick, scheme, or device to knowingly and willfully falsify, conceal, or cover up a material fact in a written application, statement or representation to the Federal Motor Carrier Safety Administration or U.S. Department of Transportation.

38.    Broker review of known indicators showing a chameleon carrier is essential to avoid the broker's hiring of unsafe chameleon carriers who endanger public safety.

### Licensing of 18-Wheeler Drivers

39.     Driver licensing standards greatly impact safety.  While foreign nationals could lawfully obtain CDLs, until recent years, these drivers comprised a small minority of all truck drivers in the United States.

40.     In one year (January 2021 to January 2022) the issuance of CDLs increased by 72% from the prior year, translating to 876,000 additional CDLs, a high percentage of which went to drivers from India, Eastern Europe, China, and Latin America. Most of these new drivers began contracting for freight loads through brokers.

41.     This spike in newly issued CDLs to foreign born drivers, coupled with exploitation of those drivers by depressing their wage allowed large trucking companies and their brokerage arms (such as JB Hunt) to exploit these drivers and gain an unfair advantage over traditional trucking companies (such as Stevens Trucking). At the same time, this negatively impacted the safety of our Nation's roads.

42.     The number of fatal crashes involving commercial motor vehicles rose from 4,821 in 2020, to 5,733 in 2021, and to 5,837 in 2022.

### B.     The Rise of Freight Brokerage

43.     Historically, trucking consisted primarily of "asset" based motor carriers— that is, trucking companies that own trucks, trailers, and directly employ truck drivers.

44.     An asset-based carrier that operates continuously under one DOT number for many years typically understands the importance of safe operations, both to protect the public and to protect the carrier's finances. A history of excessive safety violations negatively impacts that asset-based carrier's ability to acquire business. And if a crash

_____

occurs, asset-based carriers are directly responsible for the actions of their employee drivers, resulting in large out-of-pocket costs and an increase in insurance premiums if safety standards have been violated.

45.     Given the importance of safety for traditional asset-based carriers, industry numbers show that more than 40% of their operating cost each month is dedicated to driver pay. When carriers incentivize running efficient operations, drivers earn a good wage by staying within the safety rules.

46.     Freight brokerage is the non-asset side of the trucking industry that coordinates the movement of freight through motor carriers.

47.     U.S. freight brokers have asserted that they have no legal liability for non-employee drivers and that federal preemption prevents broker liability for violation of traffic safety laws by these non-employee drivers.

48.     As a result, some freight brokers including JB Hunt have chosen to increasingly utilize chameleon carriers and extremely low-cost non-employee drivers with potentially exploited hours of service to underbid traditional motor carriers including Stephens Trucking and Western Flyer, despite both the safety risks and the public and contractual representations to the contrary.

49.     This provides carrier/brokers including JB Hunt with a significant competitive advantage if profit, rather than safety, becomes the dominant concern. To maintain the appearance of safety when selling themselves to customers, some carrier/brokers including JB Hunt focus on their history of using well-qualified drivers and the safety records they established over the previous decades as traditional asset-based

carriers without fully disclosing the true facts of their new business practices.

50.     During the sales process, and during the freight hauling process in the absence of any crash or safety violation, JB Hunt will often represent to the customer that it is acting as the motor carrier, through direct statements and through the official shipping document known as the bill of lading, meaning that the driver for the carrier/broker is actually one of its own drivers. (The bill of lading is the legal document that determines who is responsible for the load, when and where it is to be delivered, and the carrier for that load.)

51.     In reality, JB Hunt commonly brokers and dispatches the shipments to significantly cheaper drivers with minimal insurance, all while maintaining the facade of control over "our" drivers.

52.     JB Hunt will provide the trailer, track the driver through GPS technology, and call the driver through "check calls" to ensure the driver is progressing on time.

53.     After a crash involving a catastrophic injury or fatality, however, JB Hunt claims that it was acting as a broker, not a carrier, and therefore claim to not be legally responsible under a federal preemption argument.

54.     Moreover, even though a carrier/broker such as JB Hunt will appear to be acting as a traditional asset-based carrier, and even though it markets itself as such, JB Hunt claims it is not required to report crashes by its contractors on its federal safety records.

55.     This allows a carrier/broker to maintain, or even lower, its already favorable per-mile safety violation record, which it then, in turn, markets to obtain additional

business. It also allows the carrier/broker to maintain or decrease its insurance premiums.

56.     This undisclosed use of extremely low-cost drivers, often driving under the DOT numbers of chameleon carriers, has resulted in a significant increase in profits to JB Hunt while enabling it to underbid traditional motor carriers including Stevens Trucking and Western Flyer.

## V.     JB HUNT BROKERAGE SEES EXPLOSIVE GROWTH

57.     On May 6, 2019, JB Hunt released "JB Hunt 360"as part of its brokerage operations. JB Hunt 360, interchangeably referred to as "360 Box," utilizes JB Hunt trailers, JB Hunt technology, and "contractor" drivers through the JB Hunt trailer network.

58.     JB Hunt began claiming there was a "driver shortage" and touted brokerage as the key solution to freight efficiency. At the same time, however, JB Hunt actively laid off long haul drivers. Not surprisingly, JB Hunt dramatically cut its labor costs through this practice.

## VI.     JB HUNT SAFETY CLAIMS GROW INCREASINGLY MISLEADING

### A.     JB Hunt's Awareness of Non-Domiciled CDL Safety Problems

59.     Trucking industry research showed the "cost per mile" for moving a load in 2022 and 2023 hovered around $2.26 per mile before profit. Subtracting labor costs of 42% left a hard operating cost per mile of $1.31 per mile.

60.     During this time, however, JB Hunt routinely brokered loads to carriers for approximately $1.75 per mile including the labor cost.

61.     *Just to break even*, JB Hunt could only pay drivers approximately 44 cents per mile; at the same time, the average well-qualified truck driver hauling for an American

trucking company earned between 80 and 90 cents per mile.

62.     JB Hunt Transportation, Inc. tracked this data through JB Hunt 360, Drive 360 and JB Hunt's loadboard at www.jbhunt.com.

63.     JB Hunt in 2019 was briefed by the Arkansas Trucking Association on the current threat posed by non-domiciled CDL drivers; it acknowledged the risks internally as well.

64.     In the years that followed leading into 2024, JB Hunt recognized a disproportionate number of crashes involved its power only non-domiciled CDL drivers. Even with the introduction of advanced safety technologies, crashes had risen since 2021, and JB Hunt internal memoranda and risk assessment documents noted the danger involved in continuing these practices while recognizing that well-established American-run companies did not face the same safety risk.

### B.     JB Hunt's "Strong Solo Sergey" Strategy

65.     While touting use of employed company drivers with strong safety records to Ford and Kimberly Clark JB Hunt uses the term "Strong Solo Sergey" behind closed doors to describe many of the drivers that handle JB Hunt full truckload loads over 1,000 miles.

66.     "Strong Solo Sergey" is a euphemism for a foreign-born driver (often Eastern European) who drive well over the allowed hours alone on what normally would constitute a team load.

67.     Strong Solo Sergey works for less than $20,000 a year doing the work of two truck drivers who would be earning between $140,000 and $240,000 collectively.

_____

68.     JB Hunt employees like Drew Taylor comment on social media about Strong Solo Sergey, quipping that Strong Solo Sergey "could visit all states with no sleep loss," and exclaimed, "Never sleep! Sergey will make America drive again!"

69.     While these JB Hunt employees apparently find humor in exploiting immigrants who drive all night, their fatigue is no laughing matter as demonstrated when Zarif Umarov hauled for JB Hunt as a brokered driver in August and September of 2023. Umarov did not speak English, ran his trucking company out of an apartment, had a non-domiciled CDL, and was required to haul team loads as a solo driver.

70.     Umarov hauled for several large JB Hunt customers including Conagra, Armacell, Ross Stores, Kohls, and Frito Lay. During these loads, Umarov used JB Hunt trailers, with JB Hunt on the bill of lading, and was being tracked minute by minute by JB Hunt. In fact, Umarov hauled almost exclusively for JB Hunt.

71.     JB Hunt provided Umarov with a JB Hunt coordinator who provided specific instructions and took over the role of dispatch. This practice ensured that JB Hunt could keep its reliance on contractors like Umarov hidden from customers.

72.     Umarov was instructed that should a crash, breakdown, or other issue occur while delivering the load in question, he was to contact JB Hunt so JB Hunt could help resolve the issue. This, too, prevented customers knowing that their freight was hauled not by a JB Hunt employed driver but by underpaid, unsafe labor.

73.     JB Hunt had check calls with Umarov through JBH 360 and other means such that  JB Hunt personnel were thus in constant contact with Umarov throughout the life of the load. Umarov was required to report to JB Hunt dispatch his arrival, departure,

and movement during trips. JB Hunt prescribed exact routing, including a required deadhead route which required a driver to drive to a location without a load, which decreased profits for the driver.

74.     JB Hunt concealed these details from its shippers by mandating that its contractors are to be paid directly by JB Hunt and prohibiting contractors from charging or contacting the shipper.

75.     JB Hunt tracked over 25 different metrics on Umarov for each load he hauled, including whether the delivery was made on time, pay rate, time taken to deliver the load, offloading time, and several other key metrics.

76.     On September 27, 2023, Umarov while speeding in a torrential rain-storm caused a crash that killed Charollette Daley and seriously injured her daughter and grand-daughters.

77.     Umarov is an example of the danger resulting from JB Hunt utilizing carriers with drivers who are untrained, desperate, and pushed to drive under conditions well beyond what federal law allows.  Their take home: less than fifteen cents per mile compared to the 80 cents or more per mile for company drivers.

### C.     Using Illicit Carriers to Lower Labor Costs and Undercut Competitors

78.     A June to September of 2025 investigation revealed multiple similar carriers hauling for JB Hunt, i.e. carriers without a terminal, safety personnel, maintenance facility, or meeting the insurance requirements of large shippers.

79.     These carriers are Eastern European or Central Asian owned, and experience explosive growth at a time when Stevens Trucking and other American trucking companies

_____

struggle to survive. These carriers' drivers log mileage that clearly violate federal regulations. The drivers routinely use drugs and alcohol, lack proficient English and have a high record of safety violations.

80.     These companies owned 10,226 trucks and were responsible in the last 24 months for 835 crashes, 9,175 safety violations, and over 1 billion miles on America's roadways.

81.     Examples from this extensive list of companies include Tutash Express, Inc. run by Syrahidin Zhaladin Uulu, Aravan Cargo, Inc. run by Sardorbek Akhmedov, Hope Trans operated by Aishat Magomedova, and Enlighted Truckers of America, LLC whose primary officer is Jugoslav Erceg.

82.     At least three of these carriers listed above had drivers detained in the recent Operation Guardian in Oklahoma where it was determined that the drivers for these companies lacked any valid paperwork to show they were (a) properly licensed to operate an 18-wheeler and (b) in the country legally.

83.     Despite knowledge of these problems, JB Hunt's intentional strategy to utilize these companies lowers its labor cost nationally, increases its profit margins and provides JB Hunt a significant competitive advantage when profit rather than safety is the primary determinant, JB Hunt would not have been able to underbid Stevens Trucking on the Ford, Barry Global Plastics, and Kimberly Clark contracts without its access to this capacity that operates its drivers for double the miles (due to skirting FMCSA safety rules) for less than half the price.

84.     These carriers do not comply with the terms JB Hunt agrees to when carrying or brokering loads for Kimberly Clark or Ford. Furthermore, JB Hunt does not disclose the safety issues or other full details of its use of this capacity to all of its customers.

### D.     Labor Trafficking and Exploitation

85.     The average long distance company driver can earn anywhere from $70,000 to $90,000 per year, whereas immigrant "contract" drivers hauling for the same shippers and brokers drive twice the hours earning well less than $20,000 a year without benefits.

86.     Often, these young men have families back home that are under the control of foreign criminal groups. Sometimes, families are kept in hotels nearby under control of criminal groups. Once placed in a truck, the exploited labor is told to drive 20 or more hours a day, sometimes being required to work 30 hours straight.

87.     If the driver stops driving or fails to answer his phone, the company will report the truck "stolen" causing the driver to be arrested. Given the driver does not have proper immigration status, or is fearful of deportation, the driver will continue to drive despite the risk to his life and the lives of others.

88.     When the driver begins to run out of time to drive through his electronic logging device, the trucking company will remote access his logbook and re-set his time. Therefore, if pulled over by law enforcement or involved in a fatal crash, the driver will appear to be operating legally.

89.     When looking at the miles driven per driver by many of the companies utilized by JB Hunt, the evidence demonstrates that these companies are likewise requiring excessive hours of driving time. But by exploiting this labor force on loads over 1,000

_Plaintiffs' Amended Complaint_                                                                 Page 16

miles (the types of lanes which have been the bread and butter of the American trucking industry over the past 50 years), JB Hunt is able to lower its bids to customers, lower its cost for moving freight, and increase its market share and profitability margins.

## VII.   **JB HUNT'S DECEPTION OF CUSTOMERS**

### A.   **Overview of JB Hunt's Representations**

90.     Utilizing the ecosystem of exploited foreign labor to underbid competitors, JB Hunt specifically solicits large customers, such as Ford, Family Dollar, Ross, Kohl's, Frito Lay, Conagra, and others, by pledging company drivers and equipment.

91.     JB Hunt's company motto is "capacity to deliver." JB Hunt advertises openly that its capacity is "qualified" and that it gives customers "unmatched access to capacity" without revealing that the "unmatched capacity" is a result of using companies openly involved in illicit activity that safe trucking companies and safe shippers avoid.

92.     For example on June 20, 2022 on www.jbhunt.com, which was directed toward potential customers such as Kimberly Clark, Ford and other Oklahoma shippers, JB Hunt made the following statement:

> "By leveraging company-owned assets **in addition to a pool of qualified third-party carriers**, we give our customers **unmatched access to capacity**," and "we matched loads with **reliable, vetted, third-party carriers** who are **best in class**."

93.     JB Hunt, however, fails to tell its customers that loads over 1,000 miles are commonly hauled by carriers that pose a substantial safety risk.

94.     JB Hunt furthermore markets itself as a safe, asset-based carrier, then

_____

intentionally disregards the contractual obligations designed to uphold those very safety standards to provide the "capacity to deliver."

95.     JB Hunt's contracts with large companies typically require JB Hunt, who claims that it is acting as the carrier, to follow specific terms designed to ensure safety. For example, one major contract required as follows:

 a.     JB Hunt remains fully responsible for all freight at the moment of pickup from shipper.

 b.     JB Hunt warrants compliance with federal guidelines and safety rules.

 c.     Requires JB Hunt to ensure proper CDLs, English language proficiency, equipment, and abide by all speed limits for all drivers hauling loads.

 d.     Mandates 24-hour communication, driver conduct rules, and accident reporting requirements, with daily EDI 214 status pings and satellite/cell communication "required for every order."

 e.     Provides for single customer service contact at JB Hunt; and

 f.     Cell phone communication with every driver.

96.     For many customers shipping loads, JB Hunt warrants that JB Hunt company drivers will be hauling customers' loads, and that each of those drivers will meet the stringent contract requirements by the shipper, including English proficiency and proper licensing. In the event of a crash, however, JB Hunt has taken a different position in litigation, asserting that it was instead acting as a broker.

97.     When operating in a brokerage capacity, JB Hunt represents that the contracted carriers meet safety standards equivalent to its own. Brokerage capacity,

_____

however, if even mentioned at all, is marketed as a backup plan rather than as the primary method for transporting freight.

98.    JB Hunt, through the use of JB Hunt 360 and its brokerage operations, uses non-domiciled CDL holders often working for less than $6 an hour, who appear at the customer's facility with a JB Hunt trailer and a bill of lading providing that JB Hunt is the carrier, and without informing the customer that these drivers violate the contract terms.

### B.    The Public Facing Safety Statements and Marketing by JB Hunt

99.    Sophisticated Fortune 500 companies such as Ford only utilize companies that project an exceptional safety culture with well qualified drivers.

100.    JB Hunt has made numerous explicit and misleading representations on its website accessible to the business public at www.jbhunt.com projecting an exceptional safety culture with well qualified drivers.

101.    JB Hunt has consistently touted its commitment to safety and its drivers in its written advertisements. These advertisements, however, do not inform their audience that JB Hunt largely relies on unsafe, un-vetted drivers who do not conform to federal safety regulations to transport freight for its customers.

102.    The following is simply one example from the JB Hunt website, published June 22, 2022, addressing driver retention and hiring methods, regarding how "everyone needs a driver":

      a.    "The need for **qualified drivers** is higher than we could have anticipated, even a few years ago."

      b.    "Knowing the market is volatile, do you really want to have to find, hire,

and retain drivers for your business?"

c.  JB Hunt has "invested in people you trust that can take those stresses off."

d.  "[F]inding and hiring truck drivers is something JB Hunt excels at. We possess an unwavering focus on company driver retention."

e.  "Our founder, Johnnie Bryan Hunt, a truck driver himself, created this company with drivers in mind."

f.  "His **driver-centric vision** survives to this day throughout our driver recruitment and retention efforts."

g.  "[W]e have access to a large pool of company drivers compared to our competitors. JB Hunt has **made investments to bolster our robust driver pool."**

h.  "RETAINING THE BEST IN THE INDUSTRY" – "[O]ne big reason that drivers choose to work for JB Hunt is because we operate a say-do company culture that places our people as a top priority."

i.  "[G]et the **top drivers in the industry** on the road for you!"

103.  Along with numerous website written statements, JB Hunt has engaged in a significant video campaign featuring its drivers.

104.  These videos, distributed through JB Hunt's website, its Facebook page, and other means, target potential customers including Ford, Barry Global Plastics and Kimberly Clark, emphasizing: "Safety can bring your business value."

105.  In public comments, high level JB Hunt executives continually push the narrative that JB Hunt drivers and their commitment to safety represent the core value of

the company.

106.    For example, in the 42nd Annual Patterson lecture series on May 15, 2024, JB Hunt CEO Shelley Simpson made numerous statements including the following: "In 2023 our people delivered record safety performances. Core to who we are is taking care of our drivers and the motoring public." This statement did not disclose the increased number of crashes by JB Hunt "contractors" that were not counted, and had they been, JB Hunt would not have delivered a "record" safety performance.

107.    JB Hunt knew based upon its internal data that it was utilizing an exploited labor pool. When looking at JB Hunt's use of companies that exploit the labor pool, these statements made by JB Hunt are false. JB Hunt made these statements to gain market share.

108.    This narrative by JB Hunt is imperative for influencing customers such as Kimberly Clark, Barry Plastics, SLI, and Ford.

## VIII.    JB HUNT'S INTERFERENCE WITH STEVENS TRUCKING'S BUSINESS

### A.    JB Hunt's Interference with Stevens Trucking's Ford Motor Company Business

109.    From 2017 to 2024, Ford hired Schneider Logistics (Schneider), a motor carrier and freight broker, to manage the logistics of arranging the shipment of its auto parts from Newport, Michigan to Texas.

110.    Over this period of time, Stevens Trucking hauled Ford loads brokered by Schneider Logistics from Ford's Newport Michigan parts warehouse to facilities in both Houston and Fort Worth.

111.    Ford signed off on Schneider utilizing Stevens Trucking to haul these lanes.

_____

112.   These contracts had a term of one year.

113.   These routes or lanes, which run through Oklahoma, ran twice a day, every day, and provided on average approximately $8,000,000 a year in revenue to Stevens Trucking and tied together Stevens Trucking's network by connecting multiple customers in Oklahoma and Michigan.

114.   This efficiency increased Stevens' profits and at-home time for its drivers.

115.   When discussing the Ford lanes with Schneider, Stevens Trucking, on several occasions, asked Schneider if it could use its brokerage authority to find coverage if necessary.

116.   On every occasion, Schneider made clear to Stevens Trucking that Ford forbids such practices.

117.   This prohibition was consistent with the contractual terms that Schneider, on behalf of Ford, imposed on Stevens Trucking. The following expectations were made crystal clear in each contract:

    a)   "Carrier (Stevens Trucking) shall be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation, including, without limitation, costs and expenses of all Carrier's transportation equipment, its maintenance, and those persons who operate it. In providing services, Carrier represents and warrants that the driver(s) utilized are competent and properly licensed, and are fully informed of their responsibilities for the protection and care of the involved commodities."

    b)   "Carrier warrants that it is legally qualified to perform the contemplated transportation . . ."

    c)   "Carrier agrees to comply with all applicable provisions of any international, federal, provincial, state and/or local law, rule and regulation."

d) "Carrier agrees not to accept a shipment from Broker (Schneider) if that shipment would require Carrier or any of its employees, agents or permitted subcontractors to exceed or violate any speed or safety law, rule or regulation."

e) "Carrier assumes liability as a common carrier for loss."

f) "To the proportionate extent only caused in whole or in part by acts or omissions of Carrier, their agents, or employees Carrier agrees to indemnify, defend and hold Broker (Schneider) and Customer (Ford), and their officers, employees, agents and directors, harmless from and against any and all fines, penalties, costs, demands, [and] damages . . ."

g) Carrier's Right to Subcontract. Except as provided in this section, Carrier shall not, in any manner, subcontract, broker or tender to any third party for transportation, any freight tendered to Carrier by Broker for transportation pursuant to this Contract. Carrier may subcontract the services that Carrier has agreed to perform for Broker under this Agreement, only if: (i) Carrier provides Broker prior written notice of such subcontracting, (ii) Broker acknowledges in writing, that the subcontracting may occur; and (iii) Carrier remains liable for the full and faithful performance of all obligations contained in this Agreement . . ."

118.    In May 2024, Schneider requested new annual bids for the Michigan to Fort Worth and Houston lanes. On May 16, 2024, after multiple rounds of competitive bidding, Schneider awarded Stevens Trucking the preliminary annual award for several lanes related to the Ford account, including the Michigan to Houston and Fort Worth lanes.

119.    A preliminary award is an award that is expected to become final once awarded. Based on industry custom and practice, once a preliminary award has been granted after multiple rounds of bidding, the award routinely becomes final. Over the course of nearly twenty years, if Stevens won the preliminary award after multiple rounds of bidding, Stevens would typically win the "final award."

120.    The preliminary award to Stevens was based upon rates proposed by Ford

and Schneider. The contract would provide revenue close to $8,000,000 per year for the Stevens Trucking business.

121.    On June 26, 2024, without advance notice, Schneider sent back the final freight award to Stevens Trucking for the Ford business.

122.    This award gutted the Stevens Trucking business—leaving only $300,000 to $400,000 of the initial $8,000,000 contract. This suddenly eliminated 95% of the Stevens Trucking business with Ford.

123.    Ford would not have allowed Schneider to award the contract to JB Hunt had Ford been aware that JB Hunt would broker the loads out to carriers who did not meet Ford's criteria.

124.    Follow up bidding on Ford lanes in August 2025 revealed that JB Hunt has continued to decrease the cost of these lanes well below what a safe asset-based carrier could possibly charge. As of August 2025, the rates are as low as $1.30 a mile—half of the operating cost for a safe asset-based carrier.

125.    An investigation of the Michigan to Houston and Fort Worth lanes reveal that JB Hunt has in fact brokered the Ford loads contrary to Schneider and Ford's statements to Stevens Trucking that such brokering is forbidden.

126.    This provides JB Hunt with an unfair advantage over safe asset-based companies like Stevens Trucking.

127.    Schnieder would not have provided JB Hunt with the Ford Contract had JB Hunt revealed its use of the unsafe capacity outlined in this pleading.

_____

**B. <u>JB Hunt's Interference with Stevens Trucking's Kimberly Clark Business</u>**

128.    Stevens Trucking successfully hauled as an asset-based carrier for Kimberly Clark for years.

129.    Stevens Trucking's Oklahoma based operations made the Jenks facility a perfect fit for Stevens Trucking's efficiency and operations.

130.    Stevens Trucking hauled $3.1 million in freight for Kimberly Clark in 2021, $5.8 million in 2022, and $4.6 million in 2023.

131.    Kimberly Clark required the following of Stevens Trucking:

   a.    Stevens Trucking would only employ qualified, experienced, properly trained and legally licensed personnel in the operation of vehicles;

   b.    Stevens Trucking would maintain an effective safety program that has undergone a safety review by the U.S. DOT.

   c.    Carrier will not hold less than a Satisfactory Safety Rating with the DOT.

   d.    Carrier will comply with legal requirements as to driver qualifications, traning and safety, theft avoidance and prevention, hours of service, and other safety regulations.

   e.    Under no circumstances will Carrier engage or use another carrier for services hereunder without ensuring that such a carrier operates lawfully, safely and dependably, and is qualified to and will provide services meeting the requirements in this agreement.

132.    JB Hunt targeted Kimberly Clark as a customer, representing to Kimberly Clark that it could move freight for (a) a cheaper cost (b) more quickly and with (c) greater access to capacity than Stevens Trucking and other competitors.

133.    JB Hunt promised Kimberly Clark that it would follow the same criteria required of Stevens for safety.

134.   Kimberly Clark relied upon JB Hunt's promise to meet these requirements based upon JB Hunt's reputation built on years of advertising, including JB Hunt's promise to offer safe capacity that met the contract terms above that exceeded Stevens Trucking and other traditional asset-based carriers.

135.   JB Hunt's promise of capacity in excess of Stevens Trucking's was material to Kimberly Clark's decision to retain JB Hunt.

### C.   JB Hunt's Interference with Western Flyer's Kimberly Clark Business

136.   Over several years, Western Flyer Express built a strong relationship with the Kimberly Clark shipping operation in Jenks, Oklahoma.

137.   Western Flyer Express successfully hauled as an asset-based carrier for Kimberly Clark for years.

138.   Western Flyer's Oklahoma based operations made the Jenks facility a perfect fit for Western Flyer's efficiency and operations.

139.   Western Flyer has lost hundreds of thousands of dollars of Kimberly Clark business to JB Hunt over the past three years.

140.   Kimberly Clark required the same safety requirements of Western Flyer that it required of Stevens Trucking above.

141.   JB Hunt targeted Kimberly Clark as a customer and represented to Kimberly Clark that it could move freight for a (a) cheaper cost (b) more quickly and with (c) greater access to capacity than Western Flyer and other competitors in 2022—2025.

142.   JB Hunt promised Kimberly Clark that it would follow the terms of the agreement above.

_____

143.    Kimberly Clark relied upon JB Hunt's promise to meet these requirements based upon JB Hunt's reputation built on years of advertising as outlined above.

144.    This included JB Hunt's promise to offer safe capacity that met the contract terms above that exceeded Western Flyer and other traditional asset based carriers.

145.    JB Hunt's promise of legitimate capacity in excess of Western Flyer was material to Kimberly Clark's decision to retain JB Hunt.

## IX.    CAUSES OF ACTION

146.    Based upon the foregoing, Plaintiffs Stevens Trucking and Western Flyer assert the following causes of action against Defendant JB Hunt.

### A. Count I: False Advertising Under the Lanham Act (15 U.S.C. § 1125(a)(1)(B))

147.    Plaintiffs incorporates all preceding paragraphs as if fully stated herein.

148.    As outlined above, JB Hunt widely disseminated numerous oral, written, video, and online statements regarding its drivers and their safety and performance.

149.    These statements were directed to key, large commercial interstate shippers and brokers such as Ford, Schneider, and Kimberly Clark.

150.    These statements were made in the advertisement and promotion of JB Hunt's commercial activity.

151.    In these statements, JB Hunt communicated to potential customers that its drivers were highly qualified and rigorously vetted and trained.

152.    In these statements, JB Hunt communicated to potential customers that driver safety was paramount to the company.

_Plaintiffs' Amended Complaint_                                                                    Page 27

153. In these statements, JB Hunt communicated to potential customers that the drivers it would use to haul the customers' loads were among the safest in the trucking industry.

154. In these statements, JB Hunt communicated to potential customers that the drivers it would use to haul the customers' loads would comply with all FMCSA regulations.

155. JB Hunt promised "capacity" on loads over 850 miles and that the capacity was safe and legal, not primarily built off an illicit enterprise tied to foreign governments.

156. These statements were objectively false and/or misleading.

157. JB Hunt did not tell its potential customers that, instead of using highly skilled and safe company drivers to haul the customers' loads, it would outsource the loads to independent drivers.

158. JB Hunt did not tell its potential customers that it knew that many of these drivers would be foreign nationals holding non-domiciled CDLs who would be willing to work at rates far less than any safety-focused company would accept.

159. JB Hunt did not tell its potential customers that these independent drivers would be accepting the loads at rates well below what any reasonable trucking company would know to be safe.

160. JB Hunt did not tell its potential customers that it knew that these independent drivers would need to violate FMCSA safety regulations in order to make it worthwhile for them to accept the load at the rates at which JB Hunt would be offering.

161. JB Hunt knew that its potential customers viewed safety as an important

_____

factor in deciding which trucking company to use as a shipper.

162.    JB Hunt did not tell customers it had no intention of following the contractual terms for safety set forth by Ford, Schneider, and Kimberly Clark

163.    As such, JB Hunt's statements were deceptive and/or likely to deceive a substantial portion of its intended audience.

164.    In fact, as outlined above, JB Hunt took intentional actions to cover up the type of unsafe contractors it was using.

165.    For example, JB Hunt placed itself on the bill of lading as the carrier, provided itself as the "single point of contact" to Ford and Schneider, and prohibited the contracted drivers from contacting Ford or Schneider.

166.    JB Hunt did the same thing for Kimberly Clark.

167.    Given the importance of safety to large, national, interstate shippers, JB Hunt's deceptive statements were likely to influence the purchasing decisions of these companies.

168.    JB Hunt's deceptive statements were influential in Schneider awarding the Ford lanes to JB Hunt.

169.    JB Hunt's deceptive statements were influential in Schneider awarding the Ford lanes to JB Hunt.

170.    JB Hunt's deceptive statements were influential in Kimberly Clark and Global Plastics awarding lanes to JB Hunt.

171.    JB Hunt knew that if Ford and Schneider knew that JB Hunt intended to use unsafe contractors, then Ford and Schneider would not have awarded JB Hunt the Ford

_____

contract.

172.   Ford and Schneider would not have awarded JB Hunt the contract if either knew that the capacity advertised by JB Hunt would not follow the terms of the parties' agreement.

173.   JB Hunt utilized its advertising to sell Ford and Schneider on the fact that its capacity would comply with the contract terms.

174.   JB Hunt knew that if Kimberly Clark knew that JB Hunt intended to use unsafe contractors, Kimberly Clark would not have awarded JB Hunt contracts.

175.   Kimberly Clark would not have awarded JB Hunt the contract if Kimberly Clark knew that the capacity advertised would not follow the terms of their respective contracts.

176.   JB Hunt utilized its advertising to sell Ford and Schnieder on the fact that its capacity would comply with the contract terms.

177.   As a proximate cause of JB Hunt's unlawful actions, Stevens Trucking and Western Flyer have suffered significant economic damages as outlined above.

178.   Stevens Trucking had to hire attorneys to investigate the sudden loss without warning of a nearly twenty-year relationship with Ford and Schneider and damages to Stevens Trucking's Kimberly Clark account. These fees and investigation costs exceed $3,500,000 to date.

179.   Stevens Trucking has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

180.   Stevens Trucking has lost significant efficiency in its operation and had to

_____

increase driver pay by rate since its drivers' miles have significantly decreased.

181.    Stevens Trucking's Oklahoma based drivers have suffered a loss of quality at work due to shorter routes, multiple stops, and more in-city driving.

182.    Stevens Trucking therefore will have to continue to deploy capital to prevent driver turnover.

183.    Western Flyer has had to hire attorneys and spend cost to investigate this claim. To date these fees and expenses exceed $300,000.00.

184.    Western Flyer has lost hundreds of thousands of dollars of Kimberly Clark business.

185.    Western Flyer has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

186.    Western Flyer has lost efficiency in its operation.

187.    Western Flyer's Oklahoma-based drivers who hauled the Kimberly Clark lanes have suffered a loss of quality at work due to shorter routes, multiple stops, and more in-city driving.

188.    Western Flyer will therefore will have to continue to deploy capital to prevent driver turnover.

## B.  Count II: Violation of the Oklahoma Deceptive Trade Practices Act (Okla. Stat. tit. 78, § 53)

189.    Plaintiffs incorporate all prior paragraphs as if fully stated herein.

190.    As set forth above, JB Hunt's statements and advertisements falsely represented to potential customers that it would staff routes with its own safe and

---

experienced company drivers.

191.    While advertising and stating that it would staff routes with its own safe and experienced company drivers, JB Hunt knew that it would be using unsafe contract drivers to fulfill the contracts it obtained.

192.    To the extent JB Hunt acknowledged the potential use of contractors, it falsely and misleadingly assured that such contractors would be well-vetted, safe, and reliable.

193.    In truth, JB Hunt knowingly deployed unsafe, unqualified, and dangerous contractors who were willing to violate safety regulations and cheat the system as described above.

194.    JB Hunt thus knowingly and falsely represented the characteristics of the services it was offering.

195.    Additionally, JB Hunt unlawfully represented that the services it was offering were of a particular quality, when the actual quality of its services were of a different quality.

196.    JB Hunt willfully made these unlawful representations. JB Hunt intentionally made the unlawful representations with the specific aim of undercutting its competitors, such as Stevens Trucking.

197.    JB Hunt agreed to contract terms with Kimberly Clark, Ford, and Schneider it had no intention of following.

198.    JB Hunt could not underbid Stevens Trucking without access to this capacity.

199.    JB Hunt could not underbid Western Flyer without access to this capacity.

_____

200.   This capacity used by JB Hunt is placing unsafe drivers on Oklahoma roads without JB Hunt informing Kimberly Clark, Ford, and Schneider.

201.   Stevens Trucking has been damaged by the unlawful representations that JB Hunt made during its business.

202.   Western Flyer has been damaged by the unlawful representations that JB Hunt made during its activities.

203.   As a result of these unlawful representations, JB Hunt was able to underbid Stevens Trucking for Ford's business to the detriment of Stevens Trucking.

204.   As a result of these unlawful representations, JB Hunt was able to underbid Stevens Trucking for Kimberly Clark's business to the detriment of Stevens Trucking.

205.   As a result of these unlawful representations, JB Hunt was able to underbid Western Flyer for Kimberly Clark's business to the detriment of Western Flyer.

206.   As a proximate cause of JB Hunt's unlawful actions, Stevens Trucking has suffered damages as outlined above.

207.   Stevens Trucking had to hire attorneys to investigate the sudden loss without warning of a six-year relationship with Ford and Schneider.

208.   Stevens Trucking had to hire attorneys to investigate the sudden loss without warning of Kimberly Clark business.

209.   Stevens Trucking has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

210.   Stevens Trucking is currently losing approximately $500,000 per month as a result of JB Hunt's actions.

_____

211. Stevens Trucking has lost significant efficiency in its operation and had to increase driver pay since its drivers' miles have significantly decreased.

212. Stevens Trucking's Oklahoma-based drivers have suffered a loss of quality at work due to shorter routes, multiple stops, and more in city driving.

213. Stevens Trucking therefore will have to continue to deploy capital to prevent driver turnover.

214. As a proximate cause of JB Hunt's unlawful actions, Western Flyer has suffered damages as outlined above on its Kimberly Clark account.

215. Western Flyer had to hire attorneys to investigate the sudden loss of Kimberly Clark business and those cost and fees to date are approximately $300,000.

216. Western Flyer has had to deploy capital to stop bleeding instead of using that capital to grow its business and market share.

217. Western Flyer has lost significant efficiency in its operation.

218. Western Flyer's Oklahoma-based drivers have suffered a loss of quality at work due to shorter routes, multiple stops, and more in city driving.

219. Western Flyer therefore will have to continue to deploy capital to prevent driver turnover.

## C. Count III: Interference With Prospective Economic Advantage

220. Plaintiffs incorporate all prior paragraphs as if fully stated herein.

### 1. Schneider and Ford

221. Stevens Trucking had a longstanding business relationship with Schneider and Ford.

_Plaintiffs' Amended Complaint_                                                                 Page 34

222.    For the six years prior to 2024, Stevens Trucking had hauled the Michigan to Fort Worth and Houston lanes for Ford. These lanes ran through Oklahoma.

223.    Schneider, on behalf of Ford, had awarded these lanes to Stevens Trucking in annual contracts. Each annual contract provided millions of dollars of revenue to Stevens Trucking.

224.    In 2024, Stevens Trucking reasonably expected to again be awarded these lanes. As set forth in more detail above, Stevens Trucking had been given the preliminary award and afterwards had made strategic cuts in order to maintain its longstanding relationship with Schneider and Ford.

225.    JB Hunt knew of Stevens Trucking's longstanding business relationship with Schneider and Ford. It also knew that Stevens Trucking had been given the preliminary award for the Michigan to Fort Worth and Houston lanes in 2024.

226.    JB Hunt intentionally interfered with Stevens Trucking's relationship with Schneider and Ford and Stevens Trucking's expectation of being given the final award for these lanes.

227.    JB Hunt induced Schneider and Ford not to give the final award for these lanes to Stevens Trucking.

228.    JB Hunt did so by representing to Schneider and Ford that it could run the lanes as an asset-based carrier at a much cheaper cost than Stevens Trucking, while concealing from Schneider and Ford that it would broker these lanes to unsafe contract carriers contrary to the terms of the contract.

229.    Additionally, JB Hunt concealed from Schneider and Ford that it knew that

_____

the contractors it would be using would find it necessary to violate FMCSA safety regulations when hauling Ford products over these lanes.

230.    JB Hunt represented to Schneider and Ford that it would use safe company drivers, that it would use contract drivers only with Schneider's and Ford's consent, that it would utilize the best in-truck safety technology, and that it would do so for less with more capacity/on time deliveries.

231.    JB Hunt, however, knew that it did not intend to follow these promises.

232.    JB Hunt's interference resulted in Schneider and Ford not finally awarding these lanes to Stevens Trucking and terminating the longstanding relationship that Stevens Trucking had with Schneider and Ford.

233.    The acts JB Hunt used to interfere with Stevens Trucking's relationship with Schneider and Ford were unfair and/or unlawful.

234.    Alternatively, to the extent the means JB Hunt used to interfere with Stevens Trucking's relationship with Schneider and Ford were lawful, JB Hunt was without justification in interfering with the relationship.

235.    As a proximate cause of JB Hunt's actions, Stevens Trucking lost an $8,000,000 per year contract plus lost opportunity cost.

236.    Stevens has lost an efficiency of, to date, $5.8 million.

237.    Stevens Trucking had to hire attorneys to investigate the loss of a six-year relationship with Ford and Schneider without warning.

238.    Stevens Trucking has had to deploy capital to stop the bleeding instead of growing the business and retaining/growing market share.

_____

239. Stevens Trucking has lost significant efficiency in its operation and had to increase driver pay since its drivers' miles have significantly decreased.

240. Stevens Trucking's Oklahoma-based drivers have suffered a loss of quality at work due to shorter routes, multiple stops, and more in city driving.

241. Stevens Trucking therefore will have to continue to deploy capital to prevent driver turnover.

242. Stevens Trucking is currently losing approximately $500,000 per month as a result of JB Hunt's actions.

## IX.   DAMAGES

243. As a result of JB Hunt's actions, as outlined above, Stevens Trucking has suffered the following damages:

   a) Approximately $8,000,000 in direct loss of revenue from the Ford Contract that was held prior to JB Hunt's actions from June 2024 to present day;

   b) Future loss of revenue from the Ford Contract that was held prior to JB Hunt's actions;

   c) Approximately $2,765,989 in direct loss of revenue from 2022 to 2024 from Kimberly Clark Contract that was held prior to JB Hunt's actions.

   d) Approximately $5,800,000 of additional damages identified from June 2024 to present day from the impact of lost network efficiency due to the loss of the Ford Contract that was held prior to JB Hunt's actions;

   e) Future damages from the continuing impact of lost network efficiency due to the loss of the Ford Contract that was held prior to JB Hunt's actions;

f)  Future damages from the loss of significant Kimberly Clark;

g)  Attorney's fees and costs to date of approximately $3,500,000;

h)  Trebling of damages as authorized by the Lanham Act;

i)  Punitive Damages as authorized under Oklahoma Common Law for JB Hunt's willful, wanton and reckless conduct in utilizing unsafe and illict capacity with knowledge of its danger;

j)  These costs, lost revenues, and lost efficiency costs are accumulating daily and will continue into the future; and

k)  Pre-judgment and post-judgment interest as allowed by law.

244.  As a result of JB Hunt's actions, as outlined above, Western Flyer has suffered the following damages:

l)  Hundreds of thousands of dollars of direct loss of revenue from the Kimberly Clark account that was held prior to JB Hunt's actions from 2022 to present day.

m) Future loss of revenue from the Kimberly Clark contract that was held prior to JB Hunt's actions;

n)  Future damages from the continuing impact of lost network efficiency due to the loss of the Kimberly Clark contract that was held prior to JB Hunt's actions;

o)  Future damages from the loss of significant Kimberly Clark business;

p)  Attorney's fees and costs to date of approximately $300,000.

q)  Trebling of damages as authorized by the Lanham Act;

r)  Punitive Damages as authorized under Oklahoma Common Law for JB Hunt's willful, wanton and reckless conduct in utilizing unsafe and illicit capacity with knowledge of its danger;

s)  These costs, lost revenues, and lost efficiency costs are accumulating daily and will continue into the future; and

t)  Pre-judgment and post-judgment interest as allowed by law.

## X.    **JURY DEMAND**

245.   Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

## **PRAYER**

Plaintiffs respectfully pray that Defendant be cited to appear and required to answer herein accordingly to law, that this cause be set for trial before a jury, that Plaintiffs recover judgment of and from said Defendant for their actual damages in this cause in such amounts as the evidence may show and the Jury may determine to be proper, including trebled and/or punitive damages, that Plaintiffs be awarded their reasonable attorney fees incurred in bringing this action, together with the costs of suit, pre-judgment interest and post judgment interest, and for all such other and further relief, both in equity and at law, to which Plaintiffs may show that they are justly entitled.

All as respectfully submitted,

**PIERCE COUCH HENDRICKSON
BAYSINGER AND GREEN LLP**

*s/Hailey M. Hopper*
Gerald P. Green, OBA No. 3563
John C. Lennon, OBA No. 30149
Hailey M. Hopper, OBA No. 31093
Post Office Box 26350
Oklahoma City, OK  73126
jgreen@piercecouch.com
jlennon@piercecouch.com
hhopper@piercecouch.com
Telephone:      405.235.1611

**WREN COOK MURPHY**

James Wren (*p.h.v. pending)*
Texas State Bar No: 22018200
Louie J. Cook (*p.h.v. pending*)
Texas State Bar No:  24101191
Paul Murphy (*p.h.v. pending)*
Texas State Bar No: 24027561
Elizabeth Fraley *(p. h. v. Pending)*
Texas State Bar No. 13180500
14205 N Mo Pac Expy Ste. 570
Austin, Texas  78728
Jim@wrencookattorneys.com
Louie@wrencookattorneys.com
Paul@wrencookattorneys.com
Liz@wrencookattorneys.com
Telephone:      737.292.4926

**DURHAM PITTARD SPALDING**

Justin R. Kaufman (*p.h.v. pending)*
New Mexico State Bar No. 21999
jkaufman@dpslawgroup.com
125 Lincoln Avenue, Suite 402
Santa Fe, New Mexico 87501
Telephone:      505.986.0600

**ATTORNEYS FOR
PLAINTIFFS**