# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) STEVENS TRUCKING CO., and<br>(2) WESTERN FLYER EXPRESS LLC,<br><br>  Plaintiffs,<br><br>vs.<br><br><br>(1) J.B. HUNT TRANSPORT, INC.,<br>(2) C.H. ROBINSON COMPANY, INC.,<br>d/b/a C.H. ROBINSON WORLDWIDE,<br>INC.<br>(3) C.H. ROBINSON INTERNATIONAL,<br>INC.<br>(4) C.H. ROBINSON COMPANY, LLC,<br>d/b/a C.H. ROBINSON WORLDWIDE,<br>(5) C.H. ROBINSON WORLDWIDE,<br>  INC., and<br>(6) TOTAL QUALITY LOGISTICS, LLC,<br><br>  Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No: 5:25-CV-01031<br><br><br>JURY TRIAL DEMANDED |

---

## PLAINTIFFS' THIRD AMENDED COMPLAINT

---

Plaintiffs, Stevens Trucking Company ("Stevens Trucking") and Western Flyer Express, LLC ("Western Flyer") (collectively "Plaintiffs"), file this Third Amended Complaint against J.B. Hunt Transport, Inc. ("JB Hunt"); C.H. Robinson Company, Inc., d/b/a C.H. Robinson Worldwide, Inc., C.H. Robinson International, Inc., C.H. Robinson Company, LLC d/b/a C.H. Robinson Worldwide, and C.H. Robinson Worldwide, Inc., (collectively "CH Robinson"); and Total Quality Logistics, LLC ("TQL"), and will show the Court as follows:

## I.  INTRODUCTION AND NATURE OF THE CASE

1. Increasingly, trucking industry observers have noted the decline of lawful asset-based trucking operations in the United States. This decline is driven by a coordinated relationship between Defendants, acting as freight brokers, and illegal freight carriers ("Illegal Carriers")—fly-by-night companies registered under fake addresses who are severely underinsured; recruit and exploit foreign drivers through forced labor; disregard safety regulations; falsify log books; and cause a disproportionately high number of crashes and fatalities on U.S. roads and highways. The combination of Defendants and these Illegal Carriers distorts lawful competition and undermines public safety. This lawsuit addresses that conduct and the resulting harm to the American trucking industry, the public, and Plaintiffs' businesses.

2. The unlawful relationship between Defendants and these Illegal Carriers operates as follows: Defendants leverage their reputations as "safe" and "compliant" transportation providers to market logistics services and position themselves to secure freight contracts with shipping customers. But Defendants have no intention of actually

shipping freight for these customers. Rather, Defendants broker the freight to Illegal Carriers—carriers who are anything but "safe" and "compliant" and, as a result, avoid labor constraints and compliance costs associated with federal safety and regulatory requirements. Through Defendants' association with these Illegal Carriers, Defendants are able to secure more contracts by offering purportedly "safe" and "compliant" services at impossibly low rates—rates that compliant carriers like Plaintiffs cannot match.

3. This unlawful enterprise creates a win-win for the Defendants and the Illegal carriers: Defendants capitalize on the Illegal Carriers' unlawfully reduced operating costs to gain access to inexpensive hauling capacity, undercut competitors, and expand brokerage margins, while the Illegal Carriers gain entry to freight contracts their regulatory status and safety records would otherwise foreclose.

4. Collectively and in concert, Defendants have cornered the U.S. market in long-haul trucking for customers who ship goods over 650 miles—all at a time when Defendants were claiming there was a truck-driver shortage and that long-haul trucking was in the worst freight "recession" in 100 years. Defendants' impossible growth was made possible by their collaboration with Illegal Carriers.

5. But these illicit gains come at a heavy cost. American asset-based trucking companies like Plaintiffs have experienced unprecedented losses and are closing their doors. And American highways have never been more deadly.

6. The Illegal Carriers, with Defendants' knowledge, routinely dispatch solo drivers on jobs that require a two-driver team, forcing drivers to operate well beyond

federally permitted hour limits and fixing logbooks to perpetuate this scheme. This practice frequently results in drivers operating for periods exceeding 20 hours in a single day.

7. This practice is so common that Defendants' employees joke about it online and have dubbed the prototypical illegal driver "Strong Solo Sergey."



8. Meanwhile, the driving public—who trusts that carriers are abiding by safety requirements—is forced to share the road with Illegal Carrier drivers operating in excess of 20 hours a day under non-compliant conditions, causing crashes and traffic fatalities on public roadways.

9. Truck drivers also suffer compressed wages to accommodate the influx of unqualified labor supplied by Illegal Carriers. And trucking companies that insist on safety compliance, adequate insurance coverage, and fair driver compensation—like Plaintiffs— are being priced out of the long-haul freight market, resulting in a gradual economic death.

10.     Likewise, freight customers, who contract with Defendants expecting safe and compliant transportation, instead have their freight diverted to non-compliant carriers they would never knowingly entrust with their goods. These Illegal Carriers would never be able to contract directly with Defendants' customers because the Illegal Carriers and their drivers do not meet even the most basic industry standards (*e.g.*, sufficient insurance coverage, English language proficiency, compliance with Federal Motor Carrier Safety Administration ("FMCSA") regulations, acceptable safety statistics, etc.). Defendants, on the other hand, meet these standards *on paper*.

11.     Defendants' relationship with Illegal Carriers allows them to maintain a safe and compliant façade. For example, despite operating as a "motor carrier" as defined by 49 C.F.R. § 390.5T—including use of their own trailers, dispatch of drivers, and assumption of care, custody, and control of freight—TQL and CH Robinson rely on their purported status as a "broker" to knowingly avoid registering as motor carriers with the Department of Transportation, which in turn allows them to evade regulatory obligations requiring the reporting of safety violations and crashes involving the Illegal Carriers they use to haul loads for their customers. Conversely, each time an Illegal Carrier is in a crash or receives a safety violation, these actions are not reported on TQL and CH Robinson's safety record. Similarly, though registered as both a carrier and a broker, when JB Hunt uses Illegal Carriers and a violation or wreck occurs, it claims it is acting only as a broker and thus does not report the violation or wreck. This shell-game with Illegal Carriers keeps the Defendants' safety records "clean" and their costs low.

12. Defendants operate, control, and influence enterprises alongside Illegal Carriers to funnel customer freight through non-compliant carriers for Defendants' financial gain. Defendants' enterprises are engaged in a pattern of racketeering activity predicated on forced labor and wire fraud from which Defendants knowingly (or with reckless disregard) derive a substantial financial benefit.

13. This lawsuit, collectively brought by four multi-generational, family-owned, Oklahoma trucking companies, seeks to end these unlawful practices and vindicate the rights of Plaintiffs for the damage that Defendants' conduct has caused.

## II. JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

14. This action arises under federal laws (18 U.S.C. §§1961-68 and 15 U.S.C. § 1125). Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

15. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, and there is complete diversity of citizenship between Plaintiffs (Oklahoma citizens) and Defendants (citizens of other states).

### B. Personal Jurisdiction

16. The Court has personal jurisdiction over Defendants. All Defendants conduct substantial, continuous, and systematic business in Oklahoma, purposefully directed unlawful acts at Oklahoma businesses, and caused foreseeable harm in the district.

17. Defendants' actions collectively have caused the Plaintiffs to lose hundreds of millions of dollars—money that would have been injected into the Oklahoma economy, to Oklahoma truck drivers, and would have helped expand Oklahoma's family businesses.

18. Defendants purposefully directed substantial commercial activity toward Oklahoma by brokering, dispatching, and coordinating freight that routinely originated from, terminated in, or transited through Oklahoma. By deliberately availing themselves of the benefits of Oklahoma freight contracts, customers, and infrastructure—while displacing Oklahoma businesses and extracting revenue from the Oklahoma marketplace—Defendants have subjected themselves to personal jurisdiction here.

**C.      Venue**

19. Venue is proper in the Western District of Oklahoma under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions occurred in this District and because Defendants maintain facilities, personnel, and operations in the district that are directly tied to the conduct alleged.

**D.      Overview of Facts Supporting Jurisdiction and Venue**

20. Plaintiffs are based in Oklahoma. Stevens Trucking is based in El Reno, and Western Flyer is based in Oklahoma City, both within this judicial district.

21. Oklahoma contains major interstate corridors (I-35, I-40, and I-44) that are integral to Defendants' interstate freight operations at issue in this case, as well as to Plaintiffs' operations. Through their deliberate and recurring use of these Oklahoma interstate corridors, Defendants establish ongoing operational contacts with this forum.

22. Defendant JB Hunt targeted Plaintiffs' contracts and business relationships involving major commercial trucking lanes extending hundreds of miles through Oklahoma, including a lane that went through the State of Oklahoma multiple times per day, almost year-round.

23. To carry out the unlawful conduct alleged herein, JB Hunt deliberately established and maintains a large trailer pool at Kimberly Clark's facility in Jenks, Oklahoma. JB Hunt then used that Oklahoma-based operation as a means to outbid Plaintiffs on subsequent Kimberly Clark freight opportunities. In connection with this facility, JB Hunt personnel interact daily with on-site dispatchers, guard-shack attendants, warehouse staff, and management to execute freight movements and support JB Hunt's ongoing commercial activities within Oklahoma and beyond.

24. CH Robinson maintains two facilities in Oklahoma City, where it houses logistics personnel and support staff serving regional customers and supporting its nationwide freight brokerage, account management, and local-customer operations.

25. CH Robinson uses its Oklahoma presence to target Oklahoma-based freight customers, including Armacell, LLC and Johnson Controls. Defendants targeted and diverted these customers from Plaintiffs, and that conduct forms part of the basis of the claims asserted in this action.

26. To service these accounts CH Robinson leaves multiple drop-trailers at Oklahoma based facilities, communicates routinely with Oklahoma-based personnel at these facilities, and dispatches drivers to these Oklahoma based facilities.

27. CH Robinson is registered to do business in Oklahoma.

28. TQL is registered to do business in Oklahoma and conducts multiple operations targeting Oklahoma, including targeting the Johnson Controls account.

29. Through its Oklahoma-directed operations, TQL pursued Johnson Controls freight routes by targeting Oklahoma lanes and facilities as part of its bidding strategy.

30. TQL secured Johnson Controls business that historically belonged to Plaintiffs, diverting those routes into TQL's brokerage network.

31. Through its brokerage operations, TQL dispatches hundreds of trucks across Oklahoma's interstate highways each day, establishing a substantial and ongoing operational presence in the state.

32. TQL maintains multiple Oklahoma customer relationships connected to these routes, embedding its brokerage operations in the Oklahoma marketplace.

33. TQL leaves multiple drop-trailers at Oklahoma based facilities, communicates routinely with Oklahoma-based personnel at these facilities, and dispatches drivers to these Oklahoma based facilities.

34. Defendants have purposefully availed themselves of the privilege of conducting substantial business activities within the state of Oklahoma, including regularly operating commercial trucking services, contracting with Oklahoma-based customers, and maintaining a continuous presence through its transportation logistics network.

35. Plaintiffs' claims arise out of or relate to Defendants' commercial transportation activities and contacts in Oklahoma, including tortious interference with Plaintiffs' customers and business relationships in Oklahoma and the shipment and movement of goods through the Western District of Oklahoma, which form an integral part of the events giving rise to the alleged harm in Oklahoma.

### III. THE PARTIES

36. Plaintiff Stevens Trucking Company is an Oklahoma corporation organized under the laws of Oklahoma with its principal place of business in Oklahoma.

37. Plaintiff Western Flyer Express, LLC is a limited liability company organized under the laws of Oklahoma with its principal place of business in Oklahoma.

38. Defendant JB Hunt is a Georgia corporation with a principal place of business in Arkansas. At all relevant times, JB Hunt was and is registered to do business in Oklahoma, conducts significant business in the State of Oklahoma, and maintains a registered agent in the State of Oklahoma.

39. JB Hunt may be served by and through its Registered Agent, Corporation Service Company, 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159-7653.

40. Defendant CH Robinson Company Inc. d/b/a C H Robinson Worldwide, Inc. is a Delaware Corporation with its principal place of business in Minnesota. At all relevant times, CH Robinson conducted significant business in the State of Oklahoma and maintains a registered agent in the State of Oklahoma. C H Robinson may be served by and through its Registered Agent, Corporation Service Company, 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159-7653.

41. C.H. Robinson International, Inc. is a Delaware Corporation with its principal place of business in Minnesota. At all relevant times, CH Robinson conducted significant business in the State of Oklahoma and maintains a registered agent in the State of Oklahoma. C H Robinson may be served by and through its Registered Agent, Corporation Service Company, 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159-7653.

42. C.H. Robinson Company, LLC d/b/a C.H. Robinson Worldwide is a Delaware Corporation with its principal place of business in Minnesota. At all relevant

times, CH Robinson conducted significant business in the State of Oklahoma and maintains a registered agent in the State of Oklahoma. C H Robinson may be served by and through its Registered Agent, Corporation Service Company, 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159-7653.

43. C.H. Robinson Worldwide, Inc. is a Delaware Corporation with its principal place of business in Minnesota. At all relevant times, CH Robinson conducted significant business in the State of Oklahoma and maintains a registered agent in the State of Oklahoma. C H Robinson may be served by and through its Registered Agent, Corporation Service Company, 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159-7653.

44. Defendant Total Quality Logistics, LLC ("TQL") is an Ohio Domestic Limited Liability Company with its principal place of business in Cincinnati, Ohio. Defendant TQL is a foreign entity transacting business in the State of Oklahoma but has failed to appoint and/or maintain a registered agent. Therefore, Defendant TQL may be served by and through the Oklahoma Secretary of State, located at Colcord Center, 421 NW 13th Street, Suite 210/220, Oklahoma City, Oklahoma 73103, for forwarding to Defendant's Registered Agent, Taft Service Solutions Corp., 301 East Fourth Street, Suite 2800, Cincinnati, Ohio 45202. *See* Fed.R.Civ.P. 4(h)(1)(A) and 18 O.S. § 1136.

## IV. <u>OVERVIEW OF THE TRUCKING INDUSTRY</u>

### A. <u>Trucking Regulation and Licensing of Companies and Drivers</u>

45. Freight "motor carriers" and freight "brokers" in the United States are both regulated under federal law.

46. Trucking companies in the United States may be registered as a motor carrier, a broker, or both. Whether a trucking company is acting as a motor carrier or a broker on a given freight load is a question of fact that cannot be determined solely by the type of licensure(s) the trucking company holds.

47. The Department of Transportation must issue a DOT number for a trucking company to become a properly licensed motor carrier in the United States.

48. A trucking company is required to operate under that DOT number and report several categories of information, including truck and driver count, home terminal address, corporate officers, and miles per year to the FMCSA.

49. Congress created the FMCSA to reduce crashes, injuries, and fatalities involving commercial motor vehicles. FMCSA fulfills that mandate by promulgating and enforcing the Federal Motor Carrier Safety Regulations and overseeing carrier safety.

50. FMCSA has enacted safety rules governing things like driver fatigue, use of drugs and alcohol, and other unsafe driving practices. Fatigue-related regulations include restrictions on drivers' hours of service.

51. The FMCSA tracks motor carrier crash data and may initiate an enforcement action when a carrier is involved in an excessive number of crashes or fatalities.

52. For the FMCSA to work effectively, trucking companies must operate all drivers, trucks, and operations under the DOT number assigned by the Department of Transportation because a company's safety record is tied to its DOT number.

## B.   The Rise of Freight Brokerage

53.   Historically, the trucking industry consisted primarily of "asset-based" motor carriers—trucking companies that own trucks and trailers and directly employ drivers.

54.   An asset-based carrier that operates continuously under one DOT number for many years typically understands the importance of safe operations, both to protect the public and to protect the carrier's finances. A history of excessive safety violations negatively impacts that asset-based carrier's ability to acquire business. And if a crash occurs, asset-based carriers are directly responsible for the actions of their employee drivers, resulting in large out-of-pocket costs and an increase in insurance premiums if safety standards have been violated.

55.   Given the importance of safety for traditional asset-based carriers, industry numbers show that more than 40% of their operating cost each month is dedicated to driver pay. When carriers prioritize running safe operations, they prioritize hiring safe drivers who, in turn, earn a good wage by staying within the safety rules.

56.   Beginning in the early 2000s, the freight industry experienced significant growth in brokerage-based logistics models. Rather than directly operating trucks and employing drivers, these brokerage operations serve as middlemen—arranging transportation by connecting shippers with other motor carriers. JB Hunt used to be a large asset-based carrier. Now it is primarily a freight broker.

57.   The expansion of brokerage divisions presented an appealing business model. It allowed companies to grow freight volume without making proportional

investments in trucks, trailers, or driver payroll. By coordinating shipments performed by other carriers, companies could increase revenue while limiting capital expenditures.

58. Alongside the reduction in operating expenses, brokerage models also created an opportunity to strategically shift operational risk. By structuring transactions around third-party carriers, companies could distance themselves from the day-to-day realities of vehicle operation, driver oversight, regulatory compliance, and perhaps most importantly (to the brokers) crashes and violations.

59. In short, the brokerage model allowed companies like Defendants to market themselves as safe and compliant service providers while allocating primary responsibility for safety and regulatory compliance to independent carriers performing the haul.

60. The Defendants in this case operate within that brokerage framework. But Defendants knowingly contract with carriers that disregard safety and regulatory obligations, which results in no one taking responsibility for the safety of drivers and equipment on American roads. The disastrous consequences fall on truck drivers, the driving public, and safety-compliant trucking companies such as Plaintiffs.

C. **Defendants Invent Demand Through a Claimed "Driver Shortage."**

61. In the late 2010s, Defendants were increasingly unhappy with the cost of labor (carriers and drivers) needed to haul their customer's freight.

62. Labor cost is approximately 40% of a legitimate trucking company's "per-mile" operating cost per truck. The cost per truck is traditionally fixed; fuel, truck purchases, permits, tires, and tolls are all relatively the same for each competitor.

63. Labor cost, thus, presented a significant opportunity to maximize Defendants' per-load margins. And Defendants relied on an age-old marketing campaign to exploit that opportunity: Create the need; sell to the need.

64. To create the need, Defendants began promoting a "truck driver shortage" in the U.S. There was no actual driver shortage.[1] Defendants did not want to pay willing drivers a living wage.

65. Defendants promoted the narrative of a "truck driver shortage" through their marketing materials and their trade group, the American Trucking Association ("ATA").

66. In 2021, the CEO of CH Robinson stated in CNBC interviews that immigration would help "alleviate" the nationwide truck driver shortage.

67. JB Hunt and ATA lobbied the Department of Transportation in 2021 to loosen licensing and immigration regulations.

68. In response, Illegal Carriers exploiting foreign labor sources began to crop up to meet Defendants' "need" for cheaper drivers. This is when the decline of the great American trucking company began.

**D.      CDL issuance spikes in response to Defendants' "trucker shortage."**

69. Following Defendants' "driver shortage" marketing campaign, in just one year (January 2021 to January 2022) the issuance of commercial driver's licenses ("CDL") increased by 72% from the prior year, translating to 876,000 additional CDLs—a high

---

[1] *See* TIME, *The Truck Driver Shortage Doesn't Exist. Saying There Is One Makes Conditions Worse For Drivers*." (Alana Semuels, Nov. 12, 2021) *available at* https://time.com/6116853/truck-driver-shortage-supply-chain/ (last visited 2/18/2026).

percentage of which went to drivers from countries with vast economic disparities and populations vulnerable to economic exploitation. Most of these new drivers began contracting for freight loads through brokers.

70. Since Defendants' "driver shortage" claims began, there has also been a significant increase in the issuance of non-domiciled CDLs. A non-domiciled CDL is a temporary CDL issued by state licensing authorities to individuals who are legally domiciled in countries other than the U.S., Mexico, or Canada. A non-domiciled CDL typically expires upon the expiration of the holder's authorized stay in the U.S.

71. Although foreign nationals have historically been permitted to obtain CDLs, such drivers represented only a small fraction of truck drivers in the U.S., until recently.

72. This spike in newly issued CDLs to foreign drivers expanded the pool of available commercial drivers. When combined with the exploitation of those drivers through depressed wages, it enabled large brokerage companies like Defendants to dramatically increase low-cost driving capacity.

73. But the emergence of this low-cost capacity negatively impacted the safety of our Nation's roads.

74. According to Department of Transportation data, the number of fatal crashes involving commercial motor vehicles rose from 4,821 in 2020, to 5,733 in 2021, and to 5,837 in 2022. That is a 20% increase in fatalities in just two years.

75. In the fall of 2025, the FMCSA issued new interim rules governing the issuance of non-domiciled CDLs with the goal of "restor[ing] the integrity of the commercial driver's license (CDL) issuance processes by significantly limiting the

authority for [states] to issue and renew non-domiciled commercial learner's permits (CLPs) and CDLs to individuals domiciled in a foreign jurisdiction."[2]

### E. The Emergence of Illegal and "Chameleon" Carriers

76. In the past several years, coinciding with the rise in foreign CDL holders, there has been a marked increase in the number of foreign-owned, DOT-registered carriers that unlawfully exploit foreign nationals to drive freight trucks in the U.S. These Illegal Carriers share several common hallmarks: they (1) list ghost addresses with the DOT to conceal their large terminals where they operate multiple fraudulent carrier entities; (2) are severely underinsured and often commit insurance fraud; (3) employ a large number of under-trained foreign nationals, many of whom cannot speak English; (4) substantially underpay their drivers through lease-to-own servitude arrangements; (5) rely heavily on drivers with non-domiciled CDLs; (6) have abysmal safety records; (7) violate driving hours limitations; and (8) alter logbooks to cover up hours-of-service violations.

77. Among these Illegal Carriers are countless "chameleon carriers." A "chameleon carrier" is a fraudulent trucking company that operates by shutting down a previous entity with a poor safety record and then reopening the same operation under a new name and DOT number to obtain a clean slate with the Department of Transportation.

78. These Illegal Carriers operate under multiple DOT numbers to avoid compliance with regulations, defraud insurance, and circumvent enforcement actions.

---

[2] *See www.federalregister.gov/documents/2025/09/29/2025-18869/restoring-integrity-to-the-issuance-of-non-domiciled-commercial-drivers-licenses-cdl* (last visited 2/18/2026).

79. These Illegal Carriers often function as one company, with one owner, but break their operations into multiple names and DOT numbers so they can close a shell company and open another overnight in the event of a fatal crash or major safety violation.

80. Federal law prohibits motor carriers from using changes in identity, registration, or DOT numbers to evade compliance with safety regulations or to conceal a history of violations. 49 C.F.R. § 386.73.

81. Federal law makes it a felony to use any trick, scheme, or device to knowingly and willfully falsify, conceal, or cover up a material fact in a written application, statement, or representation to the FMCSA or the Department of Transportation. 49 C.F.R. § 390.35; 18 U.S.C. § 1001.

82. Brokers must look for indicia of Illegal Carriers to avoid hiring unsafe carriers who willfully violate FMCSA regulations and endanger public safety.

**F.** **Super Ego**

83. One of Defendants' primary Illegal Carriers is Super Ego.

84. Super Ego was CH Robinson's 2025 1000+ trucks "Carrier of the Year."

85. Super Ego entities (Sam Express and Tutash Express) were TQL "Elite Carriers" in 2025.

86. Super Ego entities are regular carriers for JB Hunt.

87. Super Ego is a holding company with operations based out of Serbia. Super Ego does not have a motor carrier number but instead is a holding company that operates over 70 chameleon carriers in its freight network. Super Ego has publicly claimed it operates over 10,000 trucks in the U.S.

88. Super Ego requires payment to be made to a Super Ego "factoring" company, which then disperses funds into accounts for its chameleon carriers. This allows Super Ego to hide its chameleon carriers from the government and tax authorities.

89. Super Ego's chameleon carriers are constantly trading trucks back and forth in mass quantities, often after a crash or safety violation, or before insurance renewal.

90. For example, as the publicly available FMCSA data in the graphic below shows, a large number of Vehicle Identification Numbers ("VINs") move from one Super Ego carrier to another and then return to the original carrier later. This shell game lacks any legitimate purpose and is done to evade safety, insurance, and tax regulations.

| Top 15 Carrier-to-Carrier Equipment Flows: FROM CARRIER | TO CARRIER | VINs | HIGH |
|---|---|---|---|
| TRYTIME TRANSPORT LLC | ENLIGHTENED TRUCKERS OF AMERICA LLC | 228 | 45 |
| ROCKET EXPEDITING LLC | TRYTIME TRANSPORT LLC | 217 | 29 |
| TRYTIME TRANSPORT LLC | MISER LOGISTICS LLC | 130 | 21 |
| ROCKET EXPEDITING LLC | ENLIGHTENED TRUCKERS OF AMERICA LLC | 105 | 17 |
| TRYTIME TRANSPORT LLC | J & A LOGISTICS TRANSPORTATION LLC | 104 | 14 |
| ENLIGHTENED TRUCKERS OF AMERICA LLC | TRYTIME TRANSPORT LLC | 99 | 30 |

91. Drivers are instructed by their Super Ego carrier before each load which DOT number they are required to check in and haul under by dispatch based out of Serbia.[3]

92. Confidential Witness drivers confirm that dispatch personnel within the Super Ego network routinely instructed drivers to operate under rotating carrier identities and DOT authorities depending on the load assignment.

93. Below is a list of Confidential Witnesses ("CWs") who drove trucks for multiple Illegal Carriers (primarily Super Ego carriers) and were, thus, in a position to

---

[3] *See Ontiveros v. Rocket Expediting, LLC, et al.*, No. 1:25-cv-11069, Compl., ECF No. 1 (N.D. Ill. Sept. 12, 2025); *Atkinson v. Super Ego Holdings, et al.*, No. 1:22-cv-04127, Third Am. Compl., ECF No. 203 (N.D. Ill. Aug. 6, 2025).

personally observe and experience the factual allegations made herein. Because these CW drivers were given a bill of lading for each load they hauled, they could often personally see whether the load was brokered and which brokerage company was involved. These CWs provided copies of relevant bills of lading identifying Defendants, which will be provided in discovery. Each CW voluntarily provided information to Plaintiffs.

- CW1 drove a truck for Super Ego for one month in 2023 under its exploitative lease-to-own program. He was technically assigned to Super Ego affiliate Floyd, Inc, but also drove loads for several other Super Ego affiliates. He states, "Every load I hauled at Super Ego was a brokered load. There were no direct customer shipments." In addition, CW1 drove for non-Super Ego carrier MN89. He states, "[m]y experiences across all of these companies were virtually identical."

- CW2 drove for the "Super Ego network from approximately 2024 through 2025." The primary Super Ego affiliates CW2 drove for were Run Direct and Trans Solutions, Inc. He states that "[a]ll of our loads were brokered, and we were hauling for TQL, C.H. Robinson, and JB Hunt on a constant and recurring basis."

- CW3 was a driver in the Super Ego network from March 2025 to January 2026, hauling loads for affiliates AM Hotshot, LLC; Floyd, Inc.; Robert L Gast Inc.; TryTime; Enlightened Truckers of America; Rocket; and Miser. He states, "I hauled the majority of my loads for the Broker C.H. Robinson."

- CW4 was a lease-to-own driver for BND Global, a company connected to Floyd, Inc. within the Super Ego network based out of Chicago, from July 2025 to October 2025. He states that he hauled multiple loads for CH Robinson "where CH Robinson was listed as the 'carrier' on the Bill of Lading," and can identify those loads.

- CW5 was a driver for Chicago-based Illegal Carrier Load N Go, Inc. from April to June 2025. He was working under a lease-to-own arrangement and the manager who controlled his daily operations was based in Ukraine.

- CW6 drove for several Indian-owned and operated Illegal Carriers based in California over the course of his 13 years driving trucks. The last such carrier

was called New Generation. He states he regularly hauled loads for TQL and CH Robinson over the course of his time working for these companies.

94. These CWs tell a strikingly similar story. The carriers they drove for switched DOT numbers and names regularly; required drivers to drive beyond federal hours-of-service limits; manipulated electronic logging devices; paid drivers astonishingly low wages; and threatened them with penalties or further debt when they objected.

95. CW1 stated:

They all switch DOT numbers to evade enforcement. And they all use addresses in multiple states to disguise the fact that they are all controlled from the same Chicago-area network. The only variation is the name on the door.

96. Similarly, CW2, who drove for three different Chicago based carriers (including Super Ego entities) in 2024 and 2025, stated:

The switching of DOT numbers was constant and routine across all three companies. I ran under three different DOT numbers for three different Chicago-based companies. If the company received a load from a broker and did not want to use a particular DOT number, the company would email me a different company name and DOT number and instruct me to tape it to the side of the truck. The procedure was specific: approximately one mile before the pickup location, I was required to put up the name and DOT number the company wanted displayed. After making the pickup, I would remove it. Then, approximately one mile before the delivery location, I was required to put it back up for the delivery. This was a requirement of the job — not a suggestion.

97. In 2025, CW3—who drove trucks for several Super Ego entities—asked dispatch personnel about the discrepancy between his assigned carrier and the carrier name he was asked to check-in under. The Super Ego dispatcher texted this explanation back:

If I did not explain this earlier, Super Ego Holding is a mother company, we have several daughter companies, and I will always let you know as which company to check in so we do not get in trouble on shipper. This is what we do for years, it is all good, those are all our companies …

98. CW3 also explained that, despite operating under the same DOT registration throughout his entire time with Super Ego, "SuperEGO dispatch instruct[ed] me to check in at shippers to haul freight under various . . . company names (Floyd Inc., Robert L Gast Inc., TryTime, Enlightened Truckers of America, Rocket, & Miser)." CW1 and CW2 also describe hauling freight under multiple carrier designations while receiving all routing, scheduling, and operational instructions from the same dispatcher.

99. Videos online show Super Ego carriers switching DOT numbers by merely removing one sticker and replacing it with another—much like CW2 described.[4]

 

100. Super Ego carriers have an unprecedented number of safety violations.

101. Tutash Express, Inc., depicted above, has been cited for 929 safety violations and 58 crashes, and has been shut down by the FMCSA on multiple occasions—only to be

---

[4] American Truck Drivers and Live Trucking, *www.facebook.com/ATruckDrivers/videos/suspicious-activity-driver-caught-changing-mc-numbers-in-the-field-18wheeler-tru/663318819994893* (law accessed Feb. 7, 2026).

re-opened later with the same ownership, organizational structure, and trucks. Tutash Express 1, LLC, for example, was shut down by the FMCSA in 2024 and continued operating under the names Tutash Express, Inc. and Sam Express.

102. Trytime Transport has been cited for at least 1,257 safety violations, 104 crashes, a vehicle- and driver-out-of-service rate twice the national average, lists a ghost address in Ohio as its place of business to conceal its terminals in Chicago, and its trucks share VIN Numbers with at least 3 other Super Ego affiliates.

103. Collectively, Super Ego entities account for over 3,000 recorded safety violations, 266 crashes, and over 1,500 fraudulent equipment transfers in violation of FMCSA regulations.

104. Super Ego relies not only on chameleon carriers to evade authorities, but also on fraudulent manipulation of federally required electronic logbooks, which they accomplished in multiple ways.

105. For example, CW1 states:

Super Ego provided a 1-800 number for drivers to call when they ran out of available hours on their electronic logs. The process was simple and routine: when you ran out of hours, you called the Serbian 1-800 number, told them your truck number and company, and within three minutes to one hour you had fresh logs with a full set of new hours. This was the standard operating procedure at Super Ego. It was not a secret — it was how the company functioned.

106. CW4 drove for Super Ego entity BND Global in 2025, and stated:

Without my consent on several occasions my electronic logbook would be automatically "reset" to provide additional hours of service beyond the legal limit. For example, I would often run out of my 70 hours I am allowed to work during a week. Usually when I had about 25 of my 70 hours left, my

electronic logbook would be automatically reset. This means that BND had to be monitoring my electronic logbooks overseas.

107. CW4's Illegal Carrier also bribed him to avoid weigh stations in Oklahoma, and he captured the request through a screenshot on his phone:



108. CW6 who drove for non-Super Ego entities, experienced a different method of log manipulation that achieved the same result, stating:

I was required to falsify my logbooks. Specifically, I was given team loads as a solo driver and required to put down my boss or a name of a family member as a co-driver. This was done so I could "switch" between drivers and falsify my driver time. … The dual logbook system allowed the company

to conceal the true number of hours I was driving by splitting my actual hours across two identities.

109. While working for Super Ego entities, CW3 recorded a video on his cell phone showing Super Ego dispatch illegally re-setting his logbook in January of 2026 to force CW3 to haul a CH Robinson load from Illinois to Pennsylvania nonstop.

110. All CWs described a logbook manipulation scheme deployed by their respective Illegal Carriers. Other drivers working for Illegal Carriers have reported these logbook manipulations to the press.[5] The result is that, if the driver is pulled over by law enforcement or involved in a crash, the driver will appear to be operating legally.

111. Drivers in these situations are often allowed only 3-5 hours of sleep per day, and if the drivers refuse to break the hours-of-service rules, they are threatened and coerced.

112. If the driver stops driving or fails to answer his phone, the company will often report the truck "stolen," causing the driver to be arrested. Given the driver often does not have proper immigration status, or is fearful of deportation, the driver will continue to drive despite the risk to his life and the lives of others.

113. Drivers for Illegal Carriers are often paid less than minimum wage and forced to work under duress.

114. CW1 stated, "[f]or an entire month of work at Super Ego—driving thousands of miles, working around the clock, seven days a week—I made a total of $100;" that is, "[o]ne hundred dollars for a full month of working 20+ hours a day seven days a week."

---

[5] *See* Catrina Barker, THE CENTER SQUARE, (Aug 20, 2025), www.thecentersquare.com/illinois/article_ee63c06b-1492-4b14-8f8f-a6f7bee0ba57.html.

115. CW2 stated:

The company had me driving 5,000 to 6,000 miles per week. Federal hours-of-service regulations would make it physically impossible to legally drive this many miles in a week. For the entire month I worked at Super Ego, I averaged approximately two hours of sleep per night. Seven days a week. I ran one load of 1,800 miles straight without a break, without rest, without stopping for anything other than fuel.

116. The average long-distance driver should earn anywhere from $70,000 to $90,000 per year (or more), whereas immigrant "contract" drivers hauling for Illegal Carriers drive twice the hours and earn well less than $20,000 a year without benefits.

117. Super Ego and other Illegal Carriers also target vulnerable U.S. Citizens who have failed a drug test or been involved in a prior crash, promising to give these drivers a second chance and a good living.

118. CW4 found himself in this situation, stating:

I was previously disqualified from my prior employer … which limited my options as a truck driver. I was recruited by BND Global through a Facebook advertisement via direct message. This message promised me the opportunity to own my own truck and to make 75% of the load. This would equate to approximately $2,100 to $2,500 a week in my pocket. It looked like a great opportunity.

119. However, this was all a lie: "Immediately it became clear that I was going to be forced to haul well over the allowed hours of services," CW4 states. "They had isolated me, put me into a lease to own where I could never pay off the truck and pay my bills, kept forcing me to run illegal which made me afraid to ask for help from law enforcement or others, and worked me over 125 hours a week with less than five hours of rest per night."

120. Drivers working for Illegal Carriers usually have no choice but accept the conditions and pay due the forced-labor arrangements Illegal Carriers employ.

121. Since 2022, over 600 former Super Ego drivers have come forward and outlined how Super Ego's predatory schemes force drivers into slave-like conditions.[6]

122. Super Ego dispatchers alter rate confirmations to decrease driver pay. For example, if a load pays $1,500, the dispatcher will edit it and tell the driver it's $1,300.[7]

123. Super Ego deducts drivers' pay for truck and trailer leases and for significant and unlawful upcharges for fuel, escrow, insurance, maintenance, and electronic logging fees. These deductions are so extensive that some drivers who drive more than 5,000 miles per week (which is over 125 hours of work) receive negative settlement sheets.

124. CW3 stated, "I hauled the majority of my loads for Broker C.H. Robinson and was force dispatched (forced to take loads that I did not choose as a contractor)." He further explained that, because of the lease-to-own arrangement, "I believe that my pay over a 7 day work week after the aggressive deductions would come to well below minimum wage for the actual hours worked despite me sometimes driving for 80-90+ hours per week which is well above the Federal Driving Hours of Service Limits." *Id.*

125. CW4, who was also driving under the lease-to-own arrangement, stated:

> For 126 hours a week, my actual pay each week was approximately $200-$600 a week after aggressive deductions. I was charged for multiple hidden fees that were not revealed until I was already in Chicago (on a one-way ticket) and provided a truck. This included non-descript impossible to trace escrow fees, electronic logging device fees, "cargo" and "trailer" fees, fees for paying for tickets I received because the company refused to register the truck and forced me to drive on an illegal paper plate.

---

[6] *Atkinson*, No. 1:22-cv-04127, ECF No. 203; *Ontiveros*, No. 1:25-cv-11069, ECF No. 1.

[7] *Atkinson*, No. 1:22-cv-04127, ECF No. 203.

126. CW4 provided the following weekly pay stub from his Super Ego carrier:

**BND Global LLC**
**4831 N Normady Ave**
**Chicago, IL 60656**

**Trips :**

| Trip No. | Description | Mileage | Freight Amt. | Date | Amount |
|---|---|---|---|---|---|
| 32189.00 | West Memphis, AR-Lenoir, NC | 711.00 | $1400.00 | 09/16/25 | $1,050.00 |
| 32261.00 | Morristown, TN-Virginia Beach, VA | 643.00 | $1200.00 | 09/17/25 | $900.00 |
| 32276.00 | Norfolk, VA-Charlotte, NC | 344.00 | $900.00 | 09/18/25 | $675.00 |
| 32473.00 | Spartanburg, SC-Selma, TX | 1223.00 | $1700.00 | 09/19/25 | $1,275.00 |
| | | | | Total: | **$3,900.00** |

**Deductions :**

| Description | Date | Amount |
|---|---|---|
| 08/30 Truck 260, PM Service 2/2 | 09/02/25 | ($279.81) |
| Fuel 09/16-09/20 | 09/23/25 | ($1,831.15) |
| Truck | 10/01/25 | ($620.00) |
| Trailer | 10/01/25 | ($400.00) |
| Cargo | 10/01/25 | ($300.00) |
| | Total: | **($3,430.96)** |

| | Check Amount: | **$469.04** |
|---|---|---|

The deductions resulted in CW4 being paid 16 cents per mile.

127. It is no wonder that Super Ego raised enough capital to grow from 30-50 trucks in 2020 to over 10,000 trucks by 2025.

128. For context, it took Western Flyer and Stevens Trucking a combined 77 years to build an operation of over 1,300 trucks between them.

129. Super Ego's collection of Illegal Carriers makes its network one of the top ten for-hire, long-haul trucking companies in the U.S. and the largest privately held trucking company in the U.S., with revenue likely exceeding a billion dollars annually.

130. Despite this, Super Ego carriers all carry minimal insurance policies and utilize state-run, high-risk insurance funds because traditional trucking insurance will not underwrite the risk. When a crash occurs, the trucks are often excluded as "not covered

vehicles" because they have not been disclosed on the schedule of insurance. Coverage is then often declined, and the injured victims are often left with nothing.

### G.    Defendants Profit from Illegal Carriers' Labor Exploitation

131.    Defendants have increasingly utilized Illegal Carriers and their low-cost non-employee drivers to underbid traditional motor carriers, including Plaintiffs, despite both the safety risks and the public and contractual representations to the contrary.

132.    This provides carrier/brokers like Defendants with a significant competitive advantage if profit, rather than safety, becomes the dominant concern.

133.    To maintain the appearance of safety when selling themselves to customers, Defendants focus on their history of using well-qualified drivers and the safety records they established over the previous decades as traditional asset-based carriers without fully disclosing their new business practices (and their reliance on Illegal Carriers).

134.    Indeed, it is imperative for brokers like Defendants to promote themselves on their ability to provide safety and compliance given that—in their role as middlemen—their only true value to shippers is in being able to link them with quality carriers.

135.    Defendants will often represent to the customer that it is acting as the motor carrier by utilizing Defendants' own trailers, promising insurance in excess of the FMCSA minimum requirements, promising care, custody, and control of the cargo, and that Defendants will ensure compliance with all FMCSA policies and procedures.

136.    Defendants also track the cargo from pickup to destination, make "check calls" to communicate with the drivers regarding progress, and assume all responsibility for the cargo if a crash or accident occurs.

137. Moreover, Defendants' list themselves as "carriers" on the bills of lading, instead of the Illegal Carrier entities. Examples include: January 2026 CH Robinson Bill of Lading Number 207499; CH Robinson Bill of Lading Number 207439; JB Hunt Bill of Lading Number 2TG5912; JB Hunt Bill of Lading Number 5070500372; April 29, 2023 TQL Bill of Lading Number 003700008837482392; and May 30, 2024 TQL Bill of Lading for a shipment from Selkirk, New York to Sandford, North Carolina.[8]

138. But after a crash involving a catastrophic injury or fatality, each Defendant claims that it is registered merely as a broker, not a carrier, and therefore claims not to be legally responsible for the accident.

139. Defendants will then rely on their purported broker-only status (despite representations to the contrary) to claim they are not required to report the crashes on their federal safety records. This allows Defendants to maintain, or even lower, their already favorable per-mile safety violation record, which they, in turn, market to obtain additional business and to maintain or decrease their insurance premiums.

140. This undisclosed use of extremely low-cost drivers operating under the DOT numbers of Illegal Carriers has enabled Defendants to underbid traditional motor carriers including Plaintiffs, resulting in significantly increased profits for Defendants.

---

[8] These examples come from confidential witnesses as well as Counsel's own investigation into fatalities involving JB Hunt, TQL, and CH Robinson over several years.

## V. DEFENDANTS' CARRIER NETWORKS FUNCTION AS A BROKERAGE ENTERPRISE OPERATED WITH ILLEGAL CARRIERS

### A. Defendants' Carrier Network Hubs

141. On May 6, 2019, JB Hunt released "JB Hunt 360" as part of its brokerage operations. JB Hunt 360, interchangeably referred to as "360 Box," utilizes JB Hunt trailers, JB Hunt technology, and "contractor" drivers through the JB Hunt trailer network.

142. While JB Hunt was publicly promoting a "driver shortage," JB hunt privately laid off long-haul drivers. JB Hunt then pivoted to a reliance on its "Carrier Network."

143. Carriers within JB Hunt's Carrier Network (which includes Illegal Carriers) can access the 360 platform though Carrier 360 to bid on loads.



144. Similarly, CH Robinson operates an online Load Board where carriers and drivers can search for and bid on freight hauling jobs. Carriers can access a special load board by logging into CH Robinson's proprietary platform "Navisphere Carrier." This is where CH Robinson's brokerage enterprise lives, and it is where the other members in the enterprise, *i.e.*, Illegal Carriers, participate and contribute to the enterprise.

145. CH Robinson also uses the platform to direct Illegal Carriers on specific load quotas and commitments to CH Robinson customers, away from the public eye.



146.    Similarly, TQL provides a "Carrier Dashboard" for participants in its carrier network—including Illegal Carriers—to search for and bid on loads and lanes.



147.    Defendants' illegal enterprises operate within these online bidding platforms and tracking programs.

**B.    Defendants Broker and Subcontract to Illegal Carriers to Lower Labor Costs and Undercut Competitors**

148.    Brokers in the logistic industry derive their profits from the margin between what their customers will agree to pay to ship the load and what the carrier will agree to accept to haul the load.

149. Prior to 2021, the margin per load was 5 to 8%. Trucking companies competed over pennies, and bids were only lost by a few percentage points.

150. Brokers, recognizing the advantage that Illegal Carriers provided, have increased their margins to 15% to 20%. Indeed, Defendants all target margins of over 15%.

151. Customers have not agreed to pay more. Rather, with the benefit of the illegally depressed labor costs from their Illegal Carrier partners, Defendants can attain bids for less while still pocketing a greater margin because of how little the Illegal Carriers charge (and how even littler they pass onto their drivers). The less Illegal Carriers pay their drivers, the less they charge, the more margin Defendants can pocket as profit.

152. Meanwhile, Plaintiffs must haul at or near a loss on almost every load.

153. TQL and CH Robinson pay their logistics managers a commission based upon the margin they obtain, incentivizing the managers to hire the cheapest labor possible.

154. Defendants also incentivize their salesforce to keep shipping customers paying as high a price as possible (therefore not passing savings on to consumers).

### i. **CH Robinson**

155. In approximately 2021-2022, CH Robinson's "Carrier Representatives," who are employed by CH Robinson, began recruiting and growing its Illegal Carrier network, specifically working with Super Ego and its affiliates.

156. As Bruce Johnson, former head of Carrier Services, testified in a sworn deposition on January 22, 2026, CH Robinson would secure customer loads by bidding below the bids of asset-based carriers. After winning the bid, CH Robinson would then

"source" Illegal Carriers through the use its Carrier Representatives and its proprietary load board to tender the loads directly to Super Ego and other Illegal Carriers.

157. In 2022, Western Flyer was CH Robinson's Large Carrier of the Year.

158. In 2025, Super Ego was named CH Robinson's Carrier Large Carrier of the Year, boasting at the ceremony that Super Ego operates a network of over 10,000 trucks.

159. Johnson testified that CH Robinson is aware that Super Ego (a) lacks DOT Motor Carrier authority, (b) operates multiple "subsidiaries," and (c) is based in Serbia.

160. Despite knowledge of these Illegal Carriers' misconduct, CH Robinson intentionally utilizes these companies to lower labor costs nationwide, increasing its profit margins and gaining a significant competitive advantage.

161. By working with Illegal Carriers, from 2022 to present day, CH Robinson was able to underbid both Western Flyer and Stevens Trucking on the Johnson Controls account and several others that continue to be identified. In addition, CH Robinson utilized drop trailers, was listed as the carrier on the bill of lading, and agreed to assume care, custody, and control of Johnson Controls shipments, despite intentionally refusing to register with the FMCSA as a "motor carrier."

162. CW4 provided this Bill of Lading from his time working for the Super Ego network in July of 2025 showing CH Robinson as the "Carrier."



163. Super Ego and its carrier network, as well as the other Illegal Carriers used by CH Robinson, do not meet Johnson Controls' contractual requirements. Without CH Robinson bidding as its proxy, Super Ego could not have secured the contract. Conversely, without Super Ego supplying unlawfully cheap labor, CH Robinson could not have submitted a bid as low as it did.

### ii. JB Hunt

164. An investigation conducted by Plaintiffs from June through September 2025, revealed that multiple Illegal Carriers were hauling freight for JB Hunt.

165. These companies owned 10,226 trucks and were responsible in the last 24 months for 835 crashes, 9,175 safety violations, and over 1 billion miles on America's roadways, according to public data available through subscription (which Plaintiffs have).

166. Examples from this extensive list include companies within the Super Ego network that have recently been involved in major fatal crashes, including Tutash Express, Aravan Cargo, Orozco Trucking, Inc., and Enlightened Truckers of America.

167. At least three of these carriers listed above had drivers detained in the recent Operation Guardian in Oklahoma where it was determined that the drivers for these companies lacked any valid paperwork.[9]

168. On June 28, 2025, Hope Trans, another Super Ego affiliate, was involved in a crash near Terrell, Texas, that killed five people. The driver reportedly fell asleep and was falsifying his logs. A subsequent investigation into Hope Trans, LLC revealed that its overseas dispatch accessed drivers' electronic logbooks to add more hours[10]

169. After the crash, JB Hunt continued to utilize Hope Trans.

170. JB Hunt is plainly aware of the Illegal Carriers it engages. JB Hunt employees routinely comment on "Strong Solo Sergey" posts. Drew Taylor, a JB Hunt broker agent in November of 2024, commented on social media about Strong Solo Sergey, quipping that Strong Solo Sergey "could visit all states with no sleep loss," and exclaimed, "Never sleep! Sergey will make America drive again!" Taylor joked in the same post "you know he's from Chicago" (Super Ego headquarters).

171. Other examples include: Zarif Umarov, a non-domiciled CDL holder driving a JB Hunt load through an Illegal Carrier, was involved in a double-fatality crash in West Texas on September 27, 2023; in October of 2023, an Uzbekistan National driving for Illegal Carrier "Borderlands" came into oncoming traffic and killed two people in front of

---

[9] https://oklahoma.gov/governor/newsroom/newsroom/2025/governor-stitt-announced-major-operation-guardian-sweep-along-i-0.html

[10] https://www.youtube.com/watch?v=PSiuscA35Cg WFAA "blind spots" investigative reporting.

their three minor children. JB Hunt was listed as the carrier on the bill of lading in both of these crashes. And in both instances, JB Hunt represented to the customers that its drivers would be hauling the load—not Illegal Carriers.[11]

172.    In 2019, JB Hunt was briefed by the Arkansas Trucking Association on the current threat posed by non-domiciled CDL drivers operating in the illegal networks discussed above; it acknowledged the risks internally as well.

173.    In the years that followed, JB Hunt recognized a disproportionate number of crashes that involved non-domiciled CDL drivers to whom it had brokered loads, despite the introduction of advanced safety technologies.

174.    Internal JB Hunt memoranda and risk assessment documents noted the danger involved in continuing these practices while recognizing that well-established American-run companies (like Plaintiffs) did not present the same safety risk.

175.    Despite knowledge of these problems, JB Hunt intentionally continues to utilize these Illegal Carriers to lower labor costs nationwide, increase profit margins, and gain a significant competitive advantage.

176.    JB Hunt would not have been able to underbid on the Ford, Barry Global Plastics, and Kimberly Clark contracts that had historically gone to Plaintiffs without its access to the Illegal Carriers' labor sources.

177.    These Illegal Carriers also fail to comply with the contractual safety and compliance requirements JB Hunt agrees to when carrying or brokering loads for Kimberly

---

[11] *CC. et. al v. JB Hunt Transport, Inc. et. al.*, 3:24-CV-0864, Deposition of Steve Umbower, ECF No. 169-5, 10-11; 22-23 (D. Ariz. December 2, 2025).

Clark and Ford. All three companies forbid the use of forced labor, which JB Hunt's Illegal Carriers utilize extensively.

### iii. TQL

178. TQL also extensively relies on the Illegal Carriers' low-cost labor.

179. In 2025, TQL named Super Ego affiliates Sam Express and Tutash Express "elite carriers for drop trailer services and full truckloads."

180. On February 3, 2026, four people were killed in Indiana when a non-domiciled driver tied to those same Super Ego affiliates failed to stop in traffic.

181. In multiple contracts with shippers, TQL agrees to (a) ensure drivers and carriers comply with FMCSA regulations, (b) take care custody and control of the load in question, (c) maintain insurance coverage well in excess of $1,000,00.00, (d) provide TQL labeled drop trailers, and (e) implement programs to prevent forced labor.

182. TQL is consistently placed on the bill of lading in order to obscure the Illegal Carriers. For example, on May 16, 2023, TQL was listed as the carrier on a load for Tesla from Atlanta to Palo Alto, but TQL hired an Illegal Carrier to move the load.

183. TQL is not registered as a motor carrier despite acting as one.

184. According to two former TQL broker account executives who spoke to Plaintiffs, TQL operates what its own employees describe as a "boiler room" environment where junior account executives must make 300 cold calls to prospective customers per day and face termination if they fail to meet weekly, monthly, and annual sales quotas.

185. The result is a system where underpaid, overworked brokers operating under threat of termination are incentivized to find the cheapest carriers possible—creating the exact conditions that allow Illegal Carriers to thrive.

186. This high-pressure, quota-driven environment feeds directly into a race to the bottom in carrier selection and freight rates. TQL's singular goal, as Judge Barrett in *Hendricks v. Total Quality Logistics, LLC et. al.* found, is "to book them at the lowest possible rate."[12]

187. TQL employees are among the most frequent social media posters discussing the exploitation of foreign drivers. For example, TQL employee James Shephard liked the following Facebook post from November 2025.




---

[12] Judge Michael Barrett's Findings of Fact in *Hendricks v. Total Quality Logistics*, No. [Case No.], S.D. Ohio (Sept. 26, 2023) found that TQL's " practices violated the Fair Labor Standards Act — a conclusion reinforced by two U.S. Department of Labor Wage and Hour Division investigations in 2017 and 2018.

188. Without engaging in the conduct above, TQL would not have been able to take significant business from the Plaintiffs, including but not limited to Johnson Controls.

**C.      Defendants Knowingly Benefit from Forced Labor.**

189. The unreasonably low rates at which Defendants are able to bid is evidence of their reliance on the Illegal Carriers.

190. The American Trucking Research Institute ("ATRI") tracks the average marginal cost per mile across the trucking industry.



Table 8: Average Marginal Costs per Mile, 2015-2024

| Motor Carrier Costs | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Vehicle-Based* | | | | | | | | | | |
| Fuel Costs | $0.403 | $0.336 | $0.368 | $0.433 | $0.384 | $0.308 | $0.417 | $0.641 | $0.553 | $0.481 |
| Truck/Trailer Lease or Purchase Payments | $0.230 | $0.255 | $0.264 | $0.265 | $0.256 | $0.271 | $0.279 | $0.331 | $0.360 | $0.390 |
| Repair & Maintenance | $0.156 | $0.166 | $0.167 | $0.171 | $0.149 | $0.148 | $0.175 | $0.196 | $0.202 | $0.198 |
| Truck Insurance Premiums | $0.074 | $0.075 | $0.075 | $0.084 | $0.071 | $0.087 | $0.086 | $0.088 | $0.099 | $0.102 |
| Permits & Licenses | $0.019 | $0.022 | $0.023 | $0.024 | $0.020 | $0.016 | $0.016 | $0.015 | $0.009 | $0.009 |
| Tires | $0.043 | $0.035 | $0.038 | $0.038 | $0.039 | $0.043 | $0.041 | $0.045 | $0.046 | $0.047 |
| Tolls | $0.020 | $0.024 | $0.027 | $0.030 | $0.035 | $0.037 | $0.032 | $0.028 | $0.034 | $0.038 |
| *Driver-Based* | | | | | | | | | | |
| Driver Wages | $0.499 | $0.523 | $0.557 | $0.596 | $0.554 | $0.566 | $0.627 | $0.724 | $0.779 | $0.798 |
| Driver Benefits | $0.131 | $0.155 | $0.172 | $0.180 | $0.190 | $0.171 | $0.182 | $0.183 | $0.188 | $0.197 |
| **TOTAL** | **$1.575** | **$1.592** | **$1.691** | **$1.821** | **$1.699** | **$1.646** | **$1.855** | **$2.251** | **$2.270** | **$2.260** |

191. This ATRI chart shows that the cost per mile to move a load in 2022 and 2023 was approximately $2.26. Labor accounted for about 42% of that amount, or roughly $0.95 per mile, leaving a baseline non-labor operating cost of approximately $1.31 per mile—an amount which, as discussed above, is relatively inflexible across competitors.

### i.     **JB Hunt**

192.    During this time, however, JB Hunt routinely awarded loads to carriers who bid approximately $1.75 per mile, including the labor cost.

193.    This leaves only $0.44 per mile to be split between the driver and the Illegal Carrier's own profit margin. As shown above, Illegal Carriers often pay drivers far less than half of this. For example, CW4 was paid $0.16 per mile on the check stub above.

194.    JB Hunt tracks all bidding and rate data through its JB Hunt 360 platform.

### ii.     **CH Robinson**

195.    CH Robinson routinely brokers loads at rates well below ATRI's cost benchmarks. On October 1, 2025, for example, for the Johnson Controls account, CH Robinson post load no. 529743948, running from Park City, Kansas to Horn Lake, Mississippi and ultimately to Huntsville, Alabama, for $1.88 per mile for a 1,271-mile haul.

196.    After accounting for roughly $1.31 per mile in fixed non-labor operating costs, an Illegal Carrier would have only about $0.57 per mile remaining to pay its driver and keep a profit for itself.

197.    After the illegal surcharges Illegal Carriers impose on drivers, the driver may make as little as $0.10 per mile, which equates to only $3 an hour for a twenty-hour shift.

198.    Likewise, in recent bidding by CH Robinson for 2026 lanes offered by Armacell (a long-time customer of Plaintiffs), CH Robinson was able to bid at least 15% below Plaintiffs, including on lanes that originate in Yukon, Oklahoma—less than 20 miles from Plaintiffs' terminals. This means that CH Robinson would have to hire carriers to haul

the loads for *under* $1.88 a mile. Only Illegal Carriers exploiting labor can fill this capacity at such below-cost rates.

199.  In comparison, Plaintiffs historically competed with each other over a few percentage points for these Armacell lanes.

### iii.  **TQL**

200.  TQL consistently brokers loads at rates well below cost, including on the Johnson Controls account (another of Plaintiffs' historic customers).

201.  For example, TQL posted Johnson Controls load 7382687 from Wichita, KS to Lake Charles, LA (710 miles) for $900, which is approximately $1.27 per mile.

202.  Further examples include multiple 600-plus mile loads for Johnson Controls that TQL bid out at $1.83 a mile on September 20, 2025. These included loads from Morganfield KY, to Wichita, KS; Princeton, Indiana to Wichita, Kansas; Sturgis, Kentucky to Wichita, Kansas; and Grayville, Illinois to Wichita, Kansas.

203.  In 2024, TQL shipped multiple cross-country loads at under $1.60 a mile.

204.  Rates this low are now common for TQL. Plaintiffs' investigation into TQL's Illegal Carriers shows a pattern of TQL bidding multiple cross-country team loads out for less than $1.50 a mile.

205.  At these rates—and on the 20-hour shifts they are often required to work— drivers on TQL loads are making less than $3 per hour.

206.  TQL's massive market share allows it to depress rates across the country.

## VI.   DEFENDANTS DEFRAUD THEIR CUSTOMERS

207.   Despite their reliance on dangerous Illegal Carriers, Defendants continue to tout their safety records and trade on their well-established reputations. Defendants are defrauding their customers and making American roads more dangerous than ever.

### A.   JB Hunt's Misrepresentations and Omissions

208.   Utilizing the ecosystem of exploited foreign labor to underbid competitors, JB Hunt specifically solicits large customers, such as Ford, Kimberly-Clark Family Dollar, Armacell, and others, by pledging JB Hunt drivers and equipment—and the safe and compliant reputation that comes with them.

209.   Ford, Kimberly Clark, and Armacell all have contractual requirements to ensure no use of forced labor.

210.   JB Hunt's company motto is "capacity to deliver." JB Hunt advertises openly that its capacity is "qualified" and that it gives customers "unmatched access to capacity" without revealing that the "unmatched capacity" is a result of using Illegal Carriers.

211.   For example, on June 20, 2022, on www.jbhunt.com, which was directed toward potential customers such as Kimberly Clark, Ford and other Oklahoma shippers, JB Hunt made the following statement: "By leveraging company-owned assets **in addition to a pool of qualified third-party carriers**, we give our customers **unmatched access to capacity.**" JB Hunt also boasts of "match[ing] loads with **reliable, vetted, third-party carriers**" and providing "**best in class**" service.

212. JB Hunt, however, fails to tell its customers that long-haul loads are commonly hauled by Illegal Carriers that pose a substantial safety risk and/or rely on forced labor—which violates agreements with those customers and their policies.

213. JB Hunt's contracts with large customers typically require JB Hunt, ostensibly acting as the carrier, to comply with specific safety-related terms. For example, a January 31, 2016 Dollar Tree Distributions, Inc. contract required JB Hunt to:

    a.    Remain fully responsible for all freight at the moment of pickup;

    b.    Warrant compliance with federal guidelines and safety rules;

    c.    Ensure proper CDLs, English language proficiency; equipment, and abide by all speed limits for all drivers hauling loads;

    d.    Maintain 24-hour communication, driver conduct rules, and accident reporting requirements, with daily EDI 214 status pings and satellite/cell communication "required for every order;"

    e.    Provide for single customer service contact at JB Hunt; and

    f.    Maintain cell phone communication with every driver.

214. For many customers, JB Hunt warrants that JB Hunt drivers will be hauling customers' loads and that each of those drivers will meet the stringent contract requirements. In the event of a crash, however, JB Hunt takes a different position, asserting that it was instead acting as a broker and is thus immune from liability.

215. Sophisticated Fortune 500 companies such as Ford only utilize companies that project an exceptional safety culture with well qualified drivers.

216. JB Hunt leverages its customers' need for safe and compliant transportation services and markets itself as being able to meet that need, as it does in the following statements published on its website in June of 2022:

a. "The need for **qualified drivers** is higher than we could have anticipated, even a few years ago."

b. "Knowing the market is volatile, do you really want to have to find, hire, and retain drivers for your business?"

c. JB Hunt has "invested in people you trust that can take those stresses off."

d. "[F]inding and hiring truck drivers is something JB Hunt excels at. We possess an unwavering focus on company driver retention."

e. "Our founder, Johnnie Bryan Hunt, a truck driver himself, created this company with drivers in mind."

f. "His **driver-centric vision** survives to this day throughout our driver recruitment and retention efforts."

g. "[W]e have access to a large pool of company drivers compared to our competitors. JB Hunt has **made investments to bolster our robust driver pool.**"

h. "RETAINING THE BEST IN THE INDUSTRY" – "[O]ne big reason that drivers choose to work for JB Hunt is because we operate a say-do company culture that places our people as a top priority."

i. "[G]et the **top drivers in the industry** on the road for you!"

217. JB Hunt has also engaged in a significant video campaign featuring its drivers. These videos, distributed through JB Hunt's website, its Facebook page, and other means, target potential customers including Ford, Barry Global Plastics and Kimberly Clark, emphasizing: "Safety can bring your business value."

218. In public comments, high level JB Hunt executives continually push the narrative that JB Hunt's commitment to safety is the core value of the company. For example, in a May 15, 2024, lecture, JB Hunt CEO Shelley Simpson stated: "In 2023 our people delivered record safety performances. Core to who we are is taking care of our drivers and the motoring public." This statement did not disclose the increased number of crashes by JB Hunt "contractors" that were not counted. Had they been, JB Hunt would not have delivered a "record" safety performance.

219. This false narrative carefully curated by JB Hunt is imperative for influencing customers such as Kimberly Clark and Ford in the freight bidding process.

220. JB Hunt knew from internal data that it was utilizing an exploited labor pool that significantly increased the safety risks its customers paid JB Hunt to minimize.

**B.** **CH Robinson's Misrepresentations and Omissions**

221. CH Robinson, in its agreements with the customers discussed herein, along with customers across its network, represents it will only utilize safe and compliant trucking companies and drivers.

222. For example, in the Code of Conduct agreement Armacell requires its suppliers (including logistics partners) to sign, Armacell requires that its suppliers:

- "must not use any indentured or forced labour, slavery or servitude;"

- "must set working hours, wages and over-time pay in compliance with all applicable laws;"

- "must work against corruption in all its forms, including extortion and bribery;" and

- "must . . . pa[y workers] at least the minimum legal wage or a wage that meets local industry standards."

The agreement also states that it "applies to any sub-contractor that provides goods or services to the supplier," stating further that the "supplier is fully responsible for ensuring compliance with any subcontractor as if it were the supplier itself."

223. CH Robinson brokers loads for Armacell and was required to sign this Code of Conduct digitally. That it did so, knowing it was brokering loads with carriers at prices that could only be achieved through the use of forced labor, is wire fraud.

224. CH Robinson's customer agreements also require it to follow all federal and state laws and make available certain levels of insurance.

225. In signing these contracts (which today is always done digitally), knowing it would be brokering loads with carriers at prices that could only be achieved through the use of forced labor, CH Robinson commits wire fraud on its customers.

C. **TQL's Misrepresentations and Omissions**

226. TQL, in its agreements with customers discussed herein, along with customers across its network, agrees to utilize only safe and compliant carriers and drivers.

227. For example, TQL also brokers loads for Armacell, which requires contractual commitment to the Code of Conduct described above. *See* ¶ 215.

228. TQL's customer agreements also require it to follow all federal and state laws and make available certain minimum levels of insurance coverage. When TQL signs these contracts digitally, knowing it would be brokering loads with carriers at prices that could only be achieved through the use of forced labor, TQL committed wire fraud.

229.    TQL knowingly violates these agreements by not having a carrier vetting standard in place to ensure that the contracts safety terms are met.

230.    For example, Flowers Foods on a contract executed March 31, 2023, required TQL to "require and maintain carriers who carry a $10,000,000" liability insurance policy and only use Motor Carriers who follow FMCSA safety rules.

231.    TQL knowingly dispatched multiple Illegal Carriers[13] on this Flowers Foods account who only had $1,000,000 in insurance (data which is publicly available) as well as multiple FMCSA safety rule violations from 2020 to 2025 (also publicly available). When a crash occurs, TQL then claims it is immune from liability and attempts to restrict recovery to the $1,000,000.00 insurance policy, claiming the $10,000,000 per contract is not applicable because it is just the broker.

## VII.    DEFENDANTS' UNLAWFUL INTERFERENCE WITH PLAINTIFFS' BUSINESSES

### A.    JB Hunt's Interference with Stevens Trucking's Ford Business

232.    From 2017 to 2024, Ford hired Schneider Logistics ("Schneider"), a motor carrier and freight broker, to manage the logistics of arranging the shipment of its auto parts from Newport, Michigan, to Texas.

233.    Over this period of time, Stevens Trucking hauled Ford loads brokered by Schneider from Ford's Michigan warehouse to facilities in Houston and Fort Worth.

234.    Ford signed off on Schneider utilizing Stevens Trucking to haul these lanes.

---

[13]  *E.g.*, Seahawk Transit., Atlas; infinity Cargo Solutions, Inc. Dash Gomag, Inc.; Cloudtrucks, LLC; Setia Transportation, Inc.; Zero Max, Inc.

235. These routes or lanes, which run through Oklahoma, ran twice a day, every day, and provided on average approximately $8,000,000 a year in revenue to Stevens Trucking and tied together Stevens Trucking's network by connecting multiple customers in Oklahoma and Michigan.

236. This efficiency increased Stevens Trucking's profits and at-home time for its drivers while allowing for competitive prices for its customers.

237. When discussing these lanes with Schneider, Stevens Trucking asked multiple times whether Stevens could use its brokerage authority to secure coverage if necessary. And every time, Schneider made clear that Ford forbids such practices.

238. This prohibition was consistent with the contractual terms that Schneider, on behalf of Ford, imposed on Stevens Trucking. Each contract required the following:

    a. "Carrier (Stevens Trucking) shall be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation, including, without limitation, costs and expenses of all Carrier's transportation equipment, its maintenance, and those persons who operate it. In providing services, Carrier represents and warrants that the driver(s) utilized are competent and properly licensed, and are fully informed of their responsibilities for the protection and care of the involved commodities."

    b. "Carrier warrants that it is legally qualified to perform the contemplated transportation . . ."

    c. "Carrier agrees to comply with all applicable provisions of any international, federal, provincial, state and/or local law, rule and regulation."

    d. "Carrier agrees not to accept a shipment from Broker (Schneider) if that shipment would require Carrier or any of its employees, agents or permitted subcontractors to exceed or violate any speed or safety law, rule or regulation."

e. "Carrier assumes liability as a common carrier for loss."

f. Carrier's Right to Subcontract. Except as provided in this section, Carrier shall not, in any manner, subcontract, broker or tender to any third party for transportation, any freight tendered to Carrier by Broker for transportation pursuant to this Contract. Carrier may subcontract the services that Carrier has agreed to perform for Broker under this Agreement, only if: (i) Carrier provides Broker prior written notice of such subcontracting, (ii) Broker acknowledges in writing, that the subcontracting may occur; and (iii) Carrier remains liable for the full and faithful performance of all obligations contained in this Agreement . . ."

239. In May 2024, Schneider requested new annual bids for the Michigan to Fort Worth and Houston lanes. On May 16, 2024, after multiple rounds of competitive bidding, Schneider awarded Stevens Trucking the preliminary annual award for several lanes related to the Ford account, including the Michigan to Texas lanes.

240. Over the course of nearly twenty years, if Stevens Trucking won the preliminary award, Stevens Trucking would typically win the final award.

241. The preliminary award was based upon rates proposed by Ford and Schneider. The contract would provide Stevens with revenue close to $8,000,000 per year.

242. On June 26, 2024, without advance notice, Schneider sent back the final freight award to Stevens Trucking for the Ford business, drastically reducing the business going to Stevens from $8,000,000 to roughly $300,000 to $400,000, and eliminating approximately 95% of Stevens's Ford business.

243. JB Hunt won the vast majority of the rest.

244. Ford would not have allowed the contract to go to JB Hunt had Ford been aware that JB Hunt would broker loads to carriers who did not meet Ford's standards.

245. Follow-up bidding on Ford lanes in August 2025 revealed that JB Hunt has continued to decrease the cost of these lanes well below what a safe asset-based carrier could possibly charge. As of August 2025, the rates are as low as $1.30 a mile—half of the operating cost for a safe asset-based carrier.

246. An investigation of the Michigan to Houston and Fort Worth lanes reveals that JB Hunt has brokered the Ford loads contrary to Schneider statements that such brokering is forbidden.

247. This unlawful activity provides JB Hunt with an unfair advantage over safe asset-based companies like Stevens Trucking.

248. Schnieder would not have provided JB Hunt with the Ford Contract had JB Hunt revealed its use of the unsafe capacity outlined in this pleading.

### B. JB Hunt's Interference with Plaintiffs' Kimberly Clark Business

249. Stevens Trucking successfully hauled for Kimberly Clark for years, including $3.1 million in freight in 2021, $5.8 million in 2022, and $4.6 million in 2023.

250. Over several years, Western Flyer also built a strong relationship Kimberly Clark. Western Flyer's Oklahoma-based operations made it a perfect fit for running loads out of Kimberly Clark's facility in Jenks, Oklahoma.

251. Kimberly Clark required the following of these Plaintiffs:

   a. that they would only employ qualified, experienced, properly trained and legally licensed personnel in the operation of vehicles;

   b. That they would maintain an effective safety program that has undergone a safety review by the U.S. DOT.

   c. That they would maintain a Satisfactory Safety Rating with the DOT.

d. That they would comply with legal requirements as to driver qualifications, training and safety, theft avoidance and prevention, hours of service, and other safety regulations; and

e. that, under no circumstances would they engage or use another carrier for services without ensuring that such a carrier operates lawfully, safely and dependably, and is qualified to and will provide services meeting the requirements in this agreement.

252. JB Hunt targeted Kimberly Clark as a customer, representing to Kimberly Clark that it could move freight cheaper, more quickly, and with greater access to capacity than Plaintiffs.

253. JB Hunt promised Kimberly Clark that it would follow the same safety criteria required of Plaintiffs.

254. Kimberly Clark relied upon JB Hunt's promise to meet these requirements based upon JB Hunt's reputation, which was built on years of advertising itself as a safe and reliable carrier.

255. JB Hunt's promise of legitimate capacity in excess of Plaintiffs' was material to Kimberly Clark's decision to retain JB Hunt.

256. JB Hunt's promise was a lie.

**C. CH Robinson's Interference with Plaintiffs' Johnson Controls, Armacell, and other bids/customers yet to be identified.**

257. Western Flyer and Stevens Trucking have hauled for Johnson Controls since 2021. Johnson Controls was historically a large customer for both.

258. Since 2022, CH Robinson targeted Johnson Controls lanes and represented that it could move freight cheaper, more quickly, and with greater access to capacity than Plaintiffs. CH Robinson promised it could do this while providing the same level of safety

and meeting all applicable FMCSA regulations. CH Robinson also promised to provide drop trailers and take on the role of a traditional asset-based trucking company to provide assurances that safety would not be compromised by switching to a freight broker.

259. But CH Robinson did not disclose that it would be brokering Johnson Controls's business to third-party carriers who failed to meet Johnson Control's safety requirements and illegally utilized forced labor.

260. Johnson Controls relied upon CH Robinson's promise to meet its safety requirements and not utilize forced labor when making the decision to divert business from Plaintiffs to CH Robinson.

261. Plaintiffs have each lost millions of dollars in Johnson Control lanes to CH Robinson as a result of CH Robinson's fraudulent, predatory practices.

262. Plaintiffs have hauled for Armacell since 2021.

263. Armacell was historically a large customer for both.

264. Since 2022, CH Robinson targeted Armacell in the same ways and made the same promises it did Johnson Controls, as discussed above. *See* ¶251.

265. Likewise, CH Robinson did not disclose that it would be brokering Armacell's business to third-party carriers who failed to meet Armacell's safety requirements and illegally utilized forced labor.

266. In the latest Armacell bid in 2026, CH Robinson undercut Plaintiffs by at least 15%. The only way the bid could be undercut by this much is through CH Robinson's use of Illegal Carriers and forced labor, as outlined above.

267. Armacell relied upon CH Robinson's promise to meet its safety requirements and not utilize forced labor when making the decision to divert business from Plaintiffs to CH Robinson.

**D.      TQL's Interference with Johnson Controls.**

268. Plaintiffs also have lost millions of dollars in Johnson Control lanes to TQL.

269. Since 2022, TQL targeted Johnson Controls in the same ways and made the same promises CH Robinson did, as discussed above. *See* ¶251.

270. Likewise, TQL did not disclose that it would be brokering Johnson Controls's business to third-party carriers who failed to meet Johnson Controls's safety requirements and illegally utilized forced labor.

271. Likewise, Johnson Controls relied upon TQL's promise to meet its safety requirements and not utilize forced labor when making the decision to divert business from Plaintiffs to TQL.

272. As discussed above in ¶¶ 194-197, TQL routinely posts Johnson Controls loads at per-mile rates that could only be achieved through brokering with Illegal Carriers using forced labor.

## VIII.      ADDITIONAL RICO ALLEGATIONS

273. Defendants' conduct, as alleged herein, constitutes violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). *See* 18 U.S.C. §§ 1961–68.

274. RICO § 1962(b) states in relevant part: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as

a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

275. Section 1964 provides a private right of action to any individual or company who has been injured by another's violation of § 1962.

## A. Enterprise

276. Defendants each operate, control, and participate in enterprises under RICO.

277. The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" 18 U.S.C. § 1961(4).

278. First, Defendants each operate and control their respective brokerage enterprises, which Defendants call their "carrier networks." To maximize profits, each Defendants' carrier network necessarily requires the participation of Illegal Carriers who haul loads for Defendants at unlawfully suppressed rates. The Illegal Carriers achieve these low-rate bids through multiple acts of forced labor, from which Defendants derive a financial interest: the margin created by the unlawfully suppressed rates. Defendants invite Illegal Carriers to participate in the enterprise, and the brokerage enterprise would not be nearly as profitable but for the participation of Illegal Carriers in the enterprise.

279. Second, Defendants, in conjunction with the Illegal Carriers, jointly operate an association-in-fact enterprise. Defendants and the Illegal Carriers share a common purpose of maximizing profits by acquiring as many freight contracts as possible. To

achieve this purpose, Defendants rely on Illegal Carriers to haul loads at unlawfully suppressed rates, while those carriers in turn rely on Defendants to procure freight contracts they could not otherwise obtain due to their safety records and unlawful practices.

280. One such enterprise that Defendants associate with, participate in, and influence is Super Ego. As noted above, Super Ego is a massive conglomerate of Illegal Carriers who contract with foreign drivers under a lease-to-own arrangement that results in forced labor. The effect of this arrangement is debt peonage. All Defendants broker loads to Super Ego and derive substantial profits therefrom.

281. Defendants derive income from their operation of and participation in their respective and joint enterprises. If Illegal Carriers were not bidding forced-labor rates to fulfill Defendants' brokered loads, then Defendants' margins would be dramatically lower.

282. Specifically, CH Robinson after lagging behind in the market prior to 2021, grew from $16.2 billion to $22.5 billion from 2021 to 2023. TQL grew from $4.1 billion to $8.9 billion. JB Hunt grew from $9.64 billion in 2020 to $14.81 billion by 2022.

### B. Pattern of Racketeering Activity

283. Defendants systematically engage in several predicate acts that constitute racketeering activity and also conspire to engage in predicate criminal activities.

284. RICO broadly defines "racketeering activity" to include carrying out one of the predicate acts listed in 18 U.S.C. § 1961(1). Defendants have engaged in racketeering activity, including financially benefiting from peonage and forced labor (18 U.S.C. §§ 1581, 1589) and committing wire fraud (18 U.S.C. § 1343), as described below.

285.   *Wire Fraud – 18 U.S.C. § 1343*. Section 1343 prohibits devising or intending to devise a scheme to defraud or obtain money or property through false or fraudulent representations and transmitting those communications by wire in interstate commerce to execute the scheme.

286.   Defendants submit electronic bids to their customers to secure loads and lanes that they will then broker to Illegal Carriers at even lower rates. These electronic bids themselves constitute wire fraud because the suppressed rates Defendants submit as their bids factor in Defendants' knowledge of the Illegal Carriers' unlawful labor practices, yet Defendants do not disclose those practices to their customers when making such bids.

287.   When shipping customers invite or allow Defendants to bid on their lanes or loads, the customer requires that Defendants make threshold material certifications, including that their network of carriers are compliant with FMCSA regulations and that their carriers' drivers are safe, qualified, and properly licensed and carry the minimum insurance required by the shipper. Defendants must agree to these requirements to submit bids to shipping customers.

288.   However, Defendants submit electronic bids at deflated rates—and usually win the bid—knowing that they will turn around and broker the various loads to Illegal Carriers who the shipping customers would never agree to or allow to haul their freight directly because they do not meet the customer's minimum requirements and utilize forced labor. By submitting electronic bids and withholding this material information, Defendants engage in a systematic pattern of wire fraud.

289.    Further, unlike Plaintiffs, Defendants TQL and CH Robinson have failed to register as "motor carriers" with the FMCSA despite acting as a carrier-in-fact the vast majority of times they broker a load to Illegal Carriers. Despite repeatedly only registering and reporting to the FMCSA as "Brokers," TQL and CH Robinson are listed as the carrier on bills of lading for loads brokered to Illegal Carriers. Typically, the shipping customer generates the bill of lading. The driver never fills out the bill of lading. But the driver is required to take a picture of the bill of lading and send it to the broker electronically. One such bill of lading provided by CW4 is shown at ¶155. Plaintiffs possess many more.

290.    By not registering with the FMCSA as "motor carriers" but then holding themselves out as such to their customers, Defendants play a fraudulent front for the Illegal Carriers they broker loads to—loads that Illegal Carriers would never receive without Defendants' halo effect.

291.    Defendants mislead their shipping customers by promising in written contracts (described above) that experienced, safe, and well-insured drivers would be hauling their freight. Defendants promised to their customers in written contracts that the carriers/drivers would comply with all FMCSA regulations. The opposite was true. And Defendants made these false promises through electronic communications and contracts that were communicated digitally across state lines.

292.    For example, Defendants TQL and CH Robinson haul loads for Johnson Controls, whose standard contract (which Plaintiffs are in possession of) requires the *carrier* to maintain at least $5 million in general liability insurance coverage and states, "Carrier shall comply with the Federal Motor Carrier Laws and regulations[.]"

293. However, Defendants utilized the Super Ego carrier network and other Illegal Carriers from 2021 to the present to broker freight through carriers that routinely (a) exceeded hours-of-service intervention thresholds in violation of contractual safety requirements; (b) operated as fraudulent chameleon carriers; (c) manipulated electronic logging devices; and (d) failed to maintain required insurance coverage.

294. Additionally, JB Hunt promises its customers in written contracts that it will not subcontract or broker the freight, but rather that JB Hunt will use its own equipment and drivers to haul the freight. JB Hunt makes these promises in communications and contracts that are delivered digitally across state lines. In reality, JB Hunt brokers the loads to the lowest bidder and keeps the spread.

295. Defendants further rely upon the Illegal Carriers' continuous and systemic fraudulent schemes as it relates to electronic logbook manipulation and chameleon carrier activities to increase margins, knock out the competition, and secure bids.

296. As outlined above, Illegal Carriers routinely manipulate electronic log data and generate materially false service compliance records that are then transmitted through interstate wire channels including but not limited to cellular/satellite telematics, cloud sync to an ELD vendor, emails/portals to brokers and shippers, EDI/Transport management system integrations, and check-call updates uploaded to shippers and the Defendants through phone applications.

297. These electronic logbook records are kept to ensure that a carrier uses a driving team (the service shipping customers pay for) when, in reality, the Illegal Carriers

are hauling solo (non-team) loads in violation of the contractual safety expectations and federal regulatory requirements.

298. The repeated electronic transmission of doctored logs as outlined above across multiple loads and weeks/months represents a pattern that is continuous, systematic, and ongoing.

299. Defendants knowingly derive a substantial economic benefit from Illegal Carriers' fraudulent manipulation of electronic logging devices. These falsified records are used to secure freight revenue, contract opportunities, and other payment as they—like the Illegal Carrier's forced labor practices—allow Defendants to secure bids at rates and under conditions they otherwise could not meet, all of which benefits Defendants.

300. Defendants' Illegal Carriers have also committed over 1,200 acts of illegal chameleon-carrier activity, including the illegal transfer of trucks from one shell entity to another (which is reported electronically), swapping DOT numbers on trucks, and shutting down non-compliant entities only to open up new shells under the same custody/control and ownership structure to circumvent the Federal Safety Regulations, decrease insurance premiums, and avoid taxes.

301. For example, Tutash Express 1 LLC (USDIT 4005857) had its authority to haul freight involuntarily revoked on July 26, 2024. Nevertheless, the Tutash enterprise continued with Tutash Express, Inc. (USDOT 3487141), AJ Partners (USDOT 3617842) and KG Line Group (USDOT 348733) Sam Express, Inc. (primary officer Saipidin *Tutash*ov) all of whom absorbed Vin Numbers from Tutash Express 1 and share common ownership, operations control, drivers, and employees.

302. On multiple occasions, FMCSA has captured Defendants' Illegal Carrier network in the act of attempting to conceal their identity/DOT number while delivering loads interstate in violation of Section 390 of the FMCSA Regulations.[14]

303. Each time these entities submitted paperwork to the FMCSA for a new DOT number, the entities were required to affirm through electronic means that the entity did not have any common ownership with previous or current DOT numbers. The Illegal Carriers committed a material fraud by lying to the DOT that no related entities existed.

304. As outlined above, examples of fraudulent chameleon carrier vehicle transfers include Try Time Transport, LLC transferring 234 tractors to Enlightened Truckers of America improperly, and Enlightened Truckers of American transferring 99 VIN numbers over the course of four years. Several of these tractors were then returned to Try Time Transport from Enlightened Truckers of America and then transferred to additional Super Ego entities, including Rocket Expediting, J &A Logistics Transportation, LLC. All of these carriers haul loads for Defendants' enterprise(s).

305. This coordinated scheme deceives the FMCSA through multiple actions of wire fraud by falsely reporting to the Department of Transportation through electronic portals/emails/and electronic submissions (a) non-compliance history and violations of the safety regulations by the enterprise; (b) the true number of crashes caused by the enterprise;

---

[14] *I.e.* Tutash Express, Inc. 11/24/25 Iowa; 11/17/25 Van Meter Iowa; 9/21/25 I-80 E Iowa; 12/7/23 Bryan County Oklahoma; Enlightened Truckers of American, Inc. – 7/9/24 Middletown Ohio; 6/13/24 Ohio; Rocket Expediting – 1/25/24 Alabama; 5/30/23 McDowell North Carolina; Aravan Cargo – 8/19/25 I-80 WB Iowa.

and (c) the location of the enterprise and true owners with control over the enterprise—all avoid emergency shut down orders, compliance reviews, and/or other regulatory action which would prevent the Illegal Carriers from operating over the roadway.

306. These misrepresentations are material because, once the FMCSA finds out the true nature of the Illegal Carrier's operations, the FMCSA immediately shuts down the Illegal Carrier.

307. Defendants benefit from the Illegal Carriers' fraudulent activities and conspire with them because such activities allow the Illegal Carriers to perpetuate their illegal exploitation of foreign labor and thus allow Defendants to continue to secure more and more shipping contracts by leveraging the illegally suppressed labor costs of their Illegal Carrier partners in Defendants' bids to customers.

308. Defendants also routinely made false, material statements in emails to shippers and customers. Defendants represent that Illegal Carriers are safe to operate and properly registered with the FMCSA, when in fact Defendants are aware or should be aware of the Illegal Carriers' fraudulent reporting to the Department of Transportation. This conduct constitutes wire fraud.

309. Defendants also make false, material statements to customers in Form 10-K's submitted to the SEC, web-advertisements, and other electronic wires outlining that their competitive advantage is a result of vetted capacity beyond what any competitor has access to. This capacity exists only because of the unlawful practices of the Illegal Carriers and both their and Defendants' acts to conceal those schemes from enforcement officials.

310.   *Financially Benefiting from Peonage and Forced Labor* – 18 U.S.C. §§ 1581, 1589. Section 1589(a) prohibits forced labor and reads:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means:
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of **serious harm** or **threats of serious harm** to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer **serious harm** or physical restraint,
>
> shall be punished as provided under subsection (d).

311.   "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

312.   Illegal Carriers to whom Defendants broker loads and lanes engage in forced-labor tactics under which their drivers are subjected to serious harm and/or threats of serious harm.

313.   As outlined above, drivers for Super Ego (and other Illegal Carriers) are required to drive 20-plus hours a day. Refusal to do so will result in the truck being reported as stolen (*i.e.*, confrontation with law enforcement), withheld pay, and other threats.

314.   CW2, who worked for three entities in the Super Ego network, reported that if he were to stop driving during a run for any reason (other than to refuel), including

exhaustion, he would be charged a financial penalty. CW2 further reported that he was not allowed to stop for health or fatigue reasons and that the "companies used constant threats and financial coercion to force drivers to continue hauling." And: "If I pushed back or attempted to assert my rights, the company would hold my pay, refuse to give me loads, make me haul dead-heads where I would be paying the company to drive without making any money myself and work the clock against me hoping to run me out of money."

315. CW2 reported:

I was expected to haul loads from Washington State to New Jersey overnight — a distance of approximately 2,800 miles. If a driver did not meet these impossible delivery windows, the company would 'fine' the driver for the price of the entire load plus late fees plus whatever penalty the broker assessed.

316. CW1 reported how the financial arrangement between the Illegal Carriers and the drivers resulted in financial harm that compelled him to continue driving:

Drivers did not have a choice but to run these hours. The pay structure was designed so that you could not earn enough to survive — let alone cover the lease payments, trailer fees, log fees, and repair charges — without running far beyond the legal limits. If you did not run the illegal hours, you would receive a negative settlement and go further into debt to the company.

317. CW4 stated:

I drove/worked 18-20 hours a day, seven days a week (4,000 miles of driving). This equates to approximately 126 hours a week. On my electronic logbook it would look as if I was compliant. I was not allowed to go home, and my home time request were ignored repeatedly. I am a pre-diabetic and take my doctors' appointments in Tyler seriously. Despite my pleading, I was not even allowed to go to the doctor to ensure I was healthy."

318. Defendants knowingly benefited from the forced-labor practices of the Illegal Carriers, including Super Ego, and conspired with them to accomplish their

economic goals. Defendants knew the only way they could obtain bids at the rates they were offering was if they had a carrier partner on the other end who could accept the load at such drastically low rates. And Defendants knew that the only way a carrier could accept a load at such a rate was if that carrier was engaged in unlawful, forced-labor practices.

319. By knowingly benefiting from the forced labor of the Illegal Carriers, Defendants are liable for their participation in that venture. *See* 18 U.S.C. § 1589(b).

320. Section 1589(b) of RICO provides:

Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

321. In the very least, Defendants have recklessly disregarded the fact that the Illegal carriers have engaged in forced labor. Meanwhile, Defendants' employees joke about these forced labor practices online (e.g., "Strong Solo Sergey").

## C.    <u>Interstate Commerce</u>

322. Defendants' brokerage enterprises are indisputably engaged in interstate commerce, as the loads and lanes that Defendants broker to Illegal Carriers more times than not require drivers to cross state lines. Further, money is being transferred throughout Defendants' enterprise(s) across the nation from shipping customers in various states, to Defendants themselves, to Illegal Carriers operating in various states.

## IX. CAUSES OF ACTION

323. Based upon the foregoing, Plaintiffs assert the following causes of action against all Defendants (unless stated otherwise below).

**A.** **Count I: Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a)**

324. Plaintiffs incorporate all preceding paragraphs as if fully stated herein.

325. Section 1962(a) makes it unlawful for any person who has received income derived from a pattern of racketeering activity to use or invest that income, directly or indirectly, in the acquisition, establishment, or operation of an enterprise engaged in interstate commerce.

326. Defendants derived income from a pattern of racketeering activity in an interstate enterprise, including financially benefiting from forced labor and peonage violations and committing wire fraud through deceptive representations regarding carrier compliance and safety.

327. Defendants knowingly used and invested those racketeering proceeds to expand and sustain their freight brokerage enterprises and associated carrier networks.

328. Defendants' investment sustained an operating model dependent on unlawfully suppressed labor costs, enabling the continued use of Illegal Carriers and the acquisition and execution of freight contracts through unlawful practices.

329. The systematic forced labor and peonage violations and instances of wire fraud constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

330.    Plaintiffs suffered injury to their business as a direct and proximate result of Defendants' racketeering activities and use and investment of racketeering income. Specifically, the reinvestment of unlawful proceeds allowed Defendants to expand enterprise capacity, underbid lawful competitors, and maintain freight market positions that displaced Plaintiffs from established lanes and customer relationships.

**B.**    **Count II: Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b)**

331.    Plaintiffs incorporate all preceding paragraphs as if fully stated herein.

332.    Section 1962(b) makes it unlawful for any person, through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, any interest in or control of an enterprise engaged in interstate commerce.

333.    Defendants each operate, control, and participate in enterprises engaged in, and whose activities affect, interstate commerce.

334.    Defendants, through a pattern of racketeering activity including forced labor violations and wire fraud, acquired and maintained control over the enterprises and freight networks described herein. That racketeering activity allowed Defendants to secure and solidify their dominance over freight capacity, bidding pipelines, and customer relationships that would not have been obtainable through lawful competition.

335.    Specifically, Defendants used unlawfully suppressed labor costs imposed by the Illegal Carriers and fraudulent representations to customers to obtain freight contracts. This racketeering conduct enabled Defendants to dictate pricing across their enterprises,

consolidate their control over the market, and maintain control over critical freight lanes and customer accounts that once formed the foundation of Plaintiffs' businesses.

336. The systematic forced labor and peonage violations and instances of wire fraud constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

337. Plaintiffs suffered injury as a direct and proximate result of Defendants' racketeering-based acquisition and maintenance of control over these enterprises and violations of 18 U.S.C. § 1962(b). Plaintiffs have been injured in their business and property. These injuries include the ongoing loss of freight contracts, exclusion from markets controlled through racketeering, and diminished competitive standing. Plaintiffs suffered harm as a result of Defendants' control of the enterprise, not merely from the predicate acts themselves.

C. **Count III: Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**

338. Plaintiffs incorporate all preceding paragraphs as if fully stated herein.

339. Section 1962(c) makes it unlawful for any person associated with an enterprise engaged in interstate commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

340. Defendants each operate, control, and participate in enterprises engaged in, and whose activities affect, interstate commerce. And they operate, control, participate in, and otherwise rely upon, associated-in-fact enterprises consisting of numerous other companies/entities, including Illegal Carriers like Super Ego, to affect freight pricing and otherwise affect interstate commerce.

341. Defendants agreed to, conducted, and participated in the affairs and conduct of the enterprises by knowingly integrating Illegal Carriers into their brokerage operations, structuring bids around unlawfully suppressed labor costs, and continuing to route freight through carriers known to engage in forced labor and regulatory fraud.

342. Defendants also represented to customers that freight would be handled by compliant and qualified carriers. In reality, Defendants knowingly directed loads to carriers operating outside federal safety and labor standards.

343. Pursuant to and in furtherance of their fraudulent schemes, Defendants committed multiple related acts of forced labor by depressing the market and depressing wages, fraudulently obtaining contracts that rely upon depressed wages and forced labor, and regulatory fraud that enabled reduced operating costs that depressed market rates.

344. The systematic forced labor, wire fraud, and regulatory fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

345. Plaintiffs' businesses were injured by Defendants' violation of § 1962(c). As a direct and proximate result of Defendants' operation of the enterprise through racketeering activity, Plaintiffs lost freight contracts, were displaced from established lanes, and suffered competitive harm stemming from Defendants' unlawful control of carrier capacity and pricing structures.

**D.** **<u>Count IV: Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)</u>**

346. Plaintiffs incorporate all preceding paragraphs as if fully stated herein.

347.    As set forth above, Defendants agreed to and conspired to violate 18 U.S.C. § 1962 (a), (b), and (c). Defendants knew of and agreed to the overall conduct and objective of the racketeering activities of the Illegal Carriers. Specifically, Defendants relied upon Super Ego and other Illegal Carriers to employ forced labor, fraudulently manipulate logbooks, and operate chameleon carriers (among other unlawful acts) to increase their margins, knock out the competition, and secure bids against Plaintiffs. Defendants' then promised customers through contracts and other electronic communications that Defendants were only using legal, not Illegal Carriers. Defendants knew that the forced labor and fraudulent acts and communications were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes an ongoing conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of § 1962(d).

348.    Defendants have intentionally conspired and agreed to directly or indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interest in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The income derived as described above—from increased margins, market share, and bids secured against competitors, including Plaintiffs—was used or invested in the Defendants' enterprises as freight brokers, which enabled Defendants to continue to rely upon Illegal Carriers to increase their market share and further their racketeering activities.

349. As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property, including lost freight contracts, lost market share and depressed prices, lost flexibility in operations, lost opportunity, costs associated with changing business strategies in the face of lost market share, constructive exclusion from the market and costs associated with investigating lost market share.

**E.** **Count V: False Advertising Under the Lanham Act (15 U.S.C. § 1125(a)(1)(B))**

350. Plaintiffs incorporate all preceding paragraphs as if fully stated herein.

351. Defendants widely disseminated numerous oral, written, and online statements regarding its drivers and their safety and performance.

352. These statements were directed to key, large commercial interstate shippers and brokers such as Ford, Schneider, Kimberly Clark, and Johnson Controls.

353. These statements were made in the advertisement and promotion of Defendants' commercial activities.

354. In these statements, Defendants communicated to potential customers that the drivers it would use to haul the customers' loads were highly qualified, rigorously vetted, trained, and/or were among the safest in the trucking industry.

355. In these statements, Defendants communicated to potential customers that driver safety was paramount to the company.

356. In these statements, Defendants communicated to potential customers that the drivers it would use would comply with FMCSA regulations.

357. These statements were objectively false and/or misleading.

358. JB Hunt specifically did not tell its potential customers that, instead of using highly skilled and safe company drivers to haul the customers' loads, it would outsource the loads to independent drivers.

359. All three Defendants did not tell their potential customers that they knew many of the drivers it would broker loads to would be foreign nationals holding non-domiciled CDLs who would be willing to work at rates far less than any safety-focused company would accept.

360. Defendants did not tell their potential customers that these brokered drivers would be accepting the loads under conditions well below what any reasonable trucking company would know to be safe.

361. Defendants did not tell their potential customers that it knew that these brokered drivers would need to violate FMCSA safety regulations in order to make it worthwhile for them to accept the load at the rates Defendants would be offering.

362. Defendants did not tell customers they had no intention of following the contractual terms for safety set forth by the shipping customers.

363. As such, Defendants' statements were deceptive and/or likely to deceive a substantial portion of its intended audience.

364. Defendants knew that their potential customers viewed safety as an important factor in deciding which trucking company to use.

365. Given the importance of safety to shipping customers, Defendants' deceptive statements were likely to influence the purchasing decisions of these companies.

366. Defendants' deceptive statements were influential to customers, including Ford, Kimberly Clark, and Johnson Controls.

367. Defendants knew that if customers, including Ford, Kimberly Clark, and Johnson Controls, knew that Defendants intended to use unsafe Illegal Carriers, then these customers would not have awarded Defendants the contracts.

368. Customers, including Ford, Kimberly Clark, and Johnson Controls, would not have awarded Defendants the contracts if they knew that the capacity advertised by Defendants would not follow the terms of the parties' agreement.

369. As a proximate cause of Defendants' unlawful actions, Plaintiffs have suffered significant economic damages as outlined above.

370. Stevens Trucking had to hire attorneys to investigate the sudden loss without warning of a nearly twenty-year relationship with Ford and Schneider and damages to Stevens Trucking's Kimberly Clark account. These fees and investigation costs exceed $3,500,000 to date.

371. Stevens Trucking has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

372. Stevens Trucking has lost significant efficiency in its operation and had to increase driver pay by rate since its drivers' miles have significantly decreased.

373. Stevens Trucking's Oklahoma based drivers have suffered a loss of quality at work due to shorter routes, multiple stops, and more in-city driving.

374. Stevens Trucking therefore will have to continue to deploy capital to prevent driver turnover.

375. Western Flyer has had to hire attorneys and spend cost to investigate this claim. To date these fees and expenses exceed $300,000.00.

376. Western Flyer has lost hundreds of thousands of dollars of Kimberly Clark business.

377. Western Flyer has had to deploy capital to stop the bleeding instead of using that capital to grow its business and market share.

378. Western Flyer has lost efficiency in its operation.

379. Western Flyer's Oklahoma-based drivers who hauled the Kimberly Clark lanes have suffered a loss of quality at work due to shorter routes, multiple stops, and more in-city driving.

380. Western Flyer therefore will have to continue to deploy capital to prevent driver turnover.

F. **Count IV: Violation of the Oklahoma Deceptive Trade Practices Act (Okla. Stat. tit. 78, § 53)**

381. Plaintiffs incorporate all prior paragraphs as if fully stated herein.

382. Defendants' statements and advertisements falsely represented to potential customers that they would staff routes with safe and experienced drivers.

383. While advertising and stating that they would staff routes with safe and experienced drivers, Defendants knew that they would be using unsafe contract drivers to fulfill the contracts they obtained.

384. To the extent Defendants acknowledged the use of contractors, they falsely and misleadingly assured that such contractors would be well-vetted, safe, and reliable.

385. In truth, Defendants knowingly deployed unsafe, unqualified, and dangerous Illegal Carriers who were willing to violate safety regulations and cheat the system.

386. Defendants thus knowingly and falsely represented the characteristics of the services they were offering.

387. Additionally, Defendants unlawfully represented that the services they were offering were of a particular quality, when the actual quality of their services were of a different, lesser quality. For example, Defendants all promised with shippers including Ford, Armacell, Kimberly Clark, and others that Defendants would not use forced labor. But they did use forced labor supplied by their Illegal Carrier partners.

388. Defendants willfully made these unlawful representations and intentionally made the unlawful representations with the specific aim of undercutting their competitors, such as Plaintiffs.

389. Defendants agreed to contract terms with customers, including Ford, Kimberly Clark, and Johnson Controls, that Defendants had no intention of following.

390. Defendants could not underbid Plaintiffs without access to the unlawful capacity Defendants knowingly and intentionally failed to disclose to their customers.

391. This unlawful capacity used by Defendants places unsafe drivers on Oklahoma roads without notice to Defendants' customers.

392. Stevens Trucking has been damaged by the unlawful representations that Defendants made during their activities.

393. Western Flyer has been damaged by the unlawful representations that Defendants made during their activities.

394. As a result of these unlawful representations, Defendants were able to underbid Plaintiffs for business from Plaintiff's historic customers, including Ford, Kimberly Clark, and Johnson Controls, and others to the detriment of Plaintiffs.

395. As a proximate cause of Defendants' unlawful actions, Plaintiffs have been collectively damaged to the tune of hundreds of millions of dollars.

### G. Count V: Interference With Prospective Economic Advantage (By Plaintiff Stevens Trucking against Defendant JB Hunt)

396. Plaintiff incorporates all prior paragraphs as if fully stated herein.

397. Stevens Trucking had a longstanding relationship with Schneider and Ford.

398. For the six years prior to 2024, Stevens Trucking had hauled the Michigan to Fort Worth and Houston lanes for Ford. These lanes ran through Oklahoma.

399. Schneider, on behalf of Ford, awarded these lanes to Stevens Trucking in annual contracts. Each annual contract provided millions of dollars of revenue.

400. In 2024, Stevens Trucking reasonably expected to again be awarded these lanes. As set forth above, Stevens Trucking had been given the preliminary award and afterwards had made strategic cuts in order to maintain its longstanding relationship with Schneider and Ford.

401. JB Hunt knew of Stevens Trucking's longstanding business relationship with Schneider and Ford. It also knew that Stevens Trucking had been given the preliminary award for the Michigan to Fort Worth and Houston lanes in 2024.

402. JB Hunt intentionally interfered with Stevens Trucking's relationship with Schneider and Ford and induced Schneider and Ford not to give the final award for these lanes to Stevens Trucking.

403. JB Hunt did so by representing to Schneider and Ford that it could run the lanes as an asset-based carrier at a much cheaper cost than Stevens Trucking, while concealing from Schneider and Ford that it would broker these lanes to unsafe contract carriers, contrary to the terms of the contract.

404. JB Hunt's interference resulted in Schneider and Ford not finally awarding these lanes to Stevens Trucking and terminating the longstanding relationship that Stevens Trucking had with Schneider and Ford.

405. The acts JB Hunt used to interfere with Stevens Trucking's relationship with Schneider and Ford were unfair and/or unlawful.

406. As a proximate cause of JB Hunt's actions, Stevens Trucking lost an $8,000,000 per year contract plus lost opportunity cost.

407. Stevens Trucking has lost an efficiency of, to date, $5.8 million.

408. Stevens Trucking had to hire attorneys to investigate the loss of a six-year relationship with Ford and Schneider without warning.

409. Stevens Trucking has had to deploy capital to stop the bleeding instead of growing the business and retaining/growing market share.

410. Stevens Trucking has lost significant efficiency in its operation and had to increase driver pay since its drivers' miles have significantly decreased.

411. Stevens Trucking's Oklahoma-based drivers have suffered a loss of quality at work due to shorter routes, multiple stops, and more in city driving.

412. Stevens Trucking therefore will have to continue to deploy capital to prevent driver turnover.

413. Stevens Trucking is currently losing approximately $500,000 per month as a result of JB Hunt's actions.

## X. <u>DAMAGES</u>

414. As a direct and proximate result of Defendants' misconduct, as outlined above, Plaintiffs have suffered extensive past and continuing future damages, including:

a. The loss of existing and prospective contracts that Plaintiffs would have obtained absent Defendants' unlawful labor cost advantages gained from the utilization of illicit motor carriers and drivers;

b. Being required to preserve and protect existing customer relationships by operating at a loss instead of at a profit in order to lawfully compete against Defendants' unlawful labor cost advantages gained from the utilization of Illegal motor carriers and drivers; and

c. Constructive exclusion from the market due to sub-market rates being proliferated by the Defendants due to their forced labor cost advantage gained from utilizing illegal carriers and drivers.

415. As a foreseeable and proximate cause of Defendants unlawful actions, Plaintiffs were effectively left with no choice but to operate at a significant loss, despite possessing superior qualifications, experience, capacity, and performance history.

416. As a foreseeable consequence of Defendants' misconduct, Plaintiffs lost identifiable contracts, existing and likely customers, and otherwise were required to protect

existing customer and employee relationships by operating at a loss, resulting in extensive lost revenues, lost profits, and increased costs in amounts to be proven at trial.

417. Furthermore, Defendants' racketeering conduct caused Plaintiffs to suffer measurable erosion of market share in and constructive exclusion from the long-haul trucking freight market. This loss of market share and constructive exclusion was not attributable to ordinary competition, innovation, or consumer choice, but rather to Defendants' systematic use and exploitation of criminal conduct to undercut lawful competitors. Plaintiffs' reduced market presence in and constructive exclusion from the long-haul trucking freight market proximately resulting from the racketeering of Defendants has resulted in diminished revenues, reduced economies of scale, and long-term competitive harm.

418. These costs, lost revenues and market share, and lost efficiency costs are accumulating daily and will continue into the future.

419. Initial estimates show this loss exceeds $50,000,000 for Stevens Trucking and $100,000,000 for Western Flyer.

420. Additionally, pursuant to RICO, Plaintiffs seek trebling of damages, as well as recovery of attorneys' fees and costs.

## XI. <u>JURY DEMAND</u>

421. Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

## XII. <u>PRAYER</u>

422. Plaintiffs respectfully pray that Defendant be cited to appear and required to answer herein according to law, that this cause be set for trial before a jury, that Plaintiffs

recover judgment of and from said Defendant for their actual damages in this cause in such amounts as the evidence may show and the Jury may determine to be proper, including trebled and/or punitive damages, that Plaintiffs be awarded their reasonable attorney fees incurred in bringing this action, together with the costs of suit, pre-judgment interest and post judgment interest, and for all such other and further relief, both in equity and at law, to which Plaintiffs may show that they are justly entitled.

All as respectfully submitted,

**NIX PATTERSON, LLP**

*/s/ Trey Duck*
Bradley E. Beckworth, OBA No. 19982
Trey Duck, OBA No. 33347
Drew Pate, OBA No. 34600
Nathan B. Hall, OBA No. 32790
8701 Bee Cave Road
Seven Oaks East, Suite 500
Telephone: (512) 328-5333
bbeckwort@nixlaw.com
tduck@nixlaw.com
dpate@nixlaw.com
nhall@nixlaw.com

**WREN COOK**

James Wren (*admitted PHV*)
Texas State Bar No: 22018200
Louie J. Cook (*admitted PHV*)
Texas State Bar No: 24101191
Elizabeth Fraley (*p.h.v. pending*)
Texas State Bar No. 13180500
14205 N Mo Pac Expy Ste. 570
Austin, Texas 78728
Telephone: (737) 292-4926
Jim@wrencookattorneys.com
Louie@wrencookattorneys.com
Liz@wrencookattorneys.com

**DURHAM PITTARD SPALDING, LLP**

Justin R. Kaufman (*p.h.v. pending*)
New Mexico State Bar No. 21999
Molly H. Samsell (*p.h.v. pending*)
New Mexico State Bar No. 153816
125 Lincoln Avenue, Suite 402
Santa Fe, New Mexico 87501
Telephone: (888) 998-6688
jkaufman@dpslawgroup.com
msamsell@dpslawgroup.com

**PIERCE COUCH HENDRICKSON BAYSINGER AND GREEN LLP**

Gerald P. Green, OBA No. 3563
John C. Lennon, OBA No. 30149
Hailey M. Hopper, OBA No. 31093
Post Office Box 26350
Oklahoma City, OK 73126
Telephone: (405) 235-1611
jgreen@piercecouch.com
jlennon@piercecouch.com
hhopper@piercecouch.com


ATTORNEYS FOR PLAINTIFFS